1

```
                    SUPERIOR COURT OF CALIFORNIA

                      COUNTY OF SAN FRANCISCO

         BEFORE THE HONORABLE SAMUEL K. FENG, JUDGE PRESIDING

                      DEPARTMENT NUMBER 13

                           ---oOo---

PEOPLE OF THE STATE OF CALIFORNIA,)
                                  )
              Plaintiff,           )   Court No. 15014736
                                  )
vs.                               )
                                  )   JURY TRIAL
JOSE INES GARCIA ZARATE,          )
                                  )
              Defendant.           )   Pages 1 - 94
----------------------------------)
```

**REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS**

Thursday, October 26, 2017

Testimony of John Woychowski

**APPEARANCES OF COUNSEL:**

For the People:

GEORGE GASCON, DISTRICT ATTORNEY
850 Bryant Street, Suite 300
San Francisco, California 94103
BY: **DIANA GARCIA**, Assistant District Attorney

For the Defendant:

JEFF ADACHI, PUBLIC DEFENDER
555 Seventh Street, Suite 205
San Francisco, California 94103
BY: **MATT GONZALEZ**, Deputy Public Defender
BY: **FRANCISCO UGARTE**, Attorney at Law

Reported By:  Paula Shi, CSR No. 13358

JGZ-005668

1                         I N D E X

2                         ---oOo---

3  <u>PEOPLE'S WITNESSES</u>                           <u>PAGE</u>   <u>VOL.</u>

4  <u>WOYCHOWSKI, JR., JOHN</u>

5  Direct Examination by Ms. Garcia                4      1

6  Cross-Examination by Mr. Gonzalez              35      1

7

8                      E X H I B I T S

9                         ---oOo---

10 | <u>PEOPLE'S</u> | <u>DESCRIPTION</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|---|
| 20 | Firearm | 9 | 11 | 1 |
| 21 | Magazine | 9 | 11 | 1 |
| 22 | Map | 28 | 28 | 1 |
| <u>DEFENSE</u> | <u>DESCRIPTION</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
| M | Memorandum | 38 | | 1 |

16

17

18

19

20

21

22

23

24

25

26

27

28

JGZ-005669

```
 1                    THURSDAY, OCTOBER 26, 2017
 2                    P R O C E E D I N G S
 3                         ---oOo---
 4        THE COURT:  People's next witness.
 5        MS. GARCIA:  Thank you, Your Honor.  The People call
 6   Ranger John Woychowski.
 7        Your Honor, I understand that you're allowing
 8   counsel for the BLM --
 9        THE COURT:  I am.  I just need them to be seated and
10   state their appearances on the record and who they are
11   and who they represent and where they are from.
12        MR. WALL:  Good morning, Your Honor.  Robin Wall,
13   Assistant United States Attorney for the Department of
14   Justice.
15        THE COURT:  Good morning, Mr. Wall.
16        MR. WALL:  I'm representing Ranger Woychowski.
17        MR. MACK:  Good morning, Your Honor.  Kevin Mack,
18   Assistant Reginal Solicitor from the Department of the
19   Interior.
20        THE COURT:  Mr. Mack, good morning.
21        THE CLERK:  I need spellings of the names for the
22   record.
23        MS. GARCIA:  He's coming up, Your Honor.  He'll be
24   here shortly.
25        THE CLERK:  Can counsel please provide spellings of
26   your names for the reporter.
27        MR. WALL:  Robin M. Wall, R-O-B-I-N, M, W-A-L-L.
28        MR. MACK:  Kevin Mack, K-E-V-I-N, Mack, M-A-C-K.
```

1          (Pause in proceedings.)

2      **THE COURT:**  Back on the record.  People's next

3  witness.

4      **MS. GARCIA:**  Let me just get this out of your way.

5                    <u>JOHN WOYCHOWSKI, JR.,</u>

6  called as a witness for the People, having been duly

7  sworn, testified as follows:

8      **THE WITNESS:**  Yes, ma'am.

9      **THE CLERK:**  You may be seated.  Please state your

10  name and then spell it for the record.

11     **THE WITNESS:**  John, J-O-H-N, William, W-I-L-L-I-A-M,

12  Woychowski, W-O-Y-C-H-O-W-S-K-I, Jr., J-R.

13     **THE COURT:**  All right.  And good morning, sir.

14     **THE WITNESS:**  Good morning.

15     **THE COURT:**  And if I may ask real quickly, have you

16  ever testified in a court of law before?

17     **THE WITNESS:**  Yes, sir.

18     **THE COURT:**  Okay.  Ms. Garcia, your witness.

19     **MS. GARCIA:**  Thank you, Your Honor.

20                  <u>DIRECT EXAMINATION</u>

21  BY MS. GARCIA:

22  Q.   Good morning, sir.

23  A.   Good morning.

24  Q.   Can you tell us who you work for?

25  A.   I work for the Bureau of Land Management.

26  Q.   What do you do for the Bureau of Land Management?

27  A.   I'm a law enforcement officer.

28  Q.   Can you tell us what the Bureau of Land Management

1   is?

2   **A.**    The Bureau of Land Management is a federal agency

3   under the Department of the Interior, which manages

4   public lands throughout the country, more so in the

5   Western United States.

6   **Q.**    How long have you been a ranger for the BLM?

7   **A.**    Since February of 2008.

8   **Q.**    Were you in law enforcement before that?

9   **A.**    Yes, I was, from 2001 to 2006, with the National

10  Park Service, also under the Department of the Interior.

11  **Q.**    As a law enforcement officer?

12  **A.**    Yes, ma'am.

13  **Q.**    Where are you currently assigned as a ranger for the

14  BLM?

15  **A.**    In the El Centro Field Office in El Centro,

16  California.

17  **Q.**    Can you tell us where that is?

18  **A.**    That is southeast of San Diego, about 75 miles,

19  adjacent to the Mexican border of Mexicali.  And my

20  office is located approximately 12 miles from that

21  border.

22  **Q.**    Can you give us an idea of the area that you cover

23  in terms of size?

24  **A.**    Yes, ma'am.  The land area which El Centro manages

25  is 1.4 million acres of public lands dispersed throughout

26  Imperial County and San Diego County.

27  **Q.**    Can you give us some landmarks to give us an idea of

28  the kind of terrain that you are responsible for?

1    **A.**   Sure.  In my area, the most common thing that people
2    are -- we're well known for is the Imperial Sand Dunes
3    Recreation Area, which is the largest off-roading area in
4    the western here, off-road community, sand rails and
5    whatnot.  We have that in Imperial County.  And then in
6    San Diego County, as I said, we are largely known for our
7    off-roading recreational areas.  So, we have other areas
8    in San Diego County as well.
9    **Q.**   If you could talk a little slower.
10   **A.**   Yes, ma'am.  I'm sorry.
11   **Q.**   We would appreciate it.  Thank you.
12        What are your responsibilities in covering this
13   area?
14   **A.**   Well, we enforce the federal laws that our office
15   or -- that are within the 43 CFRs, 18 USCs, and then any
16   local laws that our agency in El Centro, they create
17   supplemental rules.  And so, any of those that are
18   emphasis to the specific areas, we enforce those as well.
19   **Q.**   Can you tell us what you do on a day-to-day basis?
20   **A.**   So, yeah.  Essentially, I'm a uniformed patrol
21   officer, and so I patrol these 1.4 million acres of land,
22   working in -- anywhere from rural to more towards closer
23   to city areas, usually by myself, without any other
24   backup.  Or occasionally I'll see border patrol along the
25   border fence if I'm in that area, but that's pretty much
26   it.  We're very remote.
27   **Q.**   So, you mentioned that you are a law enforcement
28   officer.  Have you received any law enforcement training?

JGZ-005673

1    **A.**    Yes, ma'am.

2    **Q.**    What kind of training have you received?  Have you

3    gone to an academy, for example?

4    **A.**    Yes, ma'am.  So, all law enforcement officers for

5    the Bureau of Land Management are required to go through

6    the federal law enforcement training center, which is in

7    Brunswick or Glynco, Georgia.  And it's -- our basic

8    academy is four and a half months.

9    **Q.**    Have you received any firearms training?

10    **A.**    Yes, ma'am.

11    **Q.**    Would you like a glass of water?  Are you okay?

12    **A.**    Sure.  Yeah.  If you have water.

13    **Q.**    It's going to get a little hot in here.  Let me get

14    you some.

15    **A.**    But, yes, firearms training -- or do you want me --

16    **Q.**    Sure.  You can go ahead and talk about that.

17    **A.**    Yeah.  Firearms training in FLETC.  It's

18    approximately -- excuse me.  FLETC is Federal Law

19    Enforcement Training Center.  That's the acronym.  We

20    receive approximately 100 hours of firearms training.

21    **Q.**    Do you receive continual firearms training?

22    **A.**    Yes, ma'am.

23    **Q.**    Can you describe that?

24    **A.**    Yes.  So, we have to qualify with all of our issued

25    firearms twice a year.  We also -- in that qualification,

26    it includes a daylight and a reduced-light qualification.

27    And then, also, we have to participate in a tactical

28    shoot, which is just various drills that the firearms

1    instructor create.

2    Q.    Does the BLM issue you firearms, or do you buy your

3    own firearms?

4    A.    The BLM issues all firearms to law enforcement.

5    Q.    What make of firearm does the BLM authorize you to

6    have?

7    A.    For our handguns, it's the Sig Sauer handguns.

8    Q.    Is that the only make of handgun that the BLM allows

9    you to have?

10   A.    For firearms -- or for handguns, yes.

11   Q.    I'd like to show you a firearm, if I may.

12         THE COURT:   Before you do that --

13         MS. GARCIA:   Yes.

14         THE COURT:   -- I just need a clarification.

15         When you said Sig Sauer handguns are issued by the

16   BLM, are there specific models?  One model or different

17   models?

18         THE WITNESS:   Yes.  So, we have -- we're issued --

19   excuse me -- two -- excuse me.  We have the choice of a

20   P226 or a P229, primary, and then we're also issued a

21   P239 for our backup.  We used to -- they used to have the

22   380, but they discontinued the use of that years ago.

23         THE COURT:   Thank you.

24         THE WITNESS:   Yes, sir.

25         MS. GARCIA:   Your Honor, I have a firearm and a

26   magazine, which I would like to mark People's next in

27   order.

28         THE COURT:   All right.  So, Ms. Garcia, People's

```
 1   next in order is Number 20.
 2        MS. GARCIA:  And, Your Honor, it's been safe -- been
 3   made safe by the sheriff.
 4        THE COURT:  Okay.  And, Deputy Andrade, confirmed?
 5        THE BAILIFF:  Yes, that's confirmed.
 6        THE COURT:  Thank you.
 7        MS. GARCIA:  And, Your Honor, if the defense would
 8   like to see the firearm, I think they should come to the
 9   clerk's table.
10        THE COURT:  Agreed.
11        MS. GARCIA:  I believe they've seen it already.
12        MR. GONZALEZ:  Yes, Your Honor, we see it.
13        THE COURT:  Thank you.
14        MS. GARCIA:  And, Your Honor, shall we mark the
15   firearm 20A and the magazine 20B?
16        THE COURT:  I'll leave it to you.
17        MS. GARCIA:  Let's just do that then.
18        THE COURT:  That's fine.  Any objection?
19               (Whereupon, People's Exhibit 20 marked for
20           identification.)
21        MS. GARCIA:  All right.  The clerk has told me that
22   we're going to mark the magazine 21, Your Honor.
23        THE COURT:  Okay.  So, the magazine will be 21.
24               (Whereupon, People's Exhibit 21 marked for
25           identification.)
26        MS. GARCIA:  May I approach the witness, Your Honor?
27        THE COURT:  You may.
28   ////
```

JGZ-005676

1    BY MS. GARCIA:

2    Q.    Ranger Woychowski, I'm going to approach you with

3    what has been marked as People's Number 20.  Can you tell

4    us what that is?

5    A.    Yes, ma'am.  That was my issued P239 backup weapon.

6    Q.    How do you know that that was your issued P239?

7    A.    By the serial number.

8    Q.    When you say "backup weapon," can you explain what

9    you mean by that?

10   A.    The backup weapons are issued to us in

11   correspondence with carrying our primary weapons.  In the

12   event of mechanical failure of our primary weapons, we

13   have a backup weapon to go to, and it's supposed to be

14   carried on our person as well when we're in uniform duty.

15   Q.    Is that also known as a secondary weapon?

16   A.    Yes.

17   Q.    Where do you carry that weapon when you're working?

18   A.    We're allowed several different ways of carrying it.

19   I personally carry it -- I have an exterior vest that I

20   wear over my uniform, which is authorized.  Inside that

21   exterior vest is a zipper straight down the middle, and I

22   carry that on my right breast.

23   Q.    How long have you owned that particular firearm?

24   A.    This was issued to me in 2009.

25        MS. GARCIA:  Your Honor, if I could, I'd like to

26   admit People's 20 and 21 subject to connection.

27        THE COURT:  Objections?

28        MR. GONZALEZ:  I don't know what "connections"

```
 1   means.
 2        THE COURT:  It's subject to cross, I presume.
 3        MR. GONZALEZ:  Yeah, no objection.
 4        MS. GARCIA:  It would be subject, Your Honor, to the
 5   firearms expert testifying.
 6        THE COURT:  Agreed.  Okay.  So, why don't we do
 7   this.
 8        MR. GONZALEZ:  That's fine.
 9        THE COURT:  So, I will agree to that.  This will be
10   basically a conditional admission of the exhibit.
11        MS. GARCIA:  Yes.  Thank you.
12        THE COURT:  That's 21 and -- I'm sorry, 20, 21.
13             (Whereupon, People's Exhibits 20 and 21
14        received in evidence.)
15        MS. GARCIA:  So we haven't opened up 21 yet, so why
16   don't we do that.  We just need some scissors.  There are
17   no bullets.
18   Q.   Ranger Woychowski, if you could please open up
19   what's been marked as People's Number 21, and tell us
20   what you're taking out of the envelope.
21   A.   It is open, ma'am.
22   Q.   Oh, it is already open.  Okay.
23   A.   Yeah.
24   Q.   Sorry.  If you could take it out and tell us what
25   that is.
26   A.   So this would be the P239 magazine to fit this
27   weapon.
28   Q.   Would you please -- you can hold up the weapon to
```

```
 1   show us.
 2        Can you tell us where the magazine goes inside the
 3   gun?
 4   A.   Yes.
 5        THE COURT:  Hold on.  Can everyone in the jury see?
 6   Can defense team?
 7        THE WITNESS:  Would you like me to stand up?
 8        THE COURT:  That will be good.  Thank you.
 9        THE WITNESS:  Sure.
10        THE COURT:  That would help.
11        For counsel for the ranger, can you see?  Are we
12   good?
13        MR. MACK:  Yes, Your Honor.
14        THE COURT:  Okay.  Go on.
15        THE WITNESS:  So, at the bottom of the grip here is
16   what's called the magazine well.  And so the magazine is
17   inserted straight into the magazine well until it locks,
18   and it will click.  And that's how you know it's secure
19   and tight.
20   BY MS. GARCIA:
21   Q.   So what goes inside of the magazine?
22   A.   Rounds of ammunition.
23   Q.   How many rounds of ammunition can fit inside that
24   magazine?
25   A.   Seven.
26   Q.   Is this a single-action and double-action weapon?
27   A.   This is -- this weapon is a double-action and
28   single-action weapon.
```

```
 1   Q.   Can you explain --
 2   A.   It's not one or the other specific.  It's both.
 3   Q.   Can you explain what that means?
 4        THE COURT:  Okay.  You can have a seat.
 5        THE WITNESS:  Yes, sir.
 6        Yes, ma'am.  So this weapon in particular, as I
 7   said, is double action and single action, and it starts
 8   out in a double-action mode, which means a pull of the
 9   trigger will create two actions.  And the first being
10   that the hammer is pushed to the back, the second action
11   being the hammer is dropped forward, which creates the
12   firing of the round of ammunition.  And that happens all
13   in one trigger pull.  So, it's one trigger pull, two
14   actions.
15        The single-action mode on this is where the hammer
16   is already in the back rear position, and with a single
17   trigger pull, the hammer will just release forward,
18   creating a firing of the ammunition from the gun.
19   BY MS. GARCIA:
20   Q.   How are you trained to carry and fire this weapon?
21   A.   For carriage purposes, we're always trained to carry
22   this in double action, with the hammer up against the
23   weapon.  And for firing purposes, depending on the
24   various drills, but every drill starts with it from
25   either the holster or, like I said, my vest, coming out
26   in double-action mode.
27        Each subsequent fire after the first round will put
28   the gun into single-action mode until I then -- either
```

1   the ammunition runs out and the slide locks back or I use

2   the decock lever, which is on the side of the weapon

3   here, with my right thumb -- I'm a right-handed

4   shooter -- which then would decock the hammer back to its

5   upright position to where I would then holster that.

6   Q.   Can you show us where the decocking lever is on your

7   gun?

8   A.   Yes, ma'am.  So, for this I'll step back.

9   Q.   Maybe we can have you step --

10      Your Honor, may he step down in front?

11      THE COURT:  Yeah, but I want to see it, too, so he

12   can stay where he is.

13      MS. GARCIA:  Sure.

14      THE WITNESS:  So, for this weapon here, the decock

15   lever -- so there's two levers on the side here next to

16   the slide.  This is what we call the slide.  There's two

17   levers here.  This first one here up front, towards

18   closest to the trigger, is going to be our decocking

19   lever.  So, when that's pressed down, when that's pressed

20   down, as you saw, the trigger will go forward and the

21   hammer moves back up to the front position of the gun.

22      MS. GARCIA:  And, Your Honor, if he may step down

23   and give the jury a closer look of where the decocking

24   lever is.

25      THE COURT:  He may.

26      MS. GARCIA:  Thank you, Your Honor.

27      If you would step in front of the jury and perhaps

28   show --

1    **THE COURT:**  So, I think the best way to do this, if

2    you step in front of the jury, Ranger, what you can do is

3    just eight to ten feet away from the --

4    **THE WITNESS:**  Sure.

5    **THE COURT:**  -- first banister.

6    **THE WITNESS:**  Yes, Your Honor.

7    **MS. GARCIA:**  Just make sure -- we have alternate

8    jurors here.  Make sure everyone can see.

9    **THE WITNESS:**  Everybody can see me?

10    **THE COURT:**  And after that, can you please turn

11    around and show it to the defense team?

12    **THE WITNESS:**  Yes, of course.

13    So, as I indicated before, on the -- for this

14    weapon, on the left-hand side of this weapon, there's two

15    levers here.  The first lever, like I said, being closest

16    to the trigger area, is the decocking lever, is what it's

17    called.  And when that's depressed down -- and I said as

18    a right-hand shooter, it's my right thumb -- that would

19    initiate the hammer, which is back here, to then come

20    into its upright position and double-action mode.

21    **MS. GARCIA:**  Thank you.  You can have a seat.

22    **THE COURT:**  Can you show it to counsel.

23    **MR. GONZALEZ:**  Can I see --

24    **THE COURT:**  No, no, no, no, stop.

25    I just want you to show, Ranger, whatever you showed

26    the jury, just show it to Mr. Gonzalez.  You're the only

27    one that's going to touch the gun for now.  Go ahead.

28    **MR. GONZALEZ:**  Why don't you step over here for a

```
 1   minute.  I just want to see this.  Are you okay?
 2        THE COURT:  No, no, no, no.
 3        MR. GONZALEZ:  Can you just move your hand like
 4   this?
 5        THE COURT:  Thank you.
 6        MR. GONZALEZ:  Let me look down.  Okay.  Thank you.
 7        THE COURT:  Thank you, Ranger.  You may have a seat.
 8        MS. GARCIA:  You can have a seat.  Thank you.
 9   Q.   Have you ever actually measured the trigger pull
10   that's required in double or in single action?
11   A.   No, I have not.
12   Q.   Do you consider your gun to have a hair pull
13   trigger?
14   A.   Well, I personally don't use that term, so I don't
15   know what you mean by that.
16   Q.   What do you think it means?
17        MR. GONZALEZ:  Well, I'm going to object.
18        THE COURT:  What's the objection?
19        MR. GONZALEZ:  He says -- it's calling for
20   speculation.  He doesn't use it.
21        THE COURT:  Agreed.  Sustained.
22   BY MS. GARCIA:
23   Q.   Have you ever heard the term "hair pull trigger"?
24   A.   Yes.
25   Q.   What do you understand that to mean?
26   A.   To me, my thought would be some type of
27   modification.  My first thought would go to like a
28   competition shoot where the -- you know, the shooting for
```

JGZ-005683

1  timed accuracy.

2  Q.   Do you believe that your gun has a hair pull

3  trigger?

4  A.   No, not at all.

5       THE COURT:   What's the objection?

6       MR. GONZALEZ:   I'm going to object.   It's lack of

7  foundation.

8       THE COURT:   Overruled.

9  BY MS. GARCIA:

10  Q.   I'm sorry.   What was your answer?

11  A.   No, not at all.

12  Q.   Why do you believe that your gun does not have a

13  hair pull trigger?

14  A.   Because our weapons are not allowed to have

15  modifications, mechanical modifications whatsoever.   And

16  they're bought from the manufacturer and issued to us

17  directly.   So I have never been made aware of any type of

18  modification.

19  Q.   Is there pressure required in order to pull the

20  trigger?

21  A.   Yes, there is.

22  Q.   You just have never actually measured it?

23  A.   That's correct.

24  Q.   Have you ever had any problems with this gun?

25  A.   No.

26  Q.   Has it ever discharged when you didn't need it to?

27  A.   No.

28  Q.   Have you ever known any of your colleagues' weapons,

1    similar weapons, P -- Sig Sauer P239, to discharge or

2    fire without them meaning for it to fire?

3    A.    Not that I'm aware of.

4    Q.    Are there inspection requirements regarding this

5    gun?

6    A.    Yes, there are.

7    Q.    Can you please explain what the BLM inspection

8    requirements are regarding this gun?

9    A.    So our national armorer is required to inspect all

10   of our weapons once every three years at a minimum.

11        **THE COURT:**  Hold on for a second.  Can you tell us

12   what is the national armorer?

13        **THE WITNESS:**  I couldn't give you by definition, but

14   what I -- an armorer is someone that's trained in all of

15   the weapons that we use.  They go to advanced training on

16   how to take the, you know, weapons apart beyond what a

17   normal user would.

18   **BY MS. GARCIA:**

19   Q.    Has your firearm, the one that's been marked as

20   People's Number 20, has that ever been inspected by an

21   armorer?

22   A.    Yes, it has.

23   Q.    When was the last time it was inspected by an

24   armorer?

25   A.    April of 2015.

26   Q.    Were any parts replaced on the gun?

27   A.    No.

28   Q.    What was the result of the inspection by the

1  armorer?

2  A.    It was taken apart, cleaned, and given back to me,

3  issued back to me.

4  Q.    Was it in working order?

5  A.    Yes.

6  Q.    When was the last time you fired the gun?

7  A.    I fired this gun at a qualification a month prior to

8  the inspection in March, I believe the date was the 26th,

9  of 2015.

10  Q.    March 26th of 2015?

11  A.    Yes, ma'am.

12  Q.    How can you be so specific about the date?

13  A.    Because it's on our -- it's required to be logged on

14  our training qualification sheet.

15  Q.    Have you had an opportunity to review those

16  documents before testifying?

17  A.    Yes, ma'am.

18  Q.    How often would you actually fire this gun?

19  A.    Based it being my backup or secondary gun, I've only

20  fired this gun during training scenarios or

21  qualifications.

22  Q.    Have you ever taken it off duty to a range or

23  somewhere to shoot it?

24  A.    No, I haven't.

25  Q.    Have you ever had to drop -- have you ever had to

26  draw that weapon while working?

27  A.    No, I haven't.

28  Q.    Are you allowed to modify the gun in any way?

1   A.    We are not personally allowed to modify the gun.

2   Q.    And you've performed no modifications to this

3   particular gun?

4   A.    That's correct.

5   Q.    What are your requirements in terms of the state of

6   the load of this gun?

7   A.    We're required to have the magazine filled to

8   capacity and with one round in the chamber.

9   Q.    What does "state of the load" mean?

10  A.    State of the load means how -- how this weapon is

11  loaded with ammunition.

12  Q.    How do you personally load this gun?  If you can

13  explain it to us, and you can use --

14  A.    Can I pick up the gun?

15  Q.    Sure.

16  A.    I'll stand up again.

17       So, as I indicated earlier, I'm right-handed, and so

18  I always hold the gun in my right hand for any type of

19  working with reloading, any type of work that I do while

20  I'm on the firing line or any training scenario.

21       And so, with my gun in my right hand, magazine in my

22  left hand, like I said, here's the magazine well.  I'd

23  insert a magazine, a full loaded magazine, seven rounds,

24  into the magazine well until it's secure and locks.

25       From there, the top -- this is called, like I said,

26  the slide, which slides back and forward.  I pull the

27  slide all the way to the rear and let it go, which then

28  engages the magazine that's inside the well here, which

```
 1   then presses, pushes one of the rounds of ammunition, the
 2   top round of ammunition into the firing chamber.
 3       And from there, with the slide being activated back,
 4   it puts it into double-action mode or -- excuse me,
 5   single-action mode.  So, from there, using the decocking
 6   lever, as I've already explained, decock it, putting it
 7   back into double action, eject the magazine, which is
 8   this other button right here on the -- near the grip.
 9   With my -- again, with my right thumb, ejecting the
10   magazine out of the magazine well, then filling the
11   magazine back to capacity and inserting the magazine back
12   into the magazine well.
13   Q.   Why are you required to maintain the gun fully
14   loaded, with one in the chamber?  This gun?
15   A.   Because that's a direction in training that we've
16   always received from our national office.
17   Q.   Do you ever shoot or carry that gun in single
18   action?
19   A.   No.  Never.
20   Q.   Do you ever store it in single action?
21   A.   No.  Excuse me, if I may.
22   Q.   Sure.
23   A.   Backing up, do I ever shoot it in single action.  As
24   I indicated, after the first round of qualification or
25   training scenario, each subsequent round will be in
26   single-action mode.  So I'd like to make that
27   clarification.  But we never start our qualification
28   and/or any type of training scenario in single-action
```

1    mode.

2    **Q.**    So, in other words, you never cock the gun by

3    pulling the hammer back to do the first pull in single

4    action?

5    **A.**    That is correct.  I do not do that.

6    **Q.**    I'd like to direct your attention to June 27th,

7    2015.

8          **THE COURT:**  Before you go there.

9          **MS. GARCIA:**  Sure.

10         **THE COURT:**  Ranger, if I may ask.  The armorer, you

11   testified earlier that that armorer is the person that

12   cleans the gun and takes it apart; am I right?

13         **THE WITNESS:**  Beyond my capabilities.  I am

14   authorized to clean the weapon, but that's it.  I

15   don't -- you know, and I could take it apart to clean it,

16   but I can't make any corrections, if there's a spring

17   loose or any modifications to it.  So, anything that's

18   beyond just cleaning it goes to a national armorer.

19         And, like I said, every three years, it is required

20   to go to a national armorer for that inspection.  Because

21   occasionally, you know, with all weapons, the springs

22   start to have wear on them and other parts have wear on

23   them.

24         **THE COURT:**  And so, let's say a gun needs -- certain

25   parts isn't working properly.  You would then give it to

26   the armorer, and then it's up to them to take care of it

27   if that's --

28         **THE WITNESS:**  That is correct.  If that's the case,

1    yes.
2        **THE COURT:**  I appreciate that.  Okay.
3    BY MS. GARCIA:
4    Q.    So I take it that you regularly clean the weapon
5    after firing it?
6    A.    Yes.
7    Q.    Does that require what is known as field stripping?
8    A.    Yes.
9    Q.    Can you just briefly describe how you clean the gun?
10   A.    Sure.  So, would you like me to give a demonstration
11   again?
12   Q.    Sure.  You may not be able to take it apart.
13   A.    Well, yeah, but at least the -- just --
14   Q.    Okay.
15   A.    So, again, for this weapon, this furthermost button
16   here would be part of the slide release.  So, to be able
17   to take this gun apart requires to pull the slide all the
18   way back, and it -- having it locked in place would allow
19   this here, this button here, to push down, which then
20   would allow the slide to come off completely from the top
21   of the weapon, which then would allow access to the
22   magazine well from the top and the bottom, and also the
23   ability to clean the -- the complete of the slide from
24   the underneath side, where you can't see.  And so, that's
25   essentially it.  There's no other parts that I can take
26   apart to clean it any further.  That's the extent of my
27   cleaning.
28   Q.    What was your habit regarding cleaning this

1  particular firearm?

2  **A.**    So, this firearm, every time I shot, I'd clean all

3  my weapons.  And this would on average -- because where I

4  work, I work in the desert, really sandy, but this

5  doesn't get too much exposure.  So, this would get

6  cleaned, you know, in conjunction with my trainings or

7  qualifications, but I would make it a habit to generally

8  clean my weapons, because even dust can get carried into

9  the workings of the gun.  So this particular weapon I

10  would clean about approximately every two months.

11  **Q.**    Again, I'd like to direct your attention to

12  June 27, 2015, which was a Saturday.  Can you tell us

13  what you did that day?

14  **A.**    Yes.  That day, I left my house with my family, and

15  we drove up the California coast and ended up in

16  San Francisco.

17  **Q.**    Were you on your way to a duty station?

18  **A.**    Yes, I was.  I was temporarily assigned to the Butte

19  field office in Helena, Montana, for a 14-day detail over

20  the July 4th weekend.

21  **Q.**    So you decided to take your family with you up the

22  California coast on your way to Montana?

23  **A.**    Yes.  So -- and our job being, you know, in law

24  enforcement, any law enforcement profession, you're going

25  to be away from your families for a long time.  And in

26  our agency, when we get the opportunity to go somewhere

27  that our families can go with us, it's very common that

28  officers would take their families with them.

1    Q.    When you -- on your way to Montana, did you take a
2    personal vehicle or an official vehicle?
3    A.    I took my personal vehicle.
4    Q.    What kind of car is it?
5    A.    It's a 2015 Buick Enclave, SUV.  And I was going to
6    say that family members -- I should put it this way.
7    Nonemployees of the government or nonemployees of my
8    agency are not allowed within my government vehicle.  So,
9    therefore, that's why we took my personal vehicle.
10   Q.    Was that a day off for you?
11   A.    Yes, it was.
12   Q.    Can you explain how you arranged that day off for
13   travel?
14   A.    So, being in law enforcement, again, I work the
15   weekends.  However, because I was going to be gone from
16   my duty station for a two-week period, I arranged with my
17   supervisor to work Monday through Friday.  I took that
18   Sunday preceding, and I worked straight through the
19   business days, Monday through Friday, to be able to
20   complete any paperwork or casework that I had from my
21   home office, which therefore would make my Saturday, that
22   Saturday, the 27th, my second day off of the week.  We
23   work five days a week, two days off.
24   Q.    So when you said you traveled with your family, how
25   many children did you have with you?
26   A.    Three children.
27   Q.    What were their ages at that time?
28   A.    My oldest son would be -- was 15.  My daughter,

1   middle daughter, would be 11.  And my youngest would be

2   six.  Excuse me.

3   Q.   Who else were you traveling with?

4   A.   My fiancée.

5   Q.   So you said that you took the coast.  Did you travel

6   on Highway 101?

7   A.   Yes, for the most part.

8   Q.   Did you eventually arrive in San Francisco?

9   A.   Yes.

10  Q.   Do you remember what time you arrived in

11  San Francisco?

12  A.   Approximately 9:30, 9:35, about there.

13       **THE COURT:**  A.m. or p.m.?

14       **THE WITNESS:**  Excuse me.  P.m.  In the evening.

15  **BY MS. GARCIA:**

16  Q.   What did you do when you got to San Francisco?

17  A.   Well, the point -- I mean, it was quite late at that

18  point for family.  And what we were looking for was just

19  a place to eat.  And so, when we exited the highway, I

20  saw the ball field and thought that there would be some

21  suitable places for a family atmosphere to eat.

22       Not being familiar with the area, that just kind of

23  stood out to me that there would be restaurants in the

24  area.  So that's why we exited there when I saw the ball

25  field and which led me down to the Embarcadero.

26       And as I --

27  Q.   So when you were on -- I'm sorry.

28  A.   Yes, ma'am.

1  Q.    When you were on Embarcadero, where did you go?

2  A.    As I indicated, I was looking for an area, a place

3  for my -- would be what I thought suitable for my

4  children, which, as soon as I entered, I remember seeing

5  like what I thought were some bars.  So I kind of wanted

6  to keep going down.

7        I did eventually see on the right-hand side what

8  appeared to be just some restaurants that looked, you

9  know, suitable for a family atmosphere.  And so, we

10 then -- I then started to look for a place to -- a safe

11 place to park my vehicle.

12 Q.    Did you eventually park your car?

13 A.    Yes.

14 Q.    Where do you remember parking your car?

15 A.    It would be -- so my vehicle ended up facing to the

16 south, and so it was not on the bay side.  It was

17 opposite of the bay side.  And I believe it was across

18 from the Pier 5, on the wall there.

19 Q.    Why did you choose that particular parking space?

20 A.    For one, it was in close proximity to where I

21 thought we'd go for a restaurant.  And, second, because

22 it appeared to be at the time the safest location.  It

23 was well lit.  It was metered parking.  And there were

24 other pedestrians and cars in the area, which made me

25 feel pretty confident and comfortable.

26        MS. GARCIA:  I have a map here that I would like to

27 mark as People's -- I believe we're up to 22, Your Honor.

28        THE COURT:  We are up to 22, Ms. Garcia.

```
 1              (Whereupon, People's Exhibit 22 marked for
 2         identification.)
 3      THE COURT:  Let's go off the record for a second.
 4              (Discussion off the record.)
 5      THE COURT:  Ms. Garcia, you just marked People's 22.
 6      MS. GARCIA:  Right.  So, Your Honor, I have a map
 7  here, and I'll have somebody more familiar with
 8  San Francisco explain exactly the streets.  But right now
 9  I would just like, if I could, have Ranger Woychowski
10  step down and take a look at the map.
11      THE COURT:  Well, before you do, the jury's already
12  seen it.  I think you should just move it into evidence
13  because it's already been published.
14      MS. GARCIA:  Of course, Your Honor.
15      THE COURT:  Any objections, Mr. Gonzalez?
16      MR. GONZALEZ:  No, Your Honor.
17      THE COURT:  People's 22 will be moved into evidence.
18      And, Ranger, you may step down and adhere to the
19  directions of counsel.
20              (Whereupon, People's Exhibit 22 received in
21         evidence.)
22  BY MS. GARCIA:
23  Q.   So, Ranger Woychowski, if you could take a look at
24  People's Number 22, the map there, do you see the yellow
25  block?
26  A.   Yes.
27  Q.   Does that appear to be approximately where you
28  parked your SUV on the night of June 27th, 2015?
```

1   A.   Yes.  Approximately.

2   Q.   All right.  Thank you.  You can have a seat.

3        Let me just take this down so everyone can see.

4        THE COURT:  Off the record.

5                 (Pause in proceedings.)

6        THE COURT:  Back on the record.

7   BY MS. GARCIA:

8   Q.   So, after you parked your car, did you notice

9   anything else that made you feel safe parking in that

10  area?

11  A.   Well, as I indicated before, the fact that there

12  were -- it was well lit was something right away that was

13  appealing to me, and that it was metered parking.  So,

14  you know, I knew you had to have some type of parking

15  enforcement.  And then beyond that, you know, there

16  was -- right in front of me was a Mercedes -- or, excuse

17  me, two parking stalls ahead, there was a Mercedes sedan,

18  and I, you know, took that to be a good sign that a

19  high-end car would be parked in the area.  And then,

20  yeah, so that's what went into that.

21  Q.   So did you eventually go to a restaurant with your

22  family?

23  A.   Yes, we did.

24  Q.   Before you went to the restaurant, can you tell us

25  how did you store People's Number 20, the secondary

26  firearm?

27  A.   Yes.  So that firearm there was in a holster, which

28  is used to carry on your belt.  It was a leather holster,

1    which had a thumb break action, which the leather part
2    would come over the top or the hammer of the gun and then
3    snap together, you know, making that gun secure there.
4    And, like I said, it was a holster that you could easily
5    put through a belt.  It had belt loops on it.  You could
6    put through on your belt.  And so, that's how I generally
7    carry that weapon.
8         That particular evening, the -- as I said, the
9    weapon was in a holster, which was then in a backpack.
10   It was a black Eddie Bauer backpack.  If you open up the
11   main interior compartment, inside that there's another
12   zipper compartment, and the firearm was in that
13   compartment, zipped, and then the exterior zipper closed
14   as well.  And so, I took that backpack with the firearm
15   in it, and I placed it behind my driver's seat.
16        So in my vehicle, as I guess a luxury feature, as
17   soon as you turn the key off, the seats -- the driver's
18   seat automatically retracts to a far rear position
19   allowing for leg room and just comfort, I guess, I don't
20   know.  And so, as that happened, I put my backpack from
21   opening the back door, right behind the driver's seat,
22   underneath that seat that's now been retracted to its
23   back position.  And that's where -- that's where I left
24   it at.
25   Q.   Did you have tinted windows?
26   A.   Yes.  So my vehicle is California compliant with the
27   front windows.  So the driver's side window and the front
28   passenger window are not tinted.  That's another reason I

1    put it in the backseat because we do have the dark

2    factory tint on the rest of the windows back, all the way

3    to the third row seating.

4    Q.    Did you lock the car?

5    A.    I did, yes.

6    Q.    Does the car have an alarm on it?

7    A.    It has the manufacturer panic alarm.  So if the

8    doors are opened without authorization from the key fob,

9    or to that degree, it would honk.

10    Q.    Was there anything in your backpack, in the Eddie

11    Bauer backpack, that would indicate that you were in law

12    enforcement?

13    A.    Yes, ma'am.  My law enforcement credentials, which

14    is -- essentially it's a wallet that contains a badge, my

15    badge, with my badge number, and my employee -- agency

16    ID, showing who I am, my authorizations and such, and the

17    department I work for.

18    Q.    Was the gun wrapped in a T-shirt or a rag?

19    A.    No.

20    Q.    Did you have a rag inside of your backpack?

21    A.    Not that I remember.

22    Q.    Tell us what happened when you came back from the

23    restaurant.

24        THE COURT:  Before you do that, did you alarm the

25    car before you left?

26        THE WITNESS:  Yes.  Well, so it's an auto feature.

27    Once you hit the lock on the key fob, it's the auto -- an

28    auto feature.  I don't have to press an additional button

```
 1   to have that engaged.
 2          THE COURT:  Was it engaged?
 3          THE WITNESS:  Yes, it was locked.
 4          THE COURT:  Thank you.
 5   BY MS. GARCIA:
 6   Q.    So, I'm sorry.  We were getting to the part when I
 7   take it you went to a restaurant with your family?
 8   A.    Yes.
 9   Q.    Did you eventually come back to your car?
10   A.    Yes.
11   Q.    What did you notice when you came back to your car?
12   A.    So, I -- you know, to kind of give you a full idea,
13   I was in hurry-up mode.  Prior to going to eat, I
14   encountered -- as I was putting that bag under there, I
15   felt the presence coming up on the street.  I thought it
16   was a car at the time.  And so, as I turned around, it
17   was a parking enforcement or what I believed to be a
18   parking enforcement officer that had stopped right
19   behind, like, the quarter panel of my car.  And then we
20   engaged in conversation with me simply asking if the area
21   was okay to park and how long they would be around until.
22   All indications were positive, and he told me that they
23   were out of service at 11 o'clock p.m.  And he
24   emphatically told me, you know, be back at your car by
25   11 o'clock because we're not around after that.
26          And so, you know, back to your question, you know,
27   in my mind, being very safety conscious, having my family
28   in an area that I'm very unfamiliar with, that was all I
```

```
 1   was thinking.  And so, we, you know, made it across to go
 2   get something to eat, and I believe I left the restaurant
 3   right around 10:50.
 4        MR. GONZALEZ:  Your Honor, may we approach for a
 5   moment?
 6        THE COURT:  Yeah.  Off the record.
 7             (Sidebar discussion off the record.)
 8        THE COURT:  Back on the record.
 9   BY MS. GARCIA:
10   Q.   What time did you eventually get back to your car
11   after the restaurant?
12   A.   I looked down on my watch at -- I had a digital
13   watch on.  It said 10:59 p.m., is when I saw my car in
14   sight.
15   Q.   What did you notice about your car, if anything, at
16   that point?
17   A.   The first thing that alerted me, my fiancée yelled
18   out, oh, my God, I can't believe this, something to that
19   effect, and which drew my attention back up to my
20   vehicle.  And I saw the backseat on the passenger side,
21   so that backseat window, was smashed out, and there was
22   glass on the ground, black glass on the ground.  And then
23   there's another set of window that goes into the third
24   row seating of like an SUV, and that was also smashed out
25   with glass on the ground there.
26   Q.   Where was your backpack with the secondary gun that
27   we've marked into evidence as Number 20?
28   A.   When I got back to the vehicle?
```

1   Q.   Yes.

2   A.   Well, it wasn't there.

3   Q.   Did you report it stolen?

4   A.   Immediately.

5   Q.   Who did you report it stolen to?

6   A.   I called 911.

7   Q.   Did you speak to an SFPD police officer and report

8   it stolen?

9   A.   On the initial phone call, I believe it was just the

10  dispatch, but once an officer arrived on scene, yes.

11  Q.   Did you also notify the BLM that your secondary

12  weapon and its backpack had been stolen?

13  A.   Yes.   Immediately following the 911 call, I called

14  my California duty officer and made notification.

15  Q.   Was there an investigation into what had happened,

16  by your own agency into what had happened on June 27th,

17  2015, the auto burglary?

18  A.   Yes, there was.

19  Q.   Did you have to participate in numerous interviews

20  for that?

21  A.   Yes, I did.

22  Q.   Was your transportation and storage of this weapon

23  consistent with BLM policies --

24  A.   Yes, it was.

25  Q.   -- at that time?

26  A.   Yes, it was, ma'am.

27  Q.   Were you disciplined in any way for the auto

28  burglary?

1    A.    No, I was not.

2         MS. GARCIA:   Thank you.  I have no further

3    questions.

4         THE COURT:   We're off the record.

5              (Pause in proceedings.)

6         THE COURT:   Back on the record.

7         Mr. Gonzalez, cross.

8         MR. GONZALEZ:   Your Honor, can we approach on the

9    other matter or do you want to wait on that?

10        THE COURT:   I want to wait on that.  You may

11   proceed.

12        MR. GONZALEZ:   Okay.

13                   CROSS-EXAMINATION

14   BY MR. GONZALEZ:

15   Q.    So, Mr. Woychowski, first of all, what's the proper

16   title to call you?  I want to be respectful to you.  Is

17   it Officer?  Would it be Ranger?  Mr.?

18   A.    Yeah, Mr. Woychowski is fine.  Yes, sir.  Thank you.

19   Q.    I want to just try to drill down on this issue that

20   you were just talking about, whether or not you were in

21   compliance with the BLM rules.

22         Are you aware of a rule in the safety and health for

23   field operations that says "All firearms when not in

24   active use shall be stored in a secure place, out of

25   sight, under lock and key, firearms will be unloaded

26   prior to storage"?  Are you aware of that?

27   A.    May I see what you're reading from?

28   Q.    Sure.

1    **THE COURT:**  You may approach.

2    **MR. GONZALEZ:**  I'm not going to mark it if that's

3    all right.

4    **THE COURT:**  That's fine.  But you may approach.

5    **MR. GONZALEZ:**  It's the highlighted portion.

6    **THE WITNESS:**  Thank you, sir.

7    **THE COURT:**  After you're done reading it, give it

8    back to Mr. Gonzalez, and let's resume.

9    **BY MR. GONZALEZ:**

10   Q.   Are you familiar with that?

11   A.   Yes, I am.

12   Q.   And is it your position that that does not apply to

13   you?

14   A.   Yes, that's correct.

15   Q.   How come?

16   A.   Because that manual is for non-law enforcement

17   personnel who at times are authorized to carry firearms.

18   That doesn't apply to law enforcement officers of the

19   bureau.

20   Q.   Okay.  Do you know someone named Special Agent Glenn

21   Van Airsdale?

22   A.   Yes, I do.

23   Q.   And do you know he conducted part of the

24   investigation into whether or not your conduct was in

25   accordance with the Bureau of Land Management rules?

26   A.   Yes, I do.

27   Q.   And --

28   **THE COURT:**  Can we get the spelling, Mr. Gonzalez?

JGZ-005703

1    MR. GONZALEZ: Yes. Glenn, G-L-E-N-N, capital

2    V-A-N, space, capital A-I-R-S-D-A-L-E.

3        THE COURT: Thank you.

4    BY MR. GONZALEZ:

5    Q.    Now, he noted, as I understand it, that there are a

6    number of rules that require a law enforcement officer

7    such as yourself when traveling in a vehicle, that they

8    must secure a firearm in a locked container. Is that

9    correct?

10   A.    No. Can I see what you're referring to?

11   Q.    Let me ask it differently. Let me ask you this.

12   Are there rules that require you to carry or to store a

13   handgun rather when you're in a BLM vehicle securely?

14   Are there such rules?

15        MS. GARCIA: Relevance, Your Honor.

16        MR. GONZALEZ: It's foundational.

17        THE COURT: Overruled. In a BLM vehicle.

18        MR. GONZALEZ: That's what I said.

19        THE COURT: I know.

20        THE WITNESS: Yes, sir.

21   BY MR. GONZALEZ:

22   Q.    Right. So there are rules that say if you're in a

23   BLM vehicle, what do you have to do? Tell me what are

24   the safety steps.

25        MS. GARCIA: Relevance, Your Honor.

26        THE COURT: Sustained.

27        MR. GONZALEZ: It's foundational to another

28   question.

1    THE COURT:  No, because he was driving a personal
2  car.
3    MR. GONZALEZ:  Well, all right.  I'll ask the
4  question then.
5    THE COURT:  Thank you.
6  BY MR. GONZALEZ:
7  Q.   Mr. Van Airsdale concluded that notwithstanding
8  whether or not you were in a BLM vehicle or not, there is
9  a general BLM rule that says, and I'm quoting, "A law
10  enforcement officer is responsible for ensuring that
11  their authorized firearms are secure at all times."
12  Isn't that true?
13  A.   May I see that?
14  Q.   Sure.  And I'm referring to the Bates stamp BLM 190.
15    THE COURT:  Before you do that, Mr. Gonzalez.
16    MR. GONZALEZ:  Let's mark this one.
17    THE COURT:  Okay.  Let's mark this as -- this will
18  be Defense next in order, which will be M, as in Mary.
19  So can you identify what that is, and we'll mark it?  And
20  then show it to both Mr. Wall, Mr. Mack, and Ms. Garcia.
21    We're off the record for a second.
22         (Discussion off the record.)
23         (Whereupon, Defense Exhibit M marked for
24       identification.)
25    THE COURT:  Back on the record.
26    MR. GONZALEZ:  We're going to staple that.
27    THE COURT:  We're off the record.
28         (Discussion off the record.)

1          THE COURT:  Back on the record.

2          MR. GONZALEZ:  May I approach the witness?

3          THE COURT:  You may.

4    BY MR. GONZALEZ:

5    Q.   Mr. Woychowski, I'm looking at -- there's a

6    subsection (a) and (b).  I'm looking at subsection (a),

7    which I read to you.

8          THE COURT:  Can you identify what Defense M is,

9    Mr. Gonzalez?

10         MR. GONZALEZ:  It is the -- it's a memo or finding

11   by Glenn Van Airsdale, a memorandum of activity by

12   Special Agent Glenn Van Airsdale.

13         THE COURT:  Thank you.

14   BY MR. GONZALEZ:

15   Q.   Have you had a chance to look at that?

16   A.   Yes, sir, I have.

17   Q.   Would you concede that a law enforcement officer is

18   responsible for ensuring that their authorized firearms

19   are secure at all times?

20   A.   Secure at all times, yes.

21   Q.   Yes.  And let me ask you the bigger question.  Would

22   you concede that you should not have left the firearm in

23   your personal vehicle in the manner in which you did?

24         MS. GARCIA:  Objection, Your Honor.

25         THE COURT:  What's the objection?

26         MS. GARCIA:  352.  Relevance.

27         THE COURT:  Sustained.  Next question.

28         MR. GONZALEZ:  Well, I'm sorry, Your Honor.  She

1    raised that he wasn't disciplined, and she raised --
2         MS. GARCIA:  Your Honor, I'd ask that we approach --
3         MR. GONZALEZ:  -- and he spoke about how safety
4    conscious he is.
5              (Simultaneous colloquy.)
6         MR. GONZALEZ:  Can we approach on this, Your Honor?
7         THE COURT:  No.  Next question.
8    BY MR. GONZALEZ:
9    Q.   Mr. Woychowski, I heard you say during the direct
10   examination -- let me find the exact words.  You said --
11   let's see here.  You said being "safety conscious."  Do
12   you remember that?
13   A.   Yes, I do.
14   Q.   And I'm asking you, is it safety conscious to leave
15   a loaded firearm unsecured within your personal vehicle?
16        MS. GARCIA:  Your Honor, relevance.  352.
17   Argumentative.
18        THE COURT:  Okay.  Now it's a good time to take a
19   break while I talk to both counsel regarding that.
20   Objection has been raised.
21        So, ladies and gentlemen, we are going to take our
22   morning recess until 11:20, at which time we will resume.
23   So, for the jurors, please remember the Court's
24   admonishment.  Please do not communicate with anyone
25   about this case.  Please don't -- that includes your
26   family members, your best friends, colleagues, anyone,
27   spiritual advisers, anyone.
28        Please don't get on social media and start

 1    communicating with anyone or anyone to you about this

 2    case.  When I say "this case," I mean the people

 3    involved, the subject matter, anything.

 4        In addition, during the recess, you may want to

 5    catch up on the news.  If you do come across an article

 6    or story about this case, whether it's in print media or

 7    on the Internet or any form of communication that you

 8    would use, be it a cell phone or tablet, move to another

 9    story and don't read that or don't watch that.  Also -- I

10    think that does it.  Have a good recess.  I'll see you at

11    11:20.

12        And for the ranger, please do not talk to anybody

13    about your testimony, only about your schedule, okay?

14        **THE WITNESS:**  Thank you.

15            (Recess.)

16    **THE COURT:**  Let it reflect that none of the jurors

17    are here.  The gallery is closed.  And Ms. Garcia is here

18    for the People.  Mr. Mack is here.  Mr. Wall is also

19    present.  And Mr. Gonzalez is here.  Mr. Ugarte,

20    Mr. Hinkley, and Mr. Garcia Zarate is present.  And

21    Ms. Cuevas is translating.

22        Okay.  The last question that was asked by

23    Mr. Gonzalez, before the Court took a recess, I heard you

24    say during direct examination something to the effect of

25    you said being safety conscious.  Do you remember that?

26    And the ranger answered, yes, I do.

27        Question, by Mr. Gonzalez, "And I'm asking you, is

28    it safety conscious to leave a loaded firearm unsecured

1    within your personal vehicle?"   The objection is 352,

2    argumentative, and relevance.

3         Mr. Gonzalez.

4         **MR. GONZALEZ:**  Your Honor, the People have elicited

5    that he's got this law enforcement training related to

6    guns, to handling guns, loading guns, moving around with

7    guns.  And that's what the whole direct examination was.

8    He's up there saying safe, safe, trained, trained, over

9    and over again.  Did the BLM do anything to you?  No, no,

10   no, I'm -- everything was -- I'm totally in the clean.  I

11   did nothing wrong.

12        Well, I should be allowed to ask.  This is very

13   basic.  Is this safe to do?  Do you think these rules

14   apply to you?  Is it a safe thing to do, to travel with a

15   loaded firearm and leave it in a car unsecured like this?

16   I don't see the objection.

17        Moreover, the fact that this ranger talked about

18   being so safety conscious and how he locked the car and

19   everything, he's opened the door.  As I pointed out to

20   the Court, respectfully, I came up at sidebar.  I said, I

21   want you to think about this because he's basically

22   saying he acted safely.  He's not being truthful.  He was

23   carrying another gun also not properly secured in the

24   vehicle.  He's opened the door to that as far as I'm

25   concerned.

26        **THE COURT:**  All right.  Ms. Garcia, I will let you

27   respond, and then --

28        **MR. GONZALEZ:**  Your Honor, the defendant needs to

1  use the bathroom.  So ...

2      **THE COURT:**  Let's go off the record for a second.

3      **MR. GONZALEZ:**  I'll waive his appearance for the

4  rest of this.

5      **THE COURT:**  Mr. Gonzalez, do you agree to waive

6  Mr. Garcia Zarate's appearance for this argument

7  regarding the above issue?

8      **MR. GONZALEZ:**  Yes.

9      **MS. GARCIA:**  I don't feel comfortable with that.  I

10  think we should wait until he comes back.

11      **THE COURT:**  All right.  Then you know what, we'll

12  just wait.  We're off the record.

13             (Discussion off the record.)

14      **THE COURT:**  Let the record reflect that Ms. Garcia

15  is here.  Mr. Mack and Mr. Wall are present.  And also

16  from the defense team, Mr. Gonzalez, Mr. Ugarte and

17  Mr. Hinkley are present.  And I have the interpreter

18  present, and Ms. Purdue is translating for Mr. Garcia

19  Zarate, who is also present.  And good afternoon to

20  everyone.

21      Let it also reflect that none of the jurors are

22  here.  The gallery is not open.  There's no one here

23  except for the defense team and the attorneys, as I

24  indicated, and also my staff and externs.

25      Okay.  Respond, Ms. Garcia.

26      **MS. GARCIA:**  Yes, Your Honor.

27      **THE COURT:**  The question is whether or not when

28  Officer Woychowski or Ranger Woychowski says that I'm

```
 1    safety conscious, does that open the door.
 2        MS. GARCIA:  No, Your Honor.  I believe his
 3    reference at that time was that he was concerned for his
 4    family being in an area -- he said he was concerned for
 5    his family, not the property, if you look at the answer
 6    and the context of the answer.
 7        I think what his opinion was about whether or not
 8    the gun was secure, whether or not it met certain
 9    policies, specific policies, I think is irrelevant, and
10    it's prejudicial to the People.  It doesn't matter
11    whether the BLM ranger thinks his gun was stored properly
12    or not.  Mr. Gonzalez has the argument, he can always
13    argue that this was not a prudent thing to do.  Those are
14    the facts.  Whatever opinion the BLM ranger has is
15    irrelevant, and it's prejudicial to the People to
16    emphasize that any further.
17        And it was also pointed out to me, Your Honor, by
18    Mr. Wall that the defense continually asks about policies
19    that do not apply to law enforcement officers.  That both
20    policies and general orders and rules were provided to
21    the defense, both the ones that apply to law enforcement
22    officers and the ones that do not.  And that Mr. Gonzalez
23    by continually focusing on the policies, rules, and
24    general orders that do not focus on law enforcement
25    officers is giving the jury the impression that what he
26    did was not consistent with BLM policy.
27        THE COURT:  Okay.
28        MS. GARCIA:  And I believe that that's a 352
```

1    objection.

2         THE COURT:  All right.  But couldn't you on redirect

3    clean that up and inform through Ranger Woychowski that

4    these policies is not applicable to X, Y, and Z, and it's

5    public?  Couldn't you clean it up that way and sanitize

6    it?

7         MS. GARCIA:  Well, I prefer not to discuss it at

8    all.  I think discussing whether or not they are

9    consistent is sufficient enough.  I do not -- I have a

10   352 objection to going any further into this.  This is a

11   murder case.  The ranger is not on trial.  This is not a

12   wrongful death case.  This is a murder case.

13        THE COURT:  Understood.

14        MS. GARCIA:  Whether or not he was following a

15   particular policy or rule is irrelevant.  I brought out

16   that he was generally -- that he was consistent with BLM

17   policies, and the defense wants to pick specific

18   policies, I believe, on purpose that do not apply to him,

19   as he's already said.  And he's -- and I've already

20   pointed out to counsel, from what Mr. Wall has told me,

21   I've already pointed out to him which specific orders

22   apply to this BLM ranger.  And I do believe that this is

23   misleading to the jury, and it's very prejudicial to the

24   People.

25        And I do not believe that when the ranger said that

26   he's safety conscious, he was referring specifically to

27   how he was storing the gun.  The context of that answer,

28   Your Honor, was that he was concerned for his family

1    being in an area that he was not familiar with.  And I do

2    not believe that that in any way, shape, or form opens

3    any doors as to how he may have secured other items in

4    the car.  That would be highly prejudicial to the People.

5        I already believe this testimony is prejudicial to

6    the People and irrelevant.  And I believe emphasizing it

7    any further would be a distraction to the jury and would

8    also confuse the issues.  And it would undermine the

9    People's case.

10        **THE COURT:**  All right.  Thank you.

11        **MR. GONZALEZ:**  Your Honor.

12        **THE COURT:**  Not yet.  I'm looking at the testimony

13    by Officer or Ranger Woychowski regarding when he

14    mentioned safety conscious.  This was a time that he was

15    speaking to the -- I believe it's a parking enforcement

16    officer, and indicating something to the effect of that

17    officer told Ranger Woychowski that he's off at

18    11 o'clock, out of service at 11 o'clock.  And he

19    emphatically told Officer Woychowski to be back in his

20    car after 11 because they're not around at that time.

21        Then Ranger Woychowski indicated being very safety

22    conscious in a place that he's unfamiliar, and that's all

23    he was thinking.

24        We're not talking about any gun.  He just said in

25    general being safety conscious.  I want to make sure that

26    I -- based on the context, my recollection was he wanted

27    to make sure that the vehicle that he was in was parked

28    in a safe place, that he was safety conscious because he

1   had his family with him.  He saw a Mercedes-Benz, a

2   high-end car, that was parked two cars or so ahead of

3   him, and he thought, you know what, because the car's

4   there, I think I'm in a place that's safe.  That's number

5   one.  So then he was not addressing safety consciousness

6   about the gun but safety consciousness in general.

7   Number one.

8          Number two --

9          MR. GONZALEZ:  But, Your Honor --

10         THE COURT:  Not yet.  Number two, the policies were

11  already raised by counsel during direct, what policies

12  did you follow, if he followed all the policies.  That's

13  pursuant to the BLM policies.

14         MS. GARCIA:  I said was it consistent with BLM

15  policies in general.

16         THE COURT:  Correct.  I understand that.

17         MS. GARCIA:  Because the Court said that that would

18  be allowed.

19         THE COURT:  That's correct.

20         MS. GARCIA:  So that's why I asked that question.

21         THE COURT:  That's correct.  So, having said that,

22  the question is, does that open the door as to safety

23  consciousness.

24         MR. GONZALEZ:  Your Honor, if I can --

25         THE COURT:  Let me finish.  Safety consciousness and

26  whether or not carrying the gun the way he had it in his

27  backpack, put it in the car, was that safe.

28  Mr. Gonzalez.

1    **MR. GONZALEZ:** Your Honor, you may recall when I was
2    examining Woychowski, I was very careful to -- and there
3    were a couple of times there were objections, and I said,
4    Your Honor, it's foundational. What I was getting at, I
5    was trying to say I understand that there's some rules
6    that don't apply to you if you're in your personal
7    vehicle. That was objected to. You didn't want me to go
8    into it. I said, fine, I'll just go to the ultimate
9    question.

10    **THE COURT:** Well, what you did was you asked
11    questions regarding a BLM vehicle, and I said he was
12    driving a personal vehicle. So that doesn't apply. And
13    I went to a next question.

14    **MR. GONZALEZ:** Right. Because it was a way to try
15    to get into it. The question I ultimately posed to him
16    was, there is the general rule that applies to law
17    enforcement officers that he violated. That's what I
18    raised ultimately with him.

19    Thereafter, I would say to the Court, Ms. Garcia
20    wasn't going to call this witness. You told us what the
21    scope of it was, and the scope of my ability to call this
22    witness relates to whether or not he follows -- followed
23    BLM policy.

24    Even putting that aside, she's the one that elicited
25    all of this. She's talking about how he's compliant with
26    all policies. He wasn't disciplined. Of course, this is
27    just straight cross-examination. What's the point of
28    being a lawyer in a trial if you can't cover the ground

```
 1    that has been laid out in direct?
 2         Regarding --
 3         THE COURT:  So let me ask you something,
 4    Mr. Gonzalez.  What is your line of questioning after
 5    that?
 6         MR. GONZALEZ:  Your Honor, the -- he is saying -- he
 7    and I do not agree.  I think he violated policy.  He
 8    doesn't.  Okay.  So now I'm asking the question.  Well,
 9    is it a safe thing to do?  Do you believe that that's a
10    smart thing to do?
11         THE COURT:  What is a smart thing to do?
12         MR. GONZALEZ:  To leave a gun, a loaded gun, in the
13    fashion he did in the car.  She's already elicited being
14    very safety conscious, and he's done all these things.  I
15    have to be allowed to ask it.
16         THE COURT:  Okay.  Submitted?
17         MR. GONZALEZ:  Yes.
18         THE COURT:  Submitted?
19         MS. GARCIA:  Yes, Your Honor.
20         THE COURT:  Okay.  You are allowed to ask that.  You
21    did open the -- I think the door is open.  And it's only
22    open for a limited number of questions only,
23    Mr. Gonzalez.  Okay.
24         Now, as to BLM policy, you can only ask --
25         MR. GONZALEZ:  20, 25?  20 or 25?
26         THE COURT:  No.  The Court will determine how far
27    you are going.
28         As to the BLM policy, you can only ask about BLM
```

 1    policy, nothing else.  If it doesn't apply to the BLM

 2    ranger, it doesn't apply.  So I don't know what --

 3         MR. GONZALEZ:  That's what I asked.

 4         THE COURT:  I don't know what other policies you're

 5    referring to, but the policies that he has to follow is

 6    BLM policy, not policy of any other law enforcement

 7    agencies.

 8         MR. WALL:  Your Honor, if I could clarify.

 9         THE COURT:  Mr. Wall.

10         MR. WALL:  We made available to both parties BLM

11    policies regarding firearms storage.  And as they relate

12    to law enforcement officers, that's in the general

13    orders.  And non-law enforcement officers, and that's in

14    the BLM manual that counsel first showed to the witness.

15         THE COURT:  All right.  I have no problem with that.

16         MR. GONZALEZ:  And I was laying the foundation that

17    those don't apply to you and these do.  I get it.

18         THE COURT:  That's fine.

19         MR. GONZALEZ:  I was laying that out.  You guys

20    objected.

21         THE COURT:  All right.  So, that's fine.

22         MR. GONZALEZ:  So I went to the ultimate question.

23         THE COURT:  Whatever question pursuant to the BLM

24    policy that applies to Ranger Woychowski, that is

25    permitted.

26         MR. GONZALEZ:  Great.

27         THE COURT:  Anything outside of that, that doesn't

28    apply to him, is not permitted.  Are we clear?

```
 1        MR. GONZALEZ:  Yes.

 2        MS. GARCIA:  Yes, because he keeps saying it, so

 3   that -- he keeps suggesting to the jury.  That's my

 4   problem.

 5        THE COURT:  I think my ruling is very simple.  So

 6   you may inquire a little further regarding the safety

 7   consciousness.  I think he opened the door for that.

 8        MR. GONZALEZ:  Let me address the other opening of

 9   the door.

10        THE COURT:  No, no, no, no.  The other part is for

11   BLM policy, I think Mr. Wall is correct.  It only --

12   well, you can ask him questions based on the policies

13   that only applies to the BLM ranger, not to others.  Fair

14   enough?

15        MR. GONZALEZ:  Your Honor, on the other issue --

16        THE COURT:  Which other issue?

17        MR. GONZALEZ:  -- when he is there, he's saying he's

18   securing the gun in the car.  He's going to go have

19   dinner.  He's making sure everything is good.  And then

20   he says on the stand being very safety conscious --

21        THE COURT:  I'm allowing you to ask the question.

22        MR. GONZALEZ:  But I'm asking to be allowed to

23   inquire of the second gun he had in the car improperly

24   stored also.

25        THE COURT:  That is not allowed.

26        MR. GONZALEZ:  Why?

27        THE COURT:  That's 352.  That's irrelevant.

28        MR. GONZALEZ:  You said if they opened the door, you
```

1    would allow me --

2        THE COURT:  They didn't open the door as to the

3    second gun.  You can talk about the first gun.  I will

4    allow that.  I think he opened the door as to safety

5    consciousness.  The second gun is 352.  You're going to

6    confuse everyone.  It's going to take more time away.

7    The second gun was not even involved in this subject

8    alleged incident.

9        MR. GONZALEZ:  It becomes involved when he starts

10    talking about how safe he is.

11        THE COURT:  I disagree with that, but I do agree in

12    part about the safety consciousness.

13        MR. GONZALEZ:  Can you tell them he needs to be

14    careful, because if he does that again I'm going to ask

15    you to let me get into it.

16        THE COURT:  That's up to counsel.

17        MR. GONZALEZ:  He shouldn't be doing that.

18        THE COURT:  That's up to counsel.

19        MR. GONZALEZ:  Because they're putting up there as

20    if he's this super safety conscious guy.  That's opening

21    the door as well.  He's not.  He had not one gun but two

22    guns in that car improperly stored.

23        THE COURT:  Mr. Gonzalez, I think I made my ruling.

24        MR. GONZALEZ:  I got you.  We're just talking at

25    this point.

26        THE COURT:  Okay.  Well, I don't want you to talk

27    anymore.

28        MR. GONZALEZ:  I'm just telling you.

1    THE COURT:  Don't talk anymore.

2    MR. GONZALEZ:  All right.

3    THE COURT:  All right.  We're off the record.

4              (Discussion off the record.)

5    THE COURT:  We're back on the record.  Let it

6    reflect that all the jurors are present.  And, ladies and

7    gentlemen of the jury, good after -- good morning again.

8    Ms. Garcia is here.  And I have Sergeant -- Lieutenant

9    Ravano.  And Mr. Wall is present, along with Mr. Mack.

10   Good morning to both of you.

11        Mr. Gonzalez is here for the defense team.

12   Mr. Ugarte is present.  Mr. Hinkley.  And Ms. Purdue is

13   translating.  And Mr. Garcia Zarate is present.

14        You may resume with your cross, Mr. Gonzalez.

15    MR. GONZALEZ:  Thank you, Your Honor.

16   Q.   So, Mr. Woychowski, I was asking you before our

17   break, do you think that was a safe way to leave the gun

18   in your vehicle when you went off to dinner?

19   A.   Yes, I do.

20   Q.   And has the Bureau of Land Management ever given you

21   a safety locking device for this firearm?

22   A.   Yes.

23   Q.   And how long does it take you to activate that

24   safety locking device on the gun?

25    MS. GARCIA:  Relevance.  352, Your Honor.

26    THE COURT:  Sustained.

27   BY MR. GONZALEZ:

28   Q.   Are you prohibited from using the safety locking

JGZ-005720

```
 1   device that the Bureau of Land Management gives to you
 2   when you're driving a private vehicle?
 3        MS. GARCIA:  Objection, Your Honor.
 4        THE COURT:  Overruled.
 5        THE WITNESS:  No, I'm not prohibited from using it,
 6   no.
 7   BY MR. GONZALEZ:
 8   Q.   All right.  Did you have the safety locking device
 9   with you when you left your car and went to the
10   restaurant on this date?
11        MS. GARCIA:  Objection, Your Honor.
12        THE COURT:  Overruled.
13        THE WITNESS:  No.
14   BY MR. GONZALEZ:
15   Q.   And why didn't you have it with you?
16   A.   Because it's not normal for me to have it, the
17   safety -- the device.
18   Q.   So even though the Bureau of Land Management issues
19   the safety device for the firearm, you don't believe --
20   there's no requirement for you to utilize it, right?
21   A.   That's correct.  There is no requirement.
22   Q.   And just so that we're on the same page, the safety
23   locking device --
24        THE COURT:  Hold on.  Hold on.  Hold on.  We're off
25   the record.
26              (Pause in proceedings.)
27        THE COURT:  Back on.
28   ////
```

1    BY MR. GONZALEZ:

2    Q.    Just so we're on the same page on this, the safety

3    locking device is a device that you can put on the gun so

4    that if somebody were to steal it, it doesn't fire,

5    correct?

6    A.    Yes.

7         MS. GARCIA:    352, Your Honor.

8         THE COURT:    Overruled.

9    BY MR. GONZALEZ:

10   Q.    Now, I want to just make sure I understand.    Were

11   you on duty or not?    Because the documents I'm looking at

12   are that you were not on duty.    Is that correct?

13        THE COURT:    Hold on.    Time frame.

14   BY MR. GONZALEZ:

15   Q.    On the date in question, when you were in

16   San Francisco.

17        THE COURT:    Thank you.

18        THE WITNESS:    I was off duty that day, yes.

19   BY MR. GONZALEZ:

20   Q.    Right.    So -- now you've told us about the manner in

21   which you loaded your Sig Sauer firearm that we're

22   talking about.    And if I understand correctly -- first of

23   all, let me just make sure to clarify this.

24        During the investigation that the Bureau of Land

25   Management conducted, you told them that you were

26   carrying that gun for your family's safety; is that

27   correct?

28        MS. GARCIA:    Relevance.    352, Your Honor.

```
 1        THE COURT:  Sustained.
 2   BY MR. GONZALEZ:
 3   Q.    Well, why were you carrying the Sig Sauer firearm
 4   that we're talking about on June 27th, 2015?
 5        MS. GARCIA:  Relevance.  352, Your Honor.
 6        THE COURT:  Sustained.  Let's move on.  He had the
 7   gun.
 8   BY MR. GONZALEZ:
 9   Q.    Well, if I understand, though, the reason -- you
10   told the jury that the BLM requires you to fully load it
11   a particular way, seven plus one, right?
12   A.    Yes.  Correct.
13   Q.    But you weren't on duty that day, right?
14   A.    That's correct.
15   Q.    You were with your family, right?
16   A.    That's correct.
17   Q.    And the ages of your family, I think, were -- you
18   told the BLM were even younger than what you told us
19   here.  The youngest was five years old at the time,
20   another was ten years old, and the third was 14 years
21   old.  Is that correct?
22   A.    Yeah.  I'm sorry.  They just had birthdays.  So if
23   I'm off by -- yeah.
24   Q.    Right.  So I just want to -- I want to make sure I
25   understand this because you're bringing -- you brought
26   that up, I thought, when Ms. Garcia asked you why do you
27   load it that way, and it was because the BLM teaches you
28   to do it that way, right?
```

1    A.    We're required to have it loaded that way.

2    Q.    Okay.  But you weren't on duty that day.  You

3    weren't required to carry the firearm apparently in any

4    particular way, right?

5    A.    No, that's not correct.

6    Q.    So you had to carry it in a way that was safe,

7    didn't you?

8    A.    I had it in a safe manner.

9    Q.    All right.  So it's your position that leaving it in

10   the backpack with the -- basically the only line of

11   defense is one smashed window is safe?

12        MS. GARCIA:  Objection, Your Honor.  Argumentative.

13        THE COURT:  Sustained.  You can ask it another way.

14   BY MR. GONZALEZ:

15   Q.    Well, my understanding, though, is you didn't use a

16   safety device, right?

17   A.    Correct.

18   Q.    And you had the gun fully loaded, in a backpack,

19   under your seat, right?

20   A.    Correct.

21   Q.    And you're saying you left it in a safe manner?

22   A.    My vehicle was secured with the key fob locking the

23   doors, behind tinted glass, in a well-lit area.  Yes, I

24   felt confident that my firearm was secured.

25   Q.    I'm not asking you if you feel comfortable about it.

26   What I'm asking you now, as you reflect on it, you didn't

27   follow -- you're saying because you were off duty, you

28   didn't have to follow BLM -- excuse me -- because you

1    were off duty and not in a BLM vehicle, you don't have to

2    follow the BLM regulations, right?

3         MS. GARCIA:  Objection.  Misstates testimony.

4    Argumentative.

5         THE COURT:  It is argumentative.  Next question.

6    Sustained.

7         MR. GONZALEZ:  Well, the tone of the question

8    doesn't make it argumentative.

9         THE COURT:  Next question, Mr. Gonzalez.  Thank you.

10   BY MR. GONZALEZ:

11   Q.   Well, let me try it a different way.  The -- you

12   would agree, wouldn't you, that if you took the Sig Sauer

13   and put a magazine, fully loaded magazine in it, there

14   would not be a bullet in the chamber, right?

15   A.   As you instructed, no.

16   Q.   All right.  And that would be -- it would be in

17   double-action mode, right?

18   A.   Yes.

19   Q.   And that's a trigger pull of about ten pounds,

20   right?

21   A.   I don't know.

22   Q.   It's never piqued your interest to know what the

23   trigger pull on your gun is?

24   A.   Not at all.

25   Q.   You've never researched it since 2015?

26   A.   No.

27   Q.   Never looked at it?

28   A.   No.

JGZ-005725

1    Q.   How many guns do you own?

2         MS. GARCIA:  Objection, Your Honor.  Relevance.

3         THE COURT:  Sustained.

4    BY MR. GONZALEZ:

5    Q.   Okay.  So you got a full magazine in it.  It's never

6    in double-action mode.  Do you think that that gun would

7    be sufficiently ready to protect yourself or your family?

8         MS. GARCIA:  Objection, Your Honor.  Incomplete

9    facts.  Confusing.  Vague.

10        THE COURT:  It's vague.

11        MR. GONZALEZ:  Well, I believe -- let me just make

12   sure I get the right section here.

13        THE COURT:  It's also 352.

14   BY MR. GONZALEZ:

15   Q.   Let's see here.  So, I think -- just so we're on --

16   so do you recall -- I think I'm on the right page.

17        Do you recall telling the Bureau of Land Management

18   investigator that you always kept the bag with you for

19   yours and your family's safety?

20        MS. GARCIA:  Objection.  Relevance.  Hearsay.  352,

21   Your Honor.

22        THE COURT:  Overruled.

23        THE WITNESS:  Can you repeat the question, please?

24   BY MR. GONZALEZ:

25   Q.   Yes.  Do you remember telling an investigator with

26   the Bureau of Land Management that you always kept the

27   bag with you for you and your family's safety?

28   A.   Yes.  That's general.  Yes.

1   Q.   All right.  And I guess my question is, because I

2   know you weren't on duty and you weren't in a BLM

3   vehicle, and we're talking about the manner in which you

4   load the gun, do you feel that at that moment you

5   followed the Bureau of Land Management rules just

6   instinctively, or did you consciously fully load it with

7   a round in the chamber?

8   A.   Of course I loaded it with a round in the chamber.

9   That's what I always do.

10   Q.   That's the way you're trained, right?

11   A.   Of course.

12   Q.   And you always do what you're trained, right?

13   A.   That's correct.

14   Q.   So, I want to understand if the -- when we looked at

15   the memo by Glenn Van Airsdale, he says that a law

16   enforcement officer is responsible for ensuring that

17   their authorized firearms are secure at all times, right?

18      MS. GARCIA:  Objection, Your Honor.  That's been

19   asked and answered.  I'd also object on relevance, 352,

20   and hearsay grounds.

21      THE COURT:  Overruled.

22      THE WITNESS:  Can you repeat the question?

23   BY MR. GONZALEZ:

24   Q.   Right.  He was quoting BLM manual 926-law

25   enforcement general orders, general order 15.  You're

26   aware of it, aren't you?

27   A.   Yes, I am.

28   Q.   And it requires a law enforcement officer, whether

```
 1   they're in their private car, BLM car, whatever, it's a
 2   general rule, is responsible for ensuring that their
 3   authorized firearms are secure at all times, right?
 4        MS. GARCIA:  Asked and answered, Your Honor.
 5        THE COURT:  Overruled.
 6        THE WITNESS:  Yes.
 7   BY MR. GONZALEZ:
 8   Q.   So, if you had been in a BLM vehicle, you would not
 9   have been allowed to leave the firearm in the manner in
10   which you did this time, correct?
11        MS. GARCIA:  Objection.  Relevance.  352,
12   Your Honor.
13        THE COURT:  Sustained.
14   BY MR. GONZALEZ:
15   Q.   Well, what I want to ask you, though, is you seem to
16   have instinctively fully loaded the gun with a bullet in
17   the chamber even though you didn't have to, but when it
18   came time to securing the gun, you didn't follow the BLM
19   requirement instinctively.  You chose your own backpack
20   safety actions, correct?
21        MS. GARCIA:  Objection, Your Honor.  That's a
22   misleading question.  Argumentative.  Misstates facts and
23   testimony.
24        THE COURT:  Sustained.
25   BY MR. GONZALEZ:
26   Q.   Now, when you were asked specifically why you did
27   this, during this investigation, you indicated it's
28   something -- you said it's something I never do.  Do you
```

1   remember that?

2   **A.**   Yes.

3       **MS. GARCIA:**   Objection.  Relevance.  Hearsay.  352,

4   Your Honor.  I ask that the answer be stricken.

5       **THE COURT:**   Well, it's overbroad.  So, the objection

6   is sustained.  Next question.

7       **MS. GARCIA:**   Can the answer be stricken, Your Honor,

8   the question and answer?

9       **THE COURT:**   Stricken.

10      **MS. GARCIA:**   Thank you.

11  **BY MR. GONZALEZ:**

12  **Q.**   And do you remember when they asked you -- let me

13  ask you this.

14      When the Bureau of Land Management asked you why you

15  secured the gun this way, you didn't tell them because it

16  was safe.  You told them it's -- I really don't know, I

17  really don't know in my mind why I left it like that.  Do

18  you remember that?

19      **MS. GARCIA:**   Objection, Your Honor.  Relevance.

20  352.  And hearsay.

21      **THE COURT:**   Sustained.

22  **BY MR. GONZALEZ:**

23  **Q.**   Wait a second.  I just want to make sure, Officer

24  Woychowski, that I understand why you did it that way.

25  Up to now, you've been saying you followed all BLM

26  procedure, right?

27  **A.**   Correct.

28  **Q.**   Okay.  So when they asked you why did you do that,

```
 1   did you tell them I just followed BLM procedure?  Is that
 2   what you said to them?
 3        MS. GARCIA:  Objection.  Relevance.  352.
 4   Argumentative.
 5        MR. GONZALEZ:  It's foundational.
 6        THE COURT:  It's sustained.
 7   BY MR. GONZALEZ:
 8   Q.   What did you -- why did you do it that way?  Let me
 9   ask you here.  Why did you do it that way?
10        MS. GARCIA:  I'm sorry, Your Honor.  Vague as to
11   why.  Do what what way?
12        THE COURT:  Overruled.
13        You can answer the question if you understand it.
14        THE WITNESS:  Please one more time repeat that for
15   me.
16        MR. GONZALEZ:  Yeah.  If it's not clear, let me
17   clarify it for counsel.  We're talking --
18        MS. GARCIA:  For the witness, Your Honor, not for
19   me.
20        MR. GONZALEZ:  Well, for everybody.
21   Q.   We're talking about why you left a fully loaded gun,
22   seven plus one in the chamber, in a backpack, under your
23   seat.  That's what we're talking about.
24        And so, the question is why did you do that?
25        MS. GARCIA:  Objection.  Relevance.  352,
26   Your Honor.
27        THE COURT:  Overruled.
28        THE WITNESS:  Well, at the time, I didn't really
```

1    have an answer because -- and to clarify, when I said

2    it's something I don't -- I don't ever do, it's in

3    regards to leaving my firearm.  I generally carry it with

4    me.  However, I'm not required to.

5    **BY MR. GONZALEZ:**

6    **Q.**    You're not required to because it was a personal

7    vehicle, right?

8    **A.**    No.

9    **Q.**    Why weren't you required to?

10        **MS. GARCIA:**  Relevance.  352, Your Honor.

11        **THE COURT:**  Sustained.

12        **MR. GONZALEZ:**  I'm just trying to understand his

13   answer.

14        **THE COURT:**  No.  Next question.

15        Oh, before I forget.  So, ladies and gentlemen, if

16   there's an objection and I sustain the objection, you're

17   not allowed to consider the question in any way for

18   anything.  You're not to consider that.  And if testimony

19   is stricken, you are not to consider that for any reason

20   either.

21        Okay.  Mr. Gonzalez, you can continue.

22   **BY MR. GONZALEZ:**

23   **Q.**    So, Mr. Woychowski, when you said I really don't

24   know why I left it, what you were referring to is you

25   generally always take it with you; is that right?

26        **MS. GARCIA:**  Objection, Your Honor.  Asked and

27   answered.  Relevance.  352.

28        **THE COURT:**  Sustained.  Next question.

1    BY MR. GONZALEZ:

2    Q.    I just asked you why you did it, and you responded

3    that it's typically not something you do because you

4    always take the gun with you.  That was your answer,

5    right?

6         MS. GARCIA:  Same objections, Your Honor.

7         THE COURT:  Sustained.  Let's move on.

8         MR. GONZALEZ:  I'm sorry.  What's the objection?  So

9    I can --

10        THE COURT:  352.  Let's move on.

11        MR. GONZALEZ:  Well, Your Honor, I think the People

12   have put at issue whether or not he followed --

13        MS. GARCIA:  Your Honor, I'd ask there not be

14   argument.

15                  (Simultaneous colloquy.)

16        THE COURT:  Next question.

17        MR. GONZALEZ:  Let's do it sidebar.

18        THE COURT:  No.  Next question.

19   BY MR. GONZALEZ:

20   Q.    So let me ask you.  Now, when you load this gun, you

21   would agree, wouldn't you, that the manner in which you

22   fully load this gun requires you to put the gun into

23   single-action mode at some point?

24   A.    Yes.

25   Q.    And whether or not you left it in single- or

26   double-action mode is dependent on whether or not you

27   depress the decocking lever, right?

28   A.    I'm sorry.  Can you repeat the question?

1    Q.    Yeah.  When you fully load this gun, you put the

2    full magazine in --

3    A.    Yes, sir.

4    Q.    -- and then you put a round in the chamber, right?

5    A.    Uh-huh.

6    Q.    And then it's --

7         THE COURT:  Hold on.  Is that a yes?

8         THE WITNESS:  Yes.

9         THE COURT:  Thank you.

10        THE WITNESS:  Sorry.

11        THE COURT:  That's okay.  That's fine.

12        THE WITNESS:  I'm sorry.

13   BY MR. GONZALEZ:

14   Q.    Then there's only six bullets in the magazine,

15   right?

16   A.    Correct.

17   Q.    And then you take the magazine out, right?

18   A.    Correct.

19   Q.    Actually, you told us that you depress the decocking

20   lever first; isn't that right?

21   A.    Yes, that's correct.

22   Q.    And if you forget to depress the decocking lever, it

23   would be in single-action mode after you fully loaded it,

24   right?

25   A.    It would be, yes.

26   Q.    Let me ask you this.  Do you -- I mean, your memory

27   is not flawless.  I mean, none of ours is, right?

28   A.    Of course.

1  **Q.**   Do you recall that when you spoke to the police, you

2  couldn't remember, when you got back to the car, whether

3  or not your door was locked or not when you spoke to them

4  about it, remember that?

5  **A.**   I don't remember that.

6  **Q.**   Okay.  Do you remember speaking to Officer -- an

7  officer from the San Francisco Police Department?

8  **A.**   Yes, I do.

9  **Q.**   Did that officer ever ask you whether or not your

10  gun was loaded?

11  **A.**   Yes, he did.

12      **MS. GARCIA:**  Relevance.  352, Your Honor.

13      **THE COURT:**  Overruled.

14  BY MR. GONZALEZ:

15  **Q.**   So he did ask you, and you told him the manner, the

16  exact manner that it was loaded?

17      **MS. GARCIA:**  Relevance.  352, Your Honor.

18      **THE COURT:**  Well, he already answered that.  So

19  let's move on.

20      **MR. GONZALEZ:**  I just want to make sure.

21  **Q.**   You explained not just that it had a full magazine

22  in it but it had one in the chamber?

23  **A.**   Yes.  That was -- I explained that.

24  **Q.**   Okay.  And so, as I understand it, at some point --

25  let's see here.

26      At some point when the backpack was recovered, if I

27  recall correctly, you told the police, at least the

28  magazine was there, meaning in the backpack, right?

JGZ-005734

```
 1        MS. GARCIA:  Relevance.  352, Your Honor.  Beyond
 2   the scope of direct.
 3        THE COURT:  Sustained.  Next question.
 4        MR. GONZALEZ:  Can we approach?  I'm not
 5   understanding what the Court thinks the scope of this is.
 6        THE COURT:  Next question, Mr. Gonzalez.  Thank you.
 7   BY MR. GONZALEZ:
 8   Q.   Well, I just want to make sure I understand, because
 9   at some point you reported the gun stolen, right?
10   A.   Yes.
11   Q.   I've looked at the police report Officer Olcomendy
12   wrote.  Have you ever seen that?
13   A.   Yes.
14   Q.   All right.  He never mentions in his police report
15   that your gun was loaded, correct?
16        MS. GARCIA:  Objection, Your Honor.  Relevance.
17   352.  And hearsay.
18        MR. GONZALEZ:  It's not offered for the truth.  It's
19   offered for what the witness knows about the report.
20        THE COURT:  All right.  Sustained.  Next question.
21   BY MR. GONZALEZ:
22   Q.   Did you ever tell Officer Olcomendy that you had, in
23   addition to the gun fully loaded with a magazine in it,
24   another magazine?
25        MS. GARCIA:  Your Honor, objection.  Objection.
26        THE COURT:  That's sustained.  And, Mr. Gonzalez,
27   remember the Court's discussion with counsel.
28        Okay.  So, ladies and gentlemen, again, remember,
```

1    whenever there's an objection and I sustain the

2    objection, you are to disregard that question.

3        Next question.

4        MR. GONZALEZ:  Your Honor, I don't think you're

5    understanding what I'm asking.

6        THE COURT:  I'm just asking you to state your next

7    question.

8        MR. GONZALEZ:  But, Your Honor, just so it's clear,

9    I'm happy to discuss with the Court the scope of this

10   examination.

11       THE COURT:  Next question.

12   BY MR. GONZALEZ:

13   Q.   You had in the backpack, when it was taken from you,

14   you had a firearm with a magazine in it, right?

15   A.   Yes.

16   Q.   And a second magazine in the backpack, right?

17       MS. GARCIA:  Relevance.  352, Your Honor.

18       MR. GONZALEZ:  She covered this in direct, Your

19   Honor, the scope of what was stolen.

20       MS. GARCIA:  I did not cover that, Your Honor.

21   Relevance.  352.

22       THE COURT:  The second magazine is not relevant,

23   Mr. Gonzalez.

24       MR. GONZALEZ:  Your Honor, there's never been a

25   motion about this or anything.

26       MS. GARCIA:  Your Honor, I ask that we not argue in

27   front of the jury.

28       MR. GONZALEZ:  Well, then let's go sidebar.

```
 1        THE COURT:  No.
 2        MR. GONZALEZ:  There's never been a --
 3        MS. GARCIA:  Your Honor, I ask that we not argue in
 4   front of the jury.
 5        THE COURT:  Mr. Gonzalez, thank you.  The second
 6   magazine is not relevant.  Next question.
 7        MR. GONZALEZ:  Okay.
 8        THE COURT:  Thank you.
 9        MR. GONZALEZ:  This is a new ruling, which I
10   strongly object.
11        MS. GARCIA:  Your Honor, I object to counsel's
12   speech.
13        THE COURT:  Noted.
14        MR. GONZALEZ:  It's not a speech, Counsel.
15        THE COURT:  Counsel, please, let's move on.  Next
16   question.  Thank you.
17   BY MR. GONZALEZ:
18   Q.   Okay.  Now, at some point -- let me just clarify
19   this.
20        Your Honor, I think we should take a break and
21   discuss the scope.
22        THE COURT:  Next question.
23   BY MR. GONZALEZ:
24   Q.   Okay.  So I believe your testimony was you did not
25   have a lockable trunk on this car; is that correct?
26   A.   Yes.  Correct.
27   Q.   Is the glove box lockable?
28   A.   No, it's not.
```

```
 1          MS. GARCIA:  Objection.  Relevance.  352.
 2          THE COURT:  Hold on.  The glove box, right?
 3          MS. GARCIA:  Yes, Your Honor.
 4          THE COURT:  Overruled.
 5  BY MR. GONZALEZ:
 6  Q.    And what model vehicle did you have?  What year was
 7  the vehicle?
 8  A.    2015.
 9  Q.    Okay.  And you made reference at one point to there
10  being some luxury devices with that vehicle, that it
11  automatically the seat comes back.  Do you remember that
12  testimony?
13  A.    Yes.
14  Q.    And you're saying that the glove box on the car you
15  have, you could not lock with your ignition key?
16  A.    I believe that's correct.  Yes.
17  Q.    When you were driving the car, traveling down the
18  coast with your family, where did you keep the Sig Sauer
19  that we've been talking about?
20          MS. GARCIA:  Relevance.  352, Your Honor.
21          THE COURT:  Sustained.
22  BY MR. GONZALEZ:
23  Q.    Well, how was it stored?
24          MS. GARCIA:  Relevance.  352.
25          THE COURT:  Overruled.
26          THE WITNESS:  It was stored in the holster, in the
27  inside of my backpack, in that inside closed compartment.
28  ////
```

```
 1    BY MR. GONZALEZ:
 2    Q.    Okay.  And I get that it was in the backpack.  Where
 3    was the backpack in the vehicle?
 4          MS. GARCIA:  Relevance.  352, Your Honor.
 5          THE COURT:  At what point in time?  When they're
 6    traveling?
 7          MR. GONZALEZ:  Yeah.  When they're on the way to
 8    San Francisco.
 9          THE COURT:  Sustained.  Next question.
10    BY MR. GONZALEZ:
11    Q.    Where was your backpack when you first parked the
12    vehicle in San Francisco?
13          MS. GARCIA:  Relevance.  352, Your Honor.
14          THE COURT:  Sustained.
15    BY MR. GONZALEZ:
16    Q.    Now, at some point, you had an encounter, you had a
17    conversation with someone that you described as a meter
18    maid or possibly security guard; do you recall that?
19    A.    Yes.
20    Q.    And can you describe that person for the jury?
21    A.    Yes.  It was a white male.  I believe he had a
22    goatee, short hair.  I believe it was -- he was wearing a
23    Polo shirt of some type.  And that's all I saw from up.
24    Q.    And now, after the car was broken into, do you
25    recall telling Bureau of Land Management investigators
26    that you were suspicious about this meter maid/security
27    guard?
28          MS. GARCIA:  Relevance.  352.  Hearsay, Your Honor.
```

```
 1          THE COURT:  Sustained.
 2   BY MR. GONZALEZ:
 3   Q.    Well, you indicated that that meter maid/security
 4   guard watched you place the backpack with the firearm in
 5   it under your seat; is that correct?
 6          MS. GARCIA:  Relevance.  352.  Hearsay, Your Honor.
 7          THE COURT:  Sustained.
 8   BY MR. GONZALEZ:
 9   Q.    Do you have any reason -- did you have any contact
10   with anybody before you left the vehicle that you
11   believed may have been involved in this auto burglary?
12   A.    Not prior to the incident, no, I didn't.
13   Q.    But is there a reason why you suspected that -- you
14   had some suspicion around the meter maid or security
15   guard?
16          MS. GARCIA:  Your Honor, assumes facts.  Irrelevant.
17   352.  Hearsay.
18          THE COURT:  Sustained.
19   BY MR. GONZALEZ:
20   Q.    You testified earlier that at the time you left the
21   vehicle, you were very safety conscious.  You were making
22   sure everything was good.  And you even spoke to this
23   security -- possible security guard.  Remember that
24   testimony?
25          MS. GARCIA:  Objection.  Misstates testimony about
26   the safety conscious context.
27          THE COURT:  Overruled.
28          THE WITNESS:  Yes.
```

1  BY MR. GONZALEZ:

2  Q.   All right.  And so, you talked to that person, and

3  you were trying to get assurances from them that what you

4  were doing was safe because you wanted to make sure

5  nobody was going to, you know -- you know, let's say, I

6  don't know, break into your car, right?

7  A.   Yes.

8  Q.   All right.  And so, did you -- do you have any

9  reason to believe that that person that you were talking

10  to was not trustworthy in any way?

11       MS. GARCIA:   Your Honor, again, relevance.  352.

12  Hearsay.  Argumentative.

13       THE COURT:   Sustained.

14  BY MR. GONZALEZ:

15  Q.   Well, you -- that meter maid/security guard made

16  representations to you about how long they would be in

17  the area, right?

18  A.   Correct.

19  Q.   And you felt comfortable from what they told you

20  that it was okay to do what you did, right?

21  A.   Based on everything, not just that one interaction.

22  Q.   Right.  So, in hindsight, looking at what happened,

23  did your opinion change about your interaction with this

24  person?

25       MS. GARCIA:   Objection, Your Honor.  Can we --

26  again, relevance.

27       THE COURT:   What's the objection?

28       MS. GARCIA:   352, Your Honor.

JGZ-005741

```
1          THE COURT:  Well, it's also speculation.
2          MS. GARCIA:  Hearsay.  Speculative.
3          THE COURT:  All right.  Next question.  It's
4   sustained.
5   BY MR. GONZALEZ:
6   Q.  Well, but you did believe -- you did indicate that
7   you believed the security guard saw you put the bag under
8   the seat, correct?
9          MS. GARCIA:  Relevance.  352.  Hearsay, Your Honor.
10         THE COURT:  Sustained.
11  BY MR. GONZALEZ:
12  Q.  All right.  Well, did anybody see you place the bag
13  under your seat before you left the car?
14         MS. GARCIA:  Your Honor, calls for speculation.
15  BY MR. GONZALEZ:
16  Q.  Or I guess I should say backpack.
17         MS. GARCIA:  Your Honor, that calls for speculation.
18  Relevance.  352.
19         THE COURT:  Sustained.
20  BY MR. GONZALEZ:
21  Q.  Now, at some point, you had a conversation with then
22  Sergeant Ravano; is that correct?  A few days after this
23  happened?
24  A.  Yes.
25  Q.  And did Sergeant Ravano ever ask you whether or not
26  the firearm you left in your car, that was stolen,
27  whether or not it was fully loaded?
28         MS. GARCIA:  Relevance.  352.  Calls for hearsay,
```

1    Your Honor.
2         THE COURT:  Overruled.
3         THE WITNESS:  Can you please repeat it now?
4    BY MR. GONZALEZ:
5    Q.    Yeah.  When you spoke to Sergeant Ravano about your
6    firearm, did you ever tell him that it was fully loaded,
7    seven plus one?
8    A.    I don't remember that.
9    Q.    All right.  Do you recall whether or not Sergeant
10   Ravano ever asked you about that?
11   A.    No, I don't remember that.
12   Q.    Do you recall Sergeant Ravano asking you about some
13   of the items that were stolen from your car?
14        MS. GARCIA:  Relevance.  352.  Hearsay, Your Honor.
15        THE COURT:  Sustained.
16        MR. GONZALEZ:  Your Honor, it's the whole purpose
17   the witness is here.
18        MS. GARCIA:  Your Honor, I'd ask that we not have
19   speeches in front of the jury.
20        THE COURT:  I think both counsel know that.
21        MR. GONZALEZ:  My speeches are much longer than
22   that, don't worry.
23        THE COURT:  All right.  I think both of you
24   understand the Court's admonishment regarding no speaking
25   objections.  That's sustained.
26        Next question, Mr. Gonzalez.  I'll give you one more
27   before we take the lunch break.
28   ////

1    **BY MR. GONZALEZ:**

2    **Q.**    When you -- when -- did Officer Ravano ask you to --

3    did he describe certain articles of clothing to you and

4    ask you if they had been stolen from you?

5        **MS. GARCIA:**  Relevance.  352, Your Honor.

6        **THE COURT:**  Sustained.

7        **MR. GONZALEZ:**  Take a break.

8        **THE COURT:**  Wait.  It's overruled.  You can ask

9    about the clothing, Mr. Gonzalez.

10        **MR. GONZALEZ:**  The question's pending.

11        **THE COURT:**  You may answer the question.

12        **THE WITNESS:**  I'm sorry.  Can you please repeat now?

13        **THE COURT:**  The question was, did Officer Ravano ask

14    you, did he describe certain articles of clothing to you

15    that had been stolen from you?

16        **THE WITNESS:**  No, he did not.  What I remember, he

17    couldn't give me details of clothing.  He was asking me

18    to give him examples of clothing that I may have had.

19        **THE COURT:**  Okay.  All right.  It's 12 o'clock.  So,

20    ladies and gentlemen, we're going to take our lunch

21    recess.  And for the jurors, first of all, again, I know

22    I sound like a bad recording, but it's so important that

23    you adhere to my admonishments.

24        Please do not talk or communicate with anybody about

25    this case.  That includes your family members, your best

26    friends, your colleagues, anyone.  Also, this case is in

27    the media every day.  Seems like every minute.  So, I'm

28    not stopping you from reading the paper, from reading the

1   Internet as to what's going on in this world, in

2   San Francisco, in California.  Regardless, I'm not

3   stopping you from reading sports articles or how many

4   Three Michelin Star restaurants we now have that's more

5   than New York or Chicago.  I'm not stopping you from

6   that.  But what I am ordering you is not to review or not

7   to look at any stories about this case, any news or news

8   stories, comments about this case, anything about this

9   case in the media, either print or the Internet or any

10  other media.

11       Also, during the lunch recess, you may want to go

12  somewhere.  And if you do go somewhere and you walk by

13  the scene where the incident occurred, please don't stop

14  and investigate.  Do what you need to do.  I'm not

15  stopping you to go to the Ferry Building to have lunch if

16  you want to have lunch there.  They have some very nice

17  restaurants.  But don't stop and investigate anywhere

18  that was discussed and shown in the courtroom.

19       And if anyone harasses you or tries to communicate

20  with you, please let me know.  So, having said that, have

21  a good lunch.

22       And for Ranger Woychowski, you're still a ward of

23  the Court.  Do not talk to anyone about your testimony,

24  only about scheduling, okay?

25       **THE WITNESS:**  Yes.

26       **THE COURT:**  So, we'll see everybody at 1:30.  See

27  you then.

28                 (Lunch recess.)

```
 1         THE COURT:  We're back on the record.  Let it
 2   reflect that all the jurors are here.  And, ladies and
 3   gentlemen of the jury, good afternoon.  Ms. Garcia is
 4   here for the People.  And Mr. Mack is here representing
 5   the Department of Interior and for Ranger Woychowski.
 6         And, Ranger, if I pronounce your name wrong, I
 7   absolutely apologize.
 8         THE WITNESS:  You are correct, sir.
 9         THE COURT:  Thank you.
10         And also present from the U.S. attorney's office,
11   Department of Justice, Mr. Robin Wall.  And good
12   afternoon to all of you.  And for the defense,
13   Mr. Gonzalez is present.  Mr. Ugarte and Mr. Hinkley is
14   here.  Good afternoon to everyone.  And I have Ms. Cuevas
15   translating for Mr. Garcia Zarate, who is also here.  He
16   has his headset on.
17         And, again, Mr. Garcia Zarate, good afternoon.  If
18   for any reason your headset isn't working and you're not
19   hearing the translation, all you have to do is let me
20   know and raise your hand, and then we'll try to remedy
21   that for you.  Okay?
22         THE DEFENDANT (Through the interpreter):  Yes.
23         THE COURT:  Is the headset working?
24         THE DEFENDANT (Through the interpreter):  Yes.
25         THE COURT:  Can you hear the translator?
26         THE DEFENDANT (Through the interpreter):  Yes.
27         THE COURT:  Very good.
28         Okay.  Mr. Gonzalez, we left off with you.
```

JGZ-005746

1       **MR. GONZALEZ:**  Thank you, Your Honor.

2       **THE COURT:**  You may proceed.

3    BY MR. GONZALEZ:

4    Q.   So, Mr. Woychowski, when Officer Olcomendy spoke to

5    you at the scene, once you had reported the auto

6    burglary, is it -- do I understand correctly that he

7    spent about an hour and 20 minutes or an hour and a half

8    at the scene?

9    A.   Yes.  Approximately.

10   Q.   Okay.  And I want to just -- I believe I was allowed

11   to ask you whether or not you told him that the firearm

12   that was taken from you was loaded, and your answer was

13   yes; is that correct?

14   A.   Correct.

15   Q.   Did you tell him at that time that in addition to

16   the firearm fully loaded being stolen, that there was an

17   additional second magazine that was also fully loaded

18   stolen from you?

19       **MS. GARCIA:**  Objection, Your Honor.  This was

20   already asked and answered.  Relevancy and --

21       **THE COURT:**  No, that was asked, but it wasn't

22   answered.  I'm going to allow that.  Go on.

23       **THE WITNESS:**  I don't remember that.

24   BY MR. GONZALEZ:

25   Q.   Okay.  Now, you did at some point when the items

26   were recovered, you indicated to Officer Olcomendy, you

27   said something like at least -- or it might have been a

28   different officer, but you said something about at least

1  the magazine was there.  Do you recall that?

2  **A.**   I did.

3  **Q.**   And you had some surprise because the officers

4  giving you back your backpack apparently hadn't searched

5  it, from what you could gather?

6      **MS. GARCIA:**  Relevance.  352, Your Honor.

7      **THE COURT:**  That's sustained.

8  BY MR. GONZALEZ:

9  **Q.**   Well, why did you say that?

10      **MS. GARCIA:**  Relevance.  352.

11      **THE COURT:**  That's also sustained.  Also sustained.

12      **MR. GONZALEZ:**  Are you looking at me or --

13      **THE COURT:**  No, no.

14      **MR. GONZALEZ:**  I'm sorry.  I heard you, so I

15  wasn't --

16      **THE INTERPRETER:**  The interpreter wasn't able to

17  hear.

18      **MR. GONZALEZ:**  Oh, okay.

19  **Q.**   Now, concerning some other items that were taken.

20  If I understand correct, there were a number of personal

21  clothing items that were taken that included shorts,

22  jeans, a variety of shirts and T-shirts; is that correct?

23  **A.**   Yes, I believe so.

24  **Q.**   And those were items that were recovered at the same

25  time you got the second magazine back; is that correct?

26  **A.**   No.

27  **Q.**   Did you ever receive those items back?

28  **A.**   Those clothing items you spoke of?

1  Q.    Yes.

2  A.    No.

3  Q.    Okay.  I have a note that they were -- oh, I'm

4  sorry.  Maybe I'm reading this incorrectly.  My

5  apologies.

6  A.    Yes, sir.

7  Q.    So those items were not recovered.

8        There is -- now, I understand that the credit cards

9  that were stolen from you, those were recovered; is that

10 correct?

11 A.    Yes, that is correct.

12 Q.    And you had an orange and black duffel bag also

13 taken from the vehicle.  That was not recovered, correct?

14 A.    Correct.

15 Q.    Okay.  Now, I had asked you under direct

16 examination -- there's so much paper, but I had asked you

17 whether or not you were -- I think I said something about

18 when you returned to your car, and you later spoke to

19 investigators from the Bureau of Land Management, you

20 could not remember if the door was unlocked when you came

21 back or whether you had to unlock it as you went around

22 the vehicle; do you remember that?

23 A.    Yes, I do.

24 Q.    Is that a true statement?

25 A.    What I explained to the investigator was that when I

26 arrived back at the vehicle, I don't remember hitting the

27 lock because I was so focused on finding if my backpack

28 was still in there or not.  However, I do remember, as I

1  always do, lock my vehicle every time I walk away from
2  it.  I usually hit it twice to hear --
3  Q.    I'm asking a different question, though.
4        MS. GARCIA:  Your Honor, let him finish the answer.
5        THE COURT:  Yeah, you have to let him finish the
6  answer.
7        MR. GONZALEZ:  All right.
8        THE COURT:  Are you finished, Ranger?
9        THE WITNESS:  No.  I was saying that I know you hit
10 it twice, it beeps.  And I usually do two more times so I
11 hear two beeps.  That's just my mental note.
12 BY MR. GONZALEZ:
13 Q.    Yeah.  I heard that.  I got that.  I'm asking you a
14 different question, and I want to make sure I ask it
15 properly, because I think what I did was I asked you
16 whether or not you remembered saying that.  So I want to
17 make sure not -- the question isn't did you say it today
18 earlier but whether or not it, in fact, happened.
19        When you got back to the vehicle, when you were
20 reporting what happened, you didn't remember whether or
21 not the door was unlocked as you opened it or if you had
22 to unlock it when you went around the vehicle, true?
23 A.    Are you asking to the officer that I first reported
24 it to?
25 Q.    Yes.
26 A.    Yes.  I didn't remember at the time.
27 Q.    Now, you've -- at what point, on what date, if you
28 recall, were you informed that you would not be facing

```
 1   criminal charges?
 2        MS. GARCIA:  Objection.  Relevance.  352,
 3   Your Honor.
 4        THE COURT:  Sustained.
 5   BY MR. GONZALEZ:
 6   Q.   When you -- when the Bureau of Land Management gave
 7   you this Sig Sauer firearm, was it a new firearm?
 8   A.   I know it was purchased that year.  I received it --
 9   it was -- appeared like a new -- like new condition.  I
10   don't know how much had been fired of it, but yes.
11   Q.   Did it have a safety manual with it?
12   A.   Yes.
13   Q.   Do you recall -- well, presumably, you read the
14   safety manual?
15   A.   Not cover to cover, no.
16   Q.   Okay.  Did you read a portion of the safety manual
17   that indicated that when traveling in a vehicle, the gun
18   should be kept unloaded?
19        MS. GARCIA:  Relevance.  352.  Hearsay, Your Honor.
20        THE COURT:  Overruled.
21        THE WITNESS:  Please repeat.
22   BY MR. GONZALEZ:
23   Q.   Yeah.  Well, let me mark the --
24        THE COURT:  Why don't you ask the question first.
25        MR. GONZALEZ:  Okay.
26        MS. GARCIA:  I object to the manual coming in.  It's
27   hearsay.  He's a law enforcement officer.  That doesn't
28   apply to him.
```

1       **THE COURT:**  I don't -- I just want Mr. Gonzalez to

2   ask the question.

3       **MR. GONZALEZ:**  I just want to make sure I got the

4   language right.

5       **THE COURT:**  And I want to make sure you ask the

6   question.

7   **BY MR. GONZALEZ:**

8   **Q.**   So did you read the portion in the manual that said

9   when transporting your firearm, keep it unloaded for your

10  safety and for the safety of others?

11  **A.**   No.  I don't remember reading that.

12  **Q.**   Okay.  Now, you've talked a lot about your training

13  in dealing with firearms, and what I want to ask you is

14  whether or not part of your training is to prevent

15  unintentional discharges.

16      **MS. GARCIA:**  Objection.  Relevance.  352.

17      **THE COURT:**  Sustained.

18  **BY MR. GONZALEZ:**

19  **Q.**   You testified in direct exam that you have been

20  trained on firearms; is that correct?

21  **A.**   Yes.

22  **Q.**   And you pointed out parts of the Sig Sauer that are

23  there for safety purposes, such as the decocking lever,

24  right?

25  **A.**   Yes.

26  **Q.**   And, well, are there any features of the Sig Sauer

27  that are there to prevent unintentional discharges?

28      **MS. GARCIA:**  Relevance.  352.

1        THE COURT:  Overruled.

2        THE WITNESS:  No.  There's no safety mechanism, no.

3  BY MR. GONZALEZ:

4  Q.    Right.  There's no external safety on it, correct?

5  A.    Correct.

6  Q.    And the whole point of having this gun is that you

7  can fire it immediately, true?

8  A.    Correct.

9  Q.    Now, you talked about the way you normally carry it

10  in your vest.  Is that like a bulletproof vest type vest?

11  A.    Yeah.  It's a ballistic exterior vest, yes.

12  Q.    Now, when you were asked questions about whether or

13  not this gun had a hair trigger, you answered that you

14  didn't believe that it did.  And when you were asked why,

15  you said because you bought it this way, that this is the

16  way you had purchased it from the manufacturer, and you

17  had gotten it in that condition.  Do you recall that?

18        MS. GARCIA:  Misstates testimony, Your Honor.

19        THE COURT:  Sustained.

20  BY MR. GONZALEZ:

21  Q.    Okay.  You testified that you don't use the phrase

22  "hair trigger"; is that true?

23  A.    Yes.

24  Q.    Right.  And so, you indicated that -- or I think you

25  opined that that might be something that related to

26  competitive shooting, right?

27  A.    That's a guess.  Yes.

28  Q.    And then you said, it didn't have a hair trigger

1    because you got -- you bought it that way; it came that

2    way from the manufacturer?

3         **MS. GARCIA:**  Misstates testimony, Your Honor.

4         **THE COURT:**  Sustained.

5    **BY MR. GONZALEZ:**

6    **Q.**   What did you say about it coming this way from the

7    manufacturer?

8         **MS. GARCIA:**  Objection.  Vague, Your Honor.

9         **THE COURT:**  Overruled.

10        **THE WITNESS:**  First of all, I did not purchase the

11   firearm.  You've said that twice.  I didn't purchase the

12   firearm.  The firearm is purchased by the bureau and

13   issued to me.  And as such, being issued to me, there

14   were no known, to me, modifications of that weapon.

15   **BY MR. GONZALEZ:**

16   **Q.**   I got it, but I'm just talking about the hair

17   trigger aspect of it.  Let me just ask you differently

18   because maybe I misheard, and the transcript will speak

19   for itself.  We can look at that later or something.  But

20   let me just ask you this.

21        You've talked about the gun being in both single-

22   and double-action mode, right?

23   **A.**   Yes.

24   **Q.**   So let's talk about it being in single-action mode

25   for a minute.  When it is in single-action mode, do you

26   believe it has a normal trigger pull, a heavy trigger

27   pull, or a light trigger pull?

28   **A.**   I believe it has a lighter than a double action

1  trigger pull.

2  **Q.**  All right.  That's not what I'm asking you.  But

3  let's ask it this way.  When the gun is in double-action

4  mode, are you saying that double-action mode for this

5  model of the Sig Sauer, is that a light, normal, or heavy

6  trigger pull?

7      **MS. GARCIA:**  Objection.  Vague as to what is meant

8  by light, medium, or heavy.

9      **THE COURT:**  Well, you know what, he can answer that

10  if he understands the question.

11      **THE WITNESS:**  I think it would be on the side of

12  medium to heavy.  It takes some pressure to pull the

13  trigger in double action, for sure.

14  **BY MR. GONZALEZ:**

15  **Q.**  And so, single action being less than half the

16  trigger pull of double action, would you agree that it's

17  a light trigger pull?

18      **MS. GARCIA:**  Objection as to the -- vague as to

19  "light."

20      **THE COURT:**  You can answer the question -- it's

21  overruled -- if you understand it.

22      **THE WITNESS:**  My understanding -- my interpretation

23  of it is that it's a lighter trigger pull than in double

24  action.  That's what I view it.

25  **BY MR. GONZALEZ:**

26  **Q.**  I got that.  But when I asked you whether or not how

27  would you -- you would characterize double action, you

28  said -- what did you say?

1    A.    I said it feels to be a medium to heavy trigger

2    pull, based on your question.

3    Q.    All right.  And you're aware that the manufacturer

4    specifications for single action are less than half the

5    specifications in double action?

6    A.    I'm not aware of that --

7        MS. GARCIA:  Hearsay.

8        THE WITNESS:  -- specifically.

9        MS. GARCIA:  Withdrawn.

10   BY MR. GONZALEZ:

11   Q.    You're not aware that in double-action mode this gun

12   is around ten-pound trigger pull?

13   A.    No.  And you said that single action is half of

14   that.  I'm not aware that it's half of that.

15   Q.    It's actually less than half.  So you're not aware

16   that single action is typically under five pounds for

17   this model from the factory?

18   A.    No.

19        MS. GARCIA:  Your Honor, hearsay and assumes facts.

20        THE COURT:  It's overruled.  It's based on his

21   understanding and knowledge.  If he doesn't know, he

22   doesn't know.

23        MR. GONZALEZ:  Great.  And I'm trying to avoid from

24   having to call him again later in the trial.  So we can

25   do it that way as well.

26   Q.    Now, Ms. Garcia asked you whether or not you were

27   aware of one of your colleagues ever having had a P239

28   discharge accidently.  Do you recall that --

```
 1    A.    Yes.
 2    Q.    -- question?
 3          And you said none that you're aware of, correct?
 4    A.    Correct.
 5    Q.    Now, just to be clear, you're talking about -- I
 6    mean, you work with seven other colleagues in an area of
 7    1.4 million acres to patrol that area?
 8          MS. GARCIA:  Your Honor, now we're in 2015.  Vague.
 9          THE COURT:  I don't know where this is going, but
10    I'm going to allow it.  It's overruled.  Go on.
11          THE WITNESS:  So, may I ask, I mean, you're
12    referring to now?  Because our numbers fluctuate greatly.
13    BY MR. GONZALEZ:
14    Q.    Was it more?  Was it less?
15    A.    So back then it was much less, and now it's more.
16    So --
17    Q.    So --
18    A.    -- I can answer either for you.
19    Q.    Why don't you tell me both.
20    A.    Yeah.  So in 2015, there were four of us.
21    Q.    Okay.
22    A.    And now, there's currently nine of us.
23    Q.    Okay.  So when you answered that question, though,
24    you're saying that you and your -- what you know of your
25    eight colleagues, there has not been an accidental
26    discharge, right?
27    A.    Yes.
28    Q.    You're not -- you've not studied the issue
```

1   throughout the Department of Interior or federal

2   government or anything like that, right?

3   A.    No, I have not.

4   Q.    Now, when you say that you're not allowed to modify

5   the firearms that are issued to you, would it be accurate

6   to say you're not allowed to modify them without approval

7   of the agency?

8   A.    I'm personally not allowed to modify any of my

9   weapons, as any modifications have to be done to it by an

10   armorer completely.

11   Q.    Does your -- when you were describing your holster,

12   your holster doesn't lock, does it?

13        MS. GARCIA:    Your Honor, objection.    For the

14   secondary weapon or primary?

15        THE COURT:    We're only talking about the primary

16   because the secondary is not at issue.    Oh, I see.    I see

17   what you mean.

18        MR. GONZALEZ:    They call it the secondary weapon.

19        THE COURT:    I got it.    Thank you, Mr. Gonzalez.

20        You may answer the question.

21        THE WITNESS:    I'm sorry.

22   BY MR. GONZALEZ:

23   Q.    I'm assuming right now that we're talking about the

24   gun that was stolen from you.    That's the only gun you've

25   mentioned a holster about, right?

26   A.    That is correct.

27   Q.    And when I heard your testimony, you made it sound

28   like it had some device that snapped shut or something,

1    right?

2    **A.**    It has a snap close on it, yes.

3    **Q.**    Now, that --

4    **A.**    With a button.

5    **Q.**    -- that is not locked, is it?

6    **A.**    No.

7    **Q.**    Okay.  And the zippers on your backpack are not

8    locked or anything?

9    **A.**    Correct.

10   **Q.**    Okay.  Now, in direct examination, you talked about

11   when you first saw the parking enforcement officer, or

12   what you believed to be a parking enforcement official of

13   some kind -- or let me say that differently.

14         I guess what you've described as a meter

15   maid/security guard, you first became aware of them

16   because you sensed their presence; is that correct?

17   **A.**    Yes, I believe that's correct.

18   **Q.**    And so, what were you doing when you sensed their

19   presence?

20   **A.**    At that time, that's when I was placing my backpack

21   underneath the seat and retrieving my wallet.

22   **Q.**    And so, while you were doing that, you turned

23   around, and you saw that individual standing there?

24   **A.**    No.  He was in a car.  He wasn't standing.  But,

25   yes, he was stationary in the -- whatever vehicle he was

26   in.

27   **Q.**    Looking towards you?

28   **A.**    Yes.

1    Q.    Let me ask you this, Mr. Woychowski.   Do you believe
2    you bear any responsibility for what happened with your
3    firearm a few days later?
4        MS. GARCIA:   Objection, Your Honor.   352.
5    Relevance.
6        THE COURT:   Sustained.
7        So, ladies and gentlemen, again, remember, if I
8    sustain an objection, you are not to consider that
9    question for any reason.   And if I indicate that
10   testimony will be stricken, you are not to consider that
11   for any reason.   Off the record.
12              (Discussion off the record.)
13       THE COURT:   Back on the record.
14       MR. GONZALEZ:   I don't have anything further.
15       THE COURT:   Okay.   Any redirect?
16       MS. GARCIA:   No, Your Honor.
17       THE COURT:   Okay.   Thank you, Officer Woychowski or
18   Ranger Woychowski or Mr. Woychowski.   Have a good day.
19       THE WITNESS:   Thank you, sir.
20       THE COURT:   You're excused subject to any recall if
21   we need you, okay?
22       THE WITNESS:   Yes, sir.
23       THE COURT:   We're off the record.
24              (End of requested portion.)
25
26
27
28

```
 1   State of California              )
                                      )
 2   County of San Francisco          )

 3

 4        I, Paula Shi, Official Reporter for the Superior

 5   Court of California, County of San Francisco, do hereby

 6   certify:

 7        That I was present at the time of the above

 8   proceedings;

 9        That I took down in machine shorthand notes all

10   proceedings had and testimony given;

11        That I thereafter transcribed said shorthand notes

12   with the aid of a computer;

13        That the above and foregoing is a full, true, and

14   correct transcription of said shorthand notes, and a full,

15   true and correct transcript of all proceedings had and

16   testimony taken;

17        That I am not a party to the action or related to a

18   party or counsel;

19        That I have no financial or other interest in the

20   outcome of the action.

21

22   Dated: 11/1/2017

23
                            Paula Shi
24                          Certified Shorthand Reporter
                            CSR No. 13358
25

26

27

28
```