Pages **1 - 121**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,              )
                                       )
            Plaintiff,                 )
                                       )
    VS.                                )          **NO. CR 17-00609 (VC)**
                                       )
JOSE INEZ GARCIA-ZARATE,               )
                                       )
            Defendant.                 )
_____    )

                            San Francisco, California
                            Wednesday, January 8, 2020

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        DAVID L. ANDERSON
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
            BY:  **ERIC CHENG**
                 **KEVIN J. BARRY**
                 **ASSISTANT UNITED STATES ATTORNEYS**
For Defendant:
                        LAW OFFICES OF MARIA BELYI
                        Pier 5 Law Offices
                        506 Broadway
                        San Francisco, California 94133
            BY:  **MARIA BELYI**
                 **ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

1   **APPEARANCES**:   (CONTINUED)

2   For Defendant:

3                                       LAW OFFICES OF J. TONY SERRA
                                        506 Broadway
                                        San Francisco, California 94133

4                              BY:   **J. TONY SERRA**
                                     **ATTORNEY AT LAW**

5

6   Also Present:   Carol Rhine-Medina, Spanish Interpreter
                    Daniel Navarro, Spanish Interpreter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1   Wednesday - January 8, 2020                        10:05 a.m.

 2                      P R O C E E D I N G S

 3                          ---o0o---

 4        THE CLERK:  Please be seated.  Calling Case

 5   Number 17-CR-00609, USA versus Jose Inez Garcia-Zarate.

 6        Counsel, please step forward and state your appearances

 7   for the record.

 8        MR. CHENG:  Good morning, Your Honor.  Eric Cheng and

 9   Kevin Barry on behalf of the United States.

10        THE COURT:  Good morning.

11        MS. BELYI:  And good morning, Your Honor.  Maria Belyi

12   and J. Tony Serra here on behalf Mr. Garcia-Zarate, who is

13   present before the Court, in custody, and being assisted by a

14   Spanish-speaking interpreter.

15        MR. SERRA:  Good morning.

16        THE COURT:  Good morning.

17        Good morning, Mr. Garcia-Zarate.

18        Okay.  Let me see.  Obviously, there are a number of

19   things --

20        THE CLERK:  We have the interpreters.

21        THE COURT:  Oh, I'm sorry.  The interpreters need to

22   make an appearance.  I apologize.

23        INTERPRETER RHINE-MEDINA:  Carol Rhine-Medina,

24   certified Spanish interpreter.  I have been sworn in the

25   matter.
```

**PROCEEDINGS**

1        **INTERPRETER NAVARRO:**  Daniel Navarro, certified

2   Spanish interpreter.  I have been sworn in the matter as well.

3        **THE COURT:**  Hello.

4        A number of things to talk about.  I wanted to, maybe, get

5   a couple of very small things out of the way first.

6        One is that there was a request somewhere, I don't know if

7   it was in the pretrial -- joint pretrial statement or something

8   like that, for the creation of an audio backup of testimony

9   given in a different language.

10        We're not able to do that.  Our audio system is unreliable

11   enough as it is that it's not something that we are going to

12   use as part of a formal part of the trial.  We try to use it

13   for civil proceedings, and not even civil trials but, you know,

14   argument in civil cases and stuff in lieu of court reporters,

15   but it's too unreliable to be using for trials.

16        So if you have any concerns, either side has any concerns

17   about the -- you know, the translations given by the

18   interpreters, by the Court-appointed interpreters, the thing to

19   do is to hire your own, quote/unquote, check interpreter -- I

20   think is what it's called -- where they can alert you where

21   they think there has been an interpretation problem and then

22   you can make an objection about that and then we can discuss

23   that outside of the presence of the jury.  So that's one small

24   issue.

25        Let me see if -- there are other, a couple of other small

**PROCEEDINGS**

1   things we can get out of the way before we jump into motions in

2   limine and jury instructions and stuff like that.

3       Oh.  I want to make -- let me just make one thing clear to

4   the Government.  Any prior statement you want to use, any video

5   you want to use any audio you want to use, I want a complete

6   paper and electronic copy of the transcript for everything.

7       So, for example, there is -- let me see.  So first -- I

8   can't remember what it is.  I think it might be the

9   interrogation or it might be the ABC interview.  I can't

10  remember.

11      We have not been provided a full electronic copy of the

12  transcript of that, and I don't see how I can assess whether,

13  you know, the snippets that you want to introduce are

14  appropriate to introduce without having the entire transcript.

15  And I want both electronic copies and paper copies.

16      So make sure we have all that as soon as possible.

17          **MR. CHENG:**  Yes, Your Honor.

18          **THE COURT:**  For anything that you want to introduce.

19          **MR. CHENG:**  Yes, and I believe --

20          **THE COURT:**  Obviously, the video, if it's video

21  recorded or audio, if there is audio, I need all of that as

22  well.

23          **MR. CHENG:**  Yes, Your Honor.  We'll provide that.

24      We have provided the police interview transcripts and

25  video, but we have not provided the complete copy of the ABC

1    video transcript, and we'll provide that.

2         **THE COURT:**  And the ABC interview, by the way, is

3    almost certainly going to be excluded.  We can talk about it

4    further, but that -- to me, almost certainly would be

5    inappropriate to introduce at trial.  But we'll -- we can talk

6    about that further.

7         Let me see.  Other little things.  What about exhibits?

8    Like all the photos, for example, that you want to use.  Do we

9    have those yet?

10        **MR. CHENG:**  No, Your Honor.  The exhibits in their

11   entirety will be provided, I believe, on Friday, under your

12   standing order.  So those will all be delivered to the Court in

13   a complete set, in binders as well as disks for any digital

14   media.

15        **THE COURT:**  Okay.  And as you can tell from the motion

16   in limine rulings, some of the photos that you were intending

17   on using, you're not going to be able to use.  But, you know,

18   perhaps in the discussions that we have here, in the discussion

19   we have here today, it will become apparent that there are some

20   remaining disputes on whether some of the photos can be used.

21   And it might make sense to get us those earlier, so we can look

22   at the photos and assess.  But, anyway, we can get to that.

23        Another small thing, I would like to set, you know, there

24   was a previous trial, right, and there was -- I assume there

25   was also prior testimony by a number of these witnesses at,

**PROCEEDINGS**

 1  like, grand jury testimony, or preliminary hearing testimony in

 2  the state court proceeding, or something like that; is that

 3  right?

 4       **MR. CHENG:**  There is testimony from a preliminary

 5  hearing, as well as the trial testimony from a subset of the

 6  witnesses we intend to call in the state court proceedings;

 7  that's correct.

 8       **THE COURT:**  Okay.  One of my trial pet peeves is

 9  impeaching witnesses with prior testimony.  Usually, it comes

10  up in civil trials with, you know, prior deposition testimony

11  or whatever.  I would like to set some ground rules for this

12  trial for how to impeach witnesses with prior testimony, and I

13  want to see if anybody has any objections to those ground

14  rules.

15       I think, you know, common problem in trials is that

16  lawyers don't know how to properly impeach witnesses with prior

17  testimony.  So they will -- the lawyer might start off by

18  asking a question about their prior testimony, instead of just

19  asking the question, and only if they answer the question

20  inconsistent with the answer they previously gave will the

21  lawyer raise the prior testimony.  That's how it's supposed to

22  be done.

23       Oftentimes lawyers just go straight into asking people

24  about what they said in their prior testimony.  That's not

25  appropriate.

**PROCEEDINGS**

1          Also, sometimes lawyers will ask a witness a question,

2     "Were you walking on the left side of the street?"

3          And the witness says "Well, no, I think actually I was

4     walking on the right side of the street."

5          And then the lawyer will paraphrase the witness' prior

6     testimony, attempt to paraphrase the witness' prior testimony,

7     which the lawyer believes is incomplete or inconsistent.  And

8     that also, I think, is not an appropriate way to do it.

9          I think the only appropriate way to impeach a witness with

10    prior testimony is to ask the witness a question.  "Isn't it

11    true that you were walking on the left side of the street?"

12         And if the witness says "No, I think I was walking on the

13    right side of the street," then you say "Your Honor, I would

14    like to read" -- or you can of course ask the witness "Didn't

15    you testify on this prior occasion," and "Weren't you under

16    oath," and "You know, did you attempt to answer all the

17    questions truthfully," without getting into the substance of

18    it.

19         And the witness says "Yes," then you say "Your Honor, I

20    would like to read page 323, lines 4 through 17 of the

21    transcript of the proceeding that took place on such and such a

22    date.

23         And I have a copy of that.  You make sure that I have a

24    copy of that in front me.  You give me an opportunity to look

25    at it.  You give opposing counsel an opportunity to look at it

**PROCEEDINGS**

1   and make any objection to reading that.  And only after that do

2   you read it.  And you read it verbatim.  You don't try to

3   paraphrase what they said.

4        Then, if you want to ask the witness follow-up questions

5   about it, after having read it into the record, you can.

6   Although I find most good lawyers, good trial lawyers, don't do

7   that.

8        And, I mean, maybe all this sounds rudimentary to you, but

9   in my five years on the bench, I have almost never seen a trial

10  lawyer do it correctly.

11       And what always happens is it results in confusion and the

12  witness doesn't know what the lawyer is talking about.  There

13  is a confusing back and forth.  There are objections and it

14  wastes a bunch of time and causes the jury to be confused.

15       And so I want to avoid that, because I anticipate that

16  there may be a number of instances in which witnesses are being

17  impeached or the lawyer attempts to impeach the witness with

18  prior testimony.  And so I want to establish firm ground rules

19  about how that happens.

20       Does anybody have any objection to that, or any questions

21  about that?

22       **MR. SERRA:**  Your Honor, what the Court has said is the

23  norm and, obviously, we will follow it.  But let me postulate a

24  situation where, perhaps, it won't be necessary to ask the

25  question.

**PROCEEDINGS**

 1      Let's hypothesize -- I'll make it a different kind of an

 2 issue -- that the prosecution asks a witness "What color was

 3 the car?"  We'll pretend it's a getaway car.

 4      And a witness says, you know, "Green."

 5      And then the prosecution says "Well, light green or dark

 6 green?"

 7      And he says "Light green."

 8      "The whole car was green?"

 9      "The whole car was green."

10      Then I come up.  I have a prior inconsistent statement

11 where the witness previously had said the car was yellow.  Do I

12 have to ask all over again, or can I use the foundation that's

13 already been laid by the prosecution?  And immediately -- and I

14 understand, you know, giving it to you, having you look at it

15 and showing how it's inconsistent, et cetera.  That's all easy.

16 But do I have to reask the questions in that situation?

17          THE COURT:  No.  But you can say "You testified on

18 direct" --

19          MR. SERRA:  Yes.  Got you.

20          THE COURT:  -- "that the car was green."  That's all.

21          MR. SERRA:  That's all, yes.

22          THE COURT:  Does anybody have any concerns or

23 questions about that?

24          MR. BARRY:  No, Your Honor.  I think we will have --

25 there may be some debate about whether something is

**PROCEEDINGS**

1  inconsistent.  And if the Court and we have the transcript that

2  they are trying to use to impeach, that will be helpful.

3  **THE COURT:**  That's right.  That's why the -- if you

4  think there is a possibility that you are going to impeach a

5  witness with prior testimony, you have to make sure that I have

6  that prior testimony in front of me, and that the opposing side

7  has that prior testimony in front of them.  That's your

8  responsibility.

9  And it's your responsibility if you plan to do it.

10  And if you haven't done that, then you're not going to get

11  to impeach them with your -- you're not going to get to impeach

12  the witness with the prior testimony.

13  Everybody has to be ready.  The other side has an

14  opportunity to object.  Oftentimes, there is nothing

15  inconsistent about the prior testimony, and the opposing side

16  says "Sure.  Go ahead; read it."

17  And that's fine if you want to do that.  Or if you want to

18  object, that's fine.

19  You know, I have, in the past, shut down attempts to read

20  prior testimony that is not inconsistent.  But, you know,

21  usually we just let the jury -- usually the jury knows whether

22  it's inconsistent or not.  And the jury gets very annoyed if a

23  lawyer tries to pretend that something is inconsistent when

24  it's not.

25  But anyway, I want though -- it sounded like nobody has

**PROCEEDINGS**

 1  any concerns or objections about those being the ground rules

 2  for impeaching witnesses with prior testimony.

 3      **MR. BARRY:**  No concerns by the Government, Your Honor.

 4  But two further questions.

 5      What if -- this is more from the defense perspective, I

 6  think.  But what if the defense is trying to elicit something

 7  that wasn't brought up on direct and that -- but was in prior

 8  testimony.  Like, you know, we focus narrowly on the witness

 9  statement and the defense wants to get into something

10  additional that was testified to in state court.  What would be

11  the mechanism for that?

12      **THE COURT:**  What I just said.  You ask them the

13  question on -- you ask them a question on cross-examination and

14  they give an answer.  And then, if that answer is inconsistent

15  with their prior testimony, then they can impeach them with the

16  prior testimony.

17      **MR. BARRY:**  And then, the other wrinkle is, if we have

18  video of the person's prior testimony we want to play the

19  video.  I mean, you'll have the -- Your Honor and the defense

20  will have the clips, but I guess it includes the, sort of, same

21  procedure.

22      **THE COURT:**  "Your Honor, I wish to play video of

23  page 323, lines 4 through 17 of the prior testimony given on

24  such and such a date."

25      So you're not saying "the prior state court trial."

**PROCEEDINGS**

 1   You're saying "the prior proceeding," you know, "that took

 2   place on such and such a date."

 3        And then we have -- I have a written transcript in front

 4   of me that you've provided.  They have a written transcript in

 5   front of them.  We can look at what you're proposing to play,

 6   and then I either say you can play the video or you can't play

 7   the video.

 8            **MR. BARRY:**  Okay.  Thank you.

 9            **THE COURT:**  Anything else?

10   You look like you're thinking.

11            **MR. SERRA:**  I always look like I'm thinking.  That's

12   because I have a difficult time thinking.

13            **THE COURT:**  Okay.

14            **MR. SERRA:**  This is what I was thinking:  The way the

15   prosecution framed the issue is that something different is

16   going to be gone into and here, you know --

17            **THE COURT:**  In cross.

18            **MR. SERRA:**  -- it's clear with you.  I assume that if

19   there is an objection, it's out of the scope of direct, you

20   would entertain that objection, rule on it, before we get to

21   whether or not he is going to use it.

22            **THE COURT:**  Yeah.

23            **MR. SERRA:**  Okay.

24            **THE COURT:**  Now, but on that, I mean, as I think I

25   said on the order that I put out on the motions in limine, I

**PROCEEDINGS**

1  mean, you know, I don't want a situation where you are forced

2  to recall a government witness because you felt like something

3  was beyond the scope on cross.

4      In other words, if you want to get into it, if you want to

5  get into something with them, get into it with them so that we

6  don't have to call them later on.

7      **MR. SERRA:**  But then would that be calling my own

8  witness out of order so that I couldn't cross, I would have to

9  use only direct?

10     **THE COURT:**  No.  My -- in other words, the way I tend

11 to do it at trial is to be fairly loose on, sort of, the

12 subject matter of cross-examination, so that we don't have to,

13 you know, call the witness again.

14     **MR. SERRA:**  I completely agree.  It saves a lot of

15 time.

16     **THE COURT:**  So when in doubt, I tend to overrule those

17 objections about beyond the scope of direct.

18     **MR. SERRA:**  I understand.  As long as I get cross and

19 not take them on -- I have had judges say that:  Well, okay if

20 you want to get it in, something different, it's your witness

21 you have to do only direct.

22     **THE COURT:**  No.  I mean, I suppose there are some

23 lines that could be crossed where I might think that that needs

24 to happen, but I never felt the need to do that.

25     **MR. SERRA:**  Okay.

**PROCEEDINGS**

1      **THE COURT:**  Okay.  Anything else on that issue?  No?

2  Okay.

3      I'm trying to decide if it makes more sense for the

4  Government to give me a list of the witnesses they intend to

5  call now, and a description of their testimony because maybe

6  that would inform our discussion of the motions in limine, or

7  whether we should get right into the motions in limine.

8      Why don't you rattle off your witnesses and give me a

9  description of what they are going to testify to?

10      **MR. SERRA:**  Your Honor, are they giving this list in

11  the order they are going to be called; is that part of your

12  request?

13      **THE COURT:**  I think it's probably too early to make

14  them do that but, to the extent they can, it would be nice.

15      **MR. CHENG:**  Yes, Your Honor.  At this time the

16  Government currently intends to call the following witnesses --

17  and we'll do it in alphabetical order.

18      First, Linda Abuan from the San Francisco Police

19  Department Criminalistics Laboratory.

20      **THE COURT:**  How do you spell that last name?

21      **MR. CHENG:**  A-b-u-a-n.

22      **THE COURT:**  Okay.

23      **MR. CHENG:**  She will be -- we expect that she will be

24  qualified as an expert in gunshot residue analysis and will

25  testify about the analysis she conducted on the gunshot residue

**PROCEEDINGS**

1    in this case.

2           **THE COURT:**  Okay.  And the gunshot residue from --

3           **MR. CHENG:**  From the defendant.

4           **THE COURT:**  Okay.

5           **MR. CHENG:**  Next there are two officers that we may

6    call; one may obviate the need for the other.  The first is

7    Andrew Bryant from the San Francisco Police Department.  And

8    the second is Brett Grennell, from the San Francisco Police

9    Department.  Both --

10          **THE COURT:**  What was the second name?

11          **MR. CHENG:**  I'm sorry, Your Honor.  Brett Grennell,

12   G-r-e-n-n-e-l-l.

13          **THE COURT:**  Okay.

14          **MR. CHENG:**  Both officers were present at the very

15   moment that the defendant was arrested on June 1st, 2015.

16          **THE COURT:**  Okay.  What are they going to testify

17   about?

18          **MR. CHENG:**  They will testify as to what they heard

19   from other police officers, the reason for looking for the

20   defendant, and then the actual process of finding the

21   defendant, arresting him, and securing the defendant for

22   gunshot residue.

23          **MR. SERRA:**  I'm taking that the hearsay is not offered

24   for the truth of the matter asserted, only to show what the

25   officers did as a consequence of hearing it.

1          **THE COURT:**  That's how I took it as well.

2          **MR. SERRA:**  We'll get to that later.

3          **THE COURT:**  You don't need to object or even seek

4    clarification now.

5          **MR. SERRA:**  It's too early.

6          **THE COURT:**  You'll have plenty of opportunity to do

7    that.  Okay.

8       And that evidence, present at the moment they arrested

9    him, why they were looking for him, how does that relate to

10   what you need to prove in this case?

11         **MR. CHENG:**  Well, Your Honor, with respect to the

12   issue of possession of the firearm, again, the very first part

13   of the story is there was a shooting.  There were eyewitnesses.

14   And these are some of the additional witnesses we'll describe.

15      There were eyewitnesses that were drawn to observe at the

16   scene that there was a shooting, because of the shooting.  And

17   these eyewitnesses observed and specifically identified the

18   defendant in relation to the shooting.  So that identification

19   was provided to police.  And then the police, in turn, were

20   specifically looking for this potential shooter.

21      That explains -- that's the reason to explain why they are

22   looking for the defendant, as well as what they were doing in

23   relation to specifically searching for the defendant at this

24   particular time.

25      And then, of course, the arrest itself and the bagging of

**PROCEEDINGS**

1  the defendant's hands for gunshot residue is relevant to

2  possession, as well as gunshot residue, we submit, will be

3  relevant to the issue of possession as well.

4       **THE COURT:**  Okay.  I assume that putting aside the

5  bagging and the gunshot residue -- which was obviously relevant

6  and seems like it's going to be a disputed issue from what I

7  can tell -- the stuff about there was a shooting, they were

8  looking for him, people identified him, none of that is

9  disputed in this case; right?

10      **MR. SERRA:**  I'm going to be objecting to hearsay, you

11 know.  If someone tells an officer you know, "I saw X, Y, and

12 Z"--

13      **THE COURT:**  No, but what I'm saying is -- I know there

14 may be a hearsay issue in there.  But I'm asking a more

15 foundational question, which is:  Nobody is going to argue, I

16 take it, that there wasn't a shooting and that they weren't

17 looking for Garcia-Zarate, and nobody is going to argue that it

18 was not legitimate to be looking for Garcia-Zarate.

19      I mean, none of that is in dispute in this case; right?

20 And so --

21      **MR. SERRA:**  We had a motion to suppress on it, but

22 that's been ruled on.  So at this juncture, no dispute.

23      **THE COURT:**  Right.  In the trial, there is not going

24 to be dispute on is it.

25      **MR. SERRA:**  Yes.

**PROCEEDINGS**

1          **MR. CHENG:**  Your Honor, two more issues that these two

2     arresting officers will testify to was the clothing of the

3     defendant, as well as the appearance of the defendant matching

4     these descriptions, as well as the specific location of the

5     arrest being close -- very close in proximity to the shooting

6     itself.

7          **THE COURT:**  Yeah, but all of that sounds -- virtually

8     everything you described seems designed to prove that it was

9     Garcia-Zarate and not somebody else.  Right?

10         Virtually everything you just described seems designed to

11    prove that this is the right guy.  But nobody disputes that

12    this is the right guy.

13         **MR. BARRY:**  Well, Your Honor, we --

14         **THE COURT:**  It's just a question of -- and nobody

15    disputes that he, on some level, handled the gun -- right?--

16    and that the gun went off --

17         **MR. SERRA:**  Wait a minute.  He may have only handled

18    the packaging, and not really --

19         **THE COURT:**  I understand that.  I was including that

20    not on some level he was -- you know, the gun went off when it

21    was -- I don't want to say, when it was in his possession --

22         **MR. SERRA:**  In his fleeting, transitory --

23         **THE COURT:**  Right.  The gun went off when it was in

24    his fleeting possession/non-possession.

25         It was him.  Right?  I mean, there is no dispute that it

1  was somebody else sitting on that chair with a gun who, you

2  know, who either inadvertently or intentionally caused the gun

3  to go off.  So the vast majority of the testimony that you're

4  describing, it's not in dispute.

5       **MR. BARRY:**  Your Honor, we don't know if it's in

6  dispute until closing argument.  If two of our witness get hit

7  by a truck, and we can't introduce photographs, they are free

8  to say, "There is a rush to judgment.  They got the wrong guy."

9       **MR. SERRA:**  Come on.  That's absurd.

10      **THE COURT:**  Please, hold on.  Don't interrupt him.

11      **MR. BARRY:**  They found some homeless guy and decided

12  to --

13      **THE COURT:**  Let's assume -- let's say not be too

14  fanciful about what's going to happen.  Okay?

15      Let's assume -- and remember there will be opening

16  statements, and there is, of course, presumably, unless they

17  waive it, there is to go to be an opening statement from the

18  defense and they are going to say what happened.  And

19  presumably it's going to be something similar to the trial

20  that's already happened.

21      You know, it seems to me that, if that happens, it's --

22  there is little, if any, need for the majority of what you

23  described from the officers.  I mean, other than, yeah, there

24  was, you know, we got -- we were told to look for this guy and

25  we found him and put a bag over his hands -- and get straight

**PROCEEDINGS**

1   to the residue stuff.  Right?

2       I mean, you -- you know, I'm getting the sense from the

3   papers that you filed in this case and some of the stuff that

4   you're saying today, that you're -- and some of the witnesses

5   that you have proposed to call, that you're wanting to retry

6   the murder case.

7           **MR. BARRY:**  Absolutely not, Your Honor.  We are

8   focusing on basically a 45- to 55-minite framework of time, and

9   that's it.  We're not -- you know, we're not asking the

10  officers what they had for breakfast, or what they were doing,

11  or what they think about homeless people or immigrants or gun

12  crimes in San Francisco.

13          **THE COURT:**  I didn't say any of that.

14          **MR. BARRY:**  But we have to be able to tell the story

15  of what happened.  And, you know, having -- precluding any

16  aspect of the arresting officers of, I was looking for a person

17  wearing this description, based on this photograph.  And

18  where -- before that, you know, getting to where that

19  photograph came from.  We have to be able to say, "This is why

20  this happened."

21      And it won't take long.  It will not take long.  The

22  arresting officers may be on for 15 minutes.  So there is no --

23  there is nothing cumulative.

24          **THE COURT:**  Okay.

25          **MR. BARRY:**  There is no waste of time.  But the

**PROCEEDINGS**

1   Government has to be able to tell a coherent story of that hour

2   of time, you know, from the hearing of the gunshots to the

3   defendant's arrest.

4        **THE COURT:**  You have to be able to tell a coherent

5   story that allows the jury to consider the possession charges.

6   It's not a coherent story about a murder.

7        **MR. BARRY:**  No.

8        **THE COURT:**  You don't have to tell a detailed or

9   coherent story about a murder.

10     So the only -- there may be issues about hearsay or

11  something.  It doesn't seem inappropriate to call these

12  witnesses.  But I initiated this discussion to make very clear

13  that you -- that the witnesses need to know that they -- what's

14  important and what's not, and what needs to be gone through

15  quickly and what is in dispute.

16     And I am not going to allow the witnesses to dwell on the

17  details of Kate Steinle's death.  And I will interrupt and cut

18  them off if they do that.

19       **MR. BARRY:**  We are absolutely not doing that.  And you

20  may have seen that we are not getting into the ballistics of

21  the skip off the pavement.  We don't want to call the coroner.

22  We don't want to put her photographs --

23       **THE COURT:**  They may want to get into the skip off the

24  payment.

25       **MR. SERRA:**  Absolutely, yes.

**PROCEEDINGS**

1        **THE COURT:**  But that's up to them.

2        **MR. BARRY:**  They are free to do that.  But we are not

3    retrying the murder case.  But the fact is that it happened,

4    that the defendant possessed a firearm.  One of the ways he

5    possessed was by pulling the trigger.

6        And not to -- I'm not making light of this in any way, but

7    I think if we look at it in a different way, it may be helpful.

8        If Mr. Steinle brought and we'll -- I appreciate the

9    Court's order on that, I have got some requests along those

10   lines.  But, if Mr. Steinle brought a life-size sculpture to

11   the Pier, and wanted to take backgrounds pictures and, like,

12   was an art exhibit and wanted to take pictures with the Bay in

13   the background of a sculpture, the fact that there was a

14   shooting and the bullet was taken from that sculpture is

15   directly relevant to the defendant's possession, especially his

16   possession of the bullet that was taken from that.

17       We're not trying to sensationalize that.  We're not

18   focusing on this murder.

19       **THE COURT:**  I didn't understand that.  But Mr. Steinle

20   is not testifying and that ruling is final.

21       **MR. BARRY:**  No, I appreciate that.

22       **THE COURT:**  Okay.

23       **MR. BARRY:**  But the only thing I request is that there

24   are photographs that are relevant and the video that's

25   relevant; so I ask to be able to be able to admit some of

**PROCEEDINGS**

1   those, like one photograph and some commentary on the video,

2   that his testimony would be necessary for.

3        But, if we can obviate that by allowing one or two

4   questions and then the admission of the photograph, we

5   appreciate -- we appreciate the ability not to ask Mr. Steinle

6   to have to testify.

7        So -- but the story is going to be very focused.  But the

8   fact that there was a shooting caused officers to respond and

9   caused them to look for him in this area --

10        **THE COURT:**  I understand that.

11        **MR. BARRY:**  Okay.  But we are not trying to

12   sensationalize it.  We are not trying to get into the

13   defendant's intent.  But we do intend to establish that he

14   pulled the trigger, for whatever reason, because that's the

15   principal way that he handled this weapon.

16        **THE COURT:**  I understand that.  But who else?

17        **MR. CHENG:**  Your Honor, next we have a few

18   eyewitnesses by the Pier.  That's Erin Carpenter, as well as

19   Maria Moreno.

20        **THE COURT:**  I want to go one by one.

21        What's Erin Carpenter going to testify to?

22        **MR. CHENG:**  Erin Carpenter and Maria Moreno were both

23   at a hotel across the street from the Pier.  They will testify

24   to hearing the gunshot drawing their attention to what was

25   happening outside, observing the defendant leaving the scene,

**PROCEEDINGS**

1  and in light of seeing the defendant leave the scene in the way

2  he did, take photographs of the defendant and bring those

3  photographs to the police.

4          **THE COURT:**  Okay.  Who else?

5          **MR. CHENG:**  We also have two eyewitnesses who were

6  physically at the Pier; that's Danny and Michelle Lo.

7          **THE COURT:**  Hm-hmm.

8          **MR. CHENG:**  They will testify to being at the Pier at

9  the time of the gunshot, being able to identify the fact that

10 there was someone there that ended up getting shot, as well as

11 identifying the fact that the defendant was there at the Pier

12 where he was, and the fact they shared photographs that they

13 took of the defendant to police.

14         **THE COURT:**  Okay.  Now, from the -- I haven't been

15 through the entire state court trial transcript yet, but from

16 the bits that I have reviewed it looked like Danny and Michelle

17 Lo's testimony was used by the Government to primarily, if not

18 entirely, to establish that he -- that -- to attempt to

19 establish that Mr. Garcia-Zarate committed murder, that he

20 intended to shoot Steinle or intended to shoot someone at the

21 Pier.

22         So I need to hear a little more from you.  Again, what you

23 have described is -- what you have described about their

24 testimony is something that's not in dispute, that Steinle got

25 shot, that a gun went off, that Steinle got shot, that

1  Garcia-Zarate was on the Pier, that he was sitting there in the

2  chair spinning around, or whatever they say he was doing.

3  Right?

4      There is -- none of that is in dispute.  So what is it

5  that they are going to testify to that will assist the jury in

6  determining whether he knowingly possessed the firearm?

7          **MR. CHENG:**  Right, Your Honor.

8      And that is not our intent to be proving a homicide case,

9  just as Mr. Barry said.  The fact is that these -- I'm sorry,

10  these eyewitnesses were at the Pier.  They observed what they

11  saw.  They also observed the defendant leaving the scene in a

12  fashion in which -- that compelled them to bring photographs

13  that they took of the defendant to police.  And where the

14  defendant --

15          **THE COURT:**  Okay.  I get that.

16          **MR. CHENG:**  What he was wearing.  What the person who

17  deceased, what she was wearing as well.

18          **THE COURT:**  Why does it matter what Kate Steinle was

19  wearing?  How is that relevant to this?

20          **MR. BARRY:**  That's for the video, Your Honor.  Where

21  they were on the Pier is critical --

22          **THE COURT:**  You can't see what she is wearing in the

23  video.

24          **MR. BARRY:**  You can see light and dark.  So one of

25  the -- Mr. Steinle was wearing something white --

**PROCEEDINGS**

1      **THE COURT:**  But I don't understand.  It's not disputed

2   that -- there is no dispute that Kate Steinle was shot and

3   killed on the Pier.  You can see it on the video.  You can see

4   the person fall.  You can see Kate Steinle fall.  And you can

5   see Mr. Garcia-Zarate walking away.

6      Why do you need Danny and Michelle Lo to come describe

7   what Kate Steinle was wearing?

8      **MR. BARRY:**  Because, if there is no foundation to say

9   that these people in the video are the Steinles, the defense

10   can argue anything at closing.

11      I mean, we can say it's not disputed, but if we don't

12   establish the evidence through whatever means, through

13   witnesses, or through stipulation, or somehow, then we haven't

14   proven our case.  And, again, we're not going to get into, you

15   know, some -- that the defendant looked angry or --

16      **THE COURT:**  Well, the defendant -- will the defendant

17   stipulate that the video shows Kate Steinle being shot on the

18   Pier?

19      **MR. SERRA:**  I have to think about that and discuss it.

20      **MR. BARRY:**  You know *Old Chief* does also indicate that

21   the Government cannot be forced to stipulate away its case,

22   especially when we're talking about 10 minutes of testimony.

23   But we're not trying to establish whether the defendant had bad

24   intent, or what -- why he pulled the trigger.

25      **THE COURT:**  I don't understand why these people need

1    to come testify about what Kate Steinle was wearing.  I don't

2    understand that.

3         **MR. BARRY:**  Because it has to do with -- it

4    corroborates everything that -- that this is the guy, that this

5    is the person involved in the gunshot.  He is walking off the

6    Pier.  He is running or walking off the Pier.

7         Michelle Lo could see where he was.  She saw where

8    Kate Steinle fell.  She saw where the defendant was and she put

9    it together that this guy was involved.  And that's why she

10   went to the police.

11        And that is significant because the defense could -- is

12   free to argue, depending on what the Government's case is or

13   how limited it is, they are free to argue that they got the

14   wrong guy.  At the end of the day, they can say "The Government

15   didn't prove that my client ever possessed a firearm.  He was a

16   poor" --

17        **THE COURT:**  They are going to say that, but I don't

18   think they are going to say -- I don't think there has been any

19   indication from the prior trial or anything anybody has said in

20   this trial that the defense plans to say that they got the

21   wrong guy.

22        **MR. BARRY:**  They don't have to announce their defense.

23        **MR. SERRA:**  I'll tell you right now, we're not going

24   that route.  We're going not going to say it was somebody else.

25        **MR. BARRY:**  And if things change during the trial and

**PROCEEDINGS**

1   we don't prove our case for some reason, if Mr. Serra sticks to

2   that, it would be ineffective assistance.  So we can't be

3   prevented from proving the case based on what we all think the

4   defense might do, or what the defense might be.

5        **THE COURT:**  Well, the problem is, we have a unique

6   situation here, where we a woman was killed on the Pier and

7   that is a very explosive aspect of the case, but it's not what

8   you have charged the defendant with.

9        **MR. BARRY:**  No.

10       **THE COURT:**  So it's incumbent on all of us to strictly

11  limit the amount of focus that this trial has on the death of

12  Kate Steinle and the details of her death.  And I am concerned

13  that you're not getting that.

14       **MR. BARRY:**  No, we understand it perfectly, Your

15  Honor.  But the -- this is not necessarily one of these -- like

16  the Court saw the transcript.  You reviewed the transcript and

17  how the evidence came in.  The evidence comes in differently.

18  We have to be able to put on that evidence.

19       And the notion that, you know, an eyewitness heard a

20  gunshot, looked over and saw someone on the ground, and then

21  saw someone else leaving the scene is critical to say why that

22  person is the one involved in the shooting.  And the reason

23  that's important is because that's how he possessed the gun.

24       So we have to be able to tell that story.  But, again, we

25  are not looking to inflame the passions of the jury.  We don't

**PROCEEDINGS**

1    want a reversal in the event of a conviction on that basis.

2          We are going to be very clinical about the fact that there

3    was a shooting.  Yes.  And the reason that's important is

4    because, for whatever reason, the defendant pulled the trigger.

5          We're not going to prove his intent.  We're not getting

6    into ballistics.  We are not going there.  But we have to be

7    able to say, "This is what happened on the Pier."  These

8    eyewitnesses were there.  Their attention was drawn to a

9    gunshot, or something that sounded like a gunshot.  They see a

10   person on the ground.  They see people converging on that

11   person trying to render aid.  And then they see someone else

12   quickly walking away.  And that's what motivated them to bring

13   these photographs to the police, and that's why the police

14   arrested the defendant.

15         And this is a quick story.  But we're not -- we completely

16   understand that.  We are not trying to say there was a murder

17   and, therefore, convict this person.  We don't -- we will not

18   go there.  We don't want that.

19         The defendant is entitled to a fair trial, but the

20   Government is also entitled to put on its case in the best way

21   it can without inflaming the passions of the jury.  And so, you

22   know, Ms.-- I don't anticipate that any of these witnesses are

23   going to say, "Oh, you know, it is a tragic thing.  Somebody

24   needs to be punished for it."  This is what I saw and this is

25   what I did.

1          **THE COURT:**  I keep saying, "I'm concerned about X."

2   And then you keep saying, "We're not going to do Y.  Don't

3   worry, we're not going to do Y."

4          I'm not concerned that the witness is going to say, "This

5   is a tragic thing and somebody is going to be punished for it."

6          Why do you -- every time I say, "I'm concerned about X,"

7   why do you respond by saying, "We're not going to do Y"?

8          **MR. BARRY:**  Because the reason --

9          **THE COURT:**  Are you being evasive or --

10         **MR. BARRY:**  No, Your Honor.  I think it's a conclusion

11  that you're concerned about X.  So the result would be to limit

12  our witnesses' testimony.  And I think that that is the -- we

13  appreciate the Court's concern about that this is going to be a

14  murder trial and it's not.

15         **THE COURT:**  Well, I'm hoping that I'm going to hear

16  something from you that gives me comfort that you're not trying

17  to put on a murder trial.  But, if you go back and you -- have

18  you reviewed the transcript of the state court trial?

19         **MR. BARRY:**  Yes.

20         **THE COURT:**  And have you reviewed the transcript,

21  Danny and Michelle Lo's testimony and the arguments that the

22  prosecution made about Danny and Michelle Lo's testimony?

23         **MR. BARRY:**  I have not reviewed that carefully.  I

24  reviewed their testimony.  I have, Your Honor.

25         **THE COURT:**  Once you do that, you will become

1    concerned about their -- I would hope that you would become

2    concerned that a good deal of what Danny and Michelle Lo said

3    in that case is not relevant to this case.

4              **MR. CHENG:**  Yes, Your Honor.  And having reviewed that

5    testimony, it is not our intent to be, again, just like

6    Mr. Barry said, we're not calling them to talk about, this is

7    what, you know, this is what the defendant's emotions were at

8    the time we saw him, this is how I felt about him.  That's not

9    what we're calling the for.

10       We're simply talking about getting in there, talking about

11   what they saw, what they heard, and the photographs that they

12   took that they provided to the police, because they saw this

13   man, in their view, taking off.

14             **THE COURT:**  That's the important part of it; right?

15   After the gun went off, they saw that, you know, everyone else

16   is looking this way, and he is walking quickly that way.

17             **MR. CHENG:**  Exactly, Your Honor.

18             **MR. BARRY:**  And to get to the Court's point as well,

19   about the impeachment.  And the Court may recall that I

20   think -- at least, Ms. Lo was impeached on this in trial.  "You

21   say he looked determined or he looked angry and you never said

22   that before."  That's one of the reasons we're not going to get

23   into that.

24             **THE COURT:**  That's beside the point.  The point is

25   that it's not relevant.

 1          **MR. BARRY:**  Exactly.

 2          **THE COURT:**  The fact that she was previously impeached

 3   on something not relevant to this trial doesn't matter.  What

 4   you should be focusing on is what's relevant to this trial.

 5          **MR. BARRY:**  Absolutely.  But it's another reason why

 6   we're not going there.

 7          **THE COURT:**  Okay.  Who else?

 8          **MR. SERRA:**  Wait.  Again, from my perspective,

 9   obviously, I'm agreeing with the Court's questions and implied

10   ruling.  On the other hand, if the Los testify, they will be

11   testifying that, you know, the person was shot and that should

12   be forbidden fruit.  We shouldn't have to hear that part of it.

13   Other parts, yes, relevant --

14          **THE COURT:**  Well, you're not saying that the jury

15   should not learn that a person was shot; are you?

16          **MR. SERRA:**  We did do an in limine motion in that

17   generic category.

18          **THE COURT:**  But you wanted -- this whole time you have

19   wanted this trial to be about how -- I mean, you approved a

20   jury questionnaire in which we inform the prospective jurors

21   that Kate Steinle was shot.

22          **MR. SERRA:**  I saw it and I think it was 21, and I

23   wrote a note "object", and I don't know whether you objected or

24   not.

25          **THE COURT:**  I mean, this whole, we have all operated

**PROCEEDINGS**

1    on the assumption this whole time that it was you who requested

2    jury questions along these lines.  I mean, you submitted a

3    whole list of questions that involved informing the jury that

4    this is a case about Kate Steinle being shot.  So I never -- it

5    never would have dawned on me that you would take the position

6    that the jury should be prevented from learning that

7    Kate Steinle was shot.  I mean, I totally agree that this needs

8    to be drastically limited.

9         MR. SERRA:  The way the Court has framed some of the

10   in limine responses, I'm agreeing with the Court.  And it will

11   come out, but it shouldn't be emphasized and shouldn't be, I

12   don't know, highlighted and --

13        THE COURT:  Yeah, I certainly agree a thousand percent

14   with that.

15        MR. SERRA:  You say that and I accept that.

16        THE COURT:  Yeah.  Okay.

17      Who else?

18        MR. CHENG:  Your Honor, next on our list in

19   alphabetical order, Craig Dong, from the San Francisco Police

20   Department.  He was an officer --

21        THE COURT:  What was the last name?

22        MR. CHENG:  Dong, D-o-n-g.

23        THE COURT:  Okay.

24        MR. CHENG:  He was an officer that immediately

25   responded to the scene and received statements from some of the

1  eyewitnesses we just spoke about.  He was the one who also put

2  out the be-on-the-look-out to the police department to look for

3  the defendant.  And he was the officer who collected the video

4  evidence from the nearby fire station, as well as along the

5  Pier.

6       **MR. SERRA:**  The only part I would be objecting would

7  be the hearsay statements of witnesses.

8       **THE COURT:**  And your response to that is?

9       **MR. CHENG:**  The witnesses will have already testified,

10 and they are not going to be -- anything that Officer Dong

11 talks about in that vain, will not be for the truth of the

12 matter asserted, but for the effect on him in sending out the

13 BOLO.

14      **MR. SERRA:**  The effect on him is irrelevant.  His

15 state of mind is irrelevant.

16      **THE COURT:**  That seems correct.

17      **MR. BARRY:**  Your Honor, if there is a hearsay

18 statement that's elicited in direct testimony, then that's the

19 time to object to it.

20      **THE COURT:**  No, I think it's good to -- I think, given

21 the sensitive nature of this case, it's good to front as many

22 of these issues as we can.  And that's why we're going through

23 the exercise that we're going through right now.

24      So why is that -- why does Dong need to testify about the

25 statement that he received from witnesses?

PROCEEDINGS

 1          **MR. CHENG:**  I think more important is that the

 2   photographs that he received from the witnesses, and the reason

 3   why he thought these photographs were relevant to send out to

 4   the police department.

 5          So that's what Officer Dong is going to be talking about

 6   in that very short -- the short introduction to why he is even

 7   involved with the case.  He responded to the scene.  He spoke

 8   with witnesses.  He received photographs from them.  He sent

 9   out a be-on-the-look-out to the police department.  And he

10   subsequently retrieved video evidence that was showing what

11   happened at the scene.

12          **THE COURT:**  Obviously, I understand the retrieval of

13   the video evidence, but, I mean, it may be that some of this we

14   may need to deal with during trial.  But there is going -- I

15   can tell that there is going to be a point at which I am saying

16   to you, you have got to stop putting on testimony about why you

17   were looking for Garcia-Zarate.  It's obvious why you were

18   looking for Garcia-Zarate.  And nobody is disputing that you --

19   nobody was disputing -- nobody is suggesting that you were

20   looking for the wrong guy.

21          And so, you know, a little bit of that, maybe, is okay.

22   But at some point you're going to get cut off.  So, I mean,

23   who -- we don't need 10 witnesses getting up and testifying

24   about why the police were looking for Garcia-Zarate.  It's

25   going to be obvious to everyone and uncontested why the police

**PROCEEDINGS**

1  were looking for Garcia-Zarate.

2      Craig Dong.  Who else?

3          **MR. CHENG:**  There is Officer Scott Hurley.

4          **THE COURT:**  Scott what?

5          **MR. CHENG:**  Hurley, H-u-r-l-e-y.

6          **THE COURT:**  Okay.

7          **MR. CHENG:**  He is an officer with the San Francisco

8  Police Department.  He was the diver who recovered the firearm

9  from the Bay at the spot that it was thrown by the defendant.

10         **THE COURT:**  Okay.  So he wasn't on the scene.  He just

11 went -- just went and got the gun afterwards.

12         **MR. CHENG:**  That's correct.

13         **THE COURT:**  Okay.  Who else?

14         **MR. CHENG:**  Next we have Albert Larochelle, who is

15 employed at Sig Sauer.  We expect to tender him as an expert in

16 firearms who inspected and tested the gun and its safeties for

17 their operational ability.

18         **THE COURT:**  This particular gun?

19         **MR. CHENG:**  Yes, Your Honor.

20         **THE COURT:**  Okay.

21         **MR. CHENG:**  We also have Andy Smith from the

22 San Francisco Police Department Criminalistics Laboratory.

23         **THE COURT:**  Okay.

24         **MR. CHENG:**  He was at the lab and he inspected the

25 weapon immediately after it was pulled from the Bay.

1          THE COURT:  What's he going to say?

2          MR. CHENG:  He performed an inspection of the weapon

3    in the condition it was retrieved from the Bay.  He reviewed

4    the bullets that came from the weapon and compared them to the

5    bullets -- the bullet that was taken from the deceased, and

6    confirmed that that is from the same weapon.  He also confirmed

7    that the gun was --

8          THE COURT:  Is that -- just while we're at it, this is

9    something I mentioned in my order, is that -- is the defense

10   stipulating that the bullet that killed Ms. Steinle is the

11   bullet that came from this weapon?

12         MS. BELYI:  I mean, I think that we would, but --

13         MR. SERRA:  The answer is, yes.

14         MR. BARRY:  That -- actually, we're happy about that.

15   Then there will be no photographs.  There will be no commentary

16   on that, just that "I retrieved this bullet from Ms. Steinle's

17   body and it is the same bullet -- it was fired from the same

18   gun."

19      This is excellent from the Government's perspective.

20         THE COURT:  And the defense said it was stipulated.

21         MR. BARRY:  If it's a stipulation reading, then again

22   that's even better.

23         THE COURT:  Does that obviate the need for Andy Smith?

24         MR. BARRY:  No.  Because he would also testify about

25   the condition of the gun as he found it, and that the only way

1   that you -- a bullet can be shot from this gun is by pulling

2   the trigger, which is directly relevant to the defendant's

3   possession.

4           **THE COURT:**  I see.

5           **MR. BARRY:**  And in light of one of the defense motions

6   in limine, the -- if we can have Mr. Smith testify that there

7   was no DNA of any kind on the firearm, that I think would

8   address the defendant's concern about no DNA expert and no DNA

9   evidence.  So if he is able to testify to that, hopefully, that

10  will address the defense's concern too.

11          **THE COURT:**  So you're saying -- you're proposing that

12  if Smith can testify that there was no DNA evidence, and if the

13  defense doesn't object that he is not qualified to testify to

14  that --

15          **MR. BARRY:**  Right.

16          **THE COURT:**  -- then that will obviate the need to call

17  a DNA expert who would testify that there is no DNA evidence on

18  the gun.

19          **MR. BARRY:**  That's right.

20          **THE COURT:**  You don't have to give an answer now, but

21  do you have an answer to that now?

22      Do you want to not object to Smith testifying that there

23  was no DNA evidence so they don't have to call their DNA

24  expert?

25          **MR. SERRA:**  I proffer a stipulation on that subject.

```
 1    No DNA.
 2          THE COURT:  So you'll -- you can have a stipulation --
 3    you'll agree to a stipulation there was no DNA evidence on the
 4    gun?
 5          MR. SERRA:  Yes, Your Honor.
 6          THE COURT:  Okay.  So there is an agreement to have a
 7    stipulation that there was no DNA evidence on the gun.
 8        There is also a stip that the bullet that killed -- the
 9    bullet that killed Ms. Steinle came from that gun.
10          MR. SERRA:  The Government's position is that they
11    don't have to stipulate.  They may want to prove it, regardless
12    of my proffer to stipulate.
13          THE COURT:  What's that?
14          MR. SERRA:  They may want to prove it.  They may not
15    want to stipulate.
16          THE COURT:  They just said they are happy to have that
17    stipulation.
18          MR. SERRA:  What about the previous one?
19          THE COURT:  I think they said they are happy to have
20    both stipulations, the stipulation that -- I may have -- if I
21    misheard, you can correct me if I'm misremembering, they are
22    happy to have the stipulation that there was no DNA evidence on
23    the gun, and they are happy to have the stipulation that the
24    bullet that killed Ms. Steinle came from that gun.
25          Is that right?
```

**PROCEEDINGS**

1          **MR. SERRA:**  So the Court to the prosecution, you're

2     agreeable to that -- those two?

3          **MR. BARRY:**  Yes, Your Honor.  But just let me --

4     because I don't -- let me clarify how that would be set up.

5          So we will introduce the bullet into evidence and then we

6     would probably read the stipulation.

7          And for the DNA, we just want to set it up with two

8     questions.  And that -- did you have this -- the firearm

9     prepared for DNA testing, or swabbed for DNA.  Yes.

10          And then the stipulation would be, there was no DNA found

11     on the weapon at all.

12          So we would need the foundational question of --

13          **THE COURT:**  Just to show that the officers tried.

14          **MR. BARRY:**  Exactly.  Exactly.

15          **THE COURT:**  Sounds fine.  Okay.  Get those written up.

16          **MR. BARRY:**  Again, we will have to introduce the

17     bullet into evidence.  So I just don't want to make the -- I

18     don't want to have those questions make the Court think we're

19     going back on our agreement.  He won't get into the testing.

20     We won't get into the striations.  We just agree that this is

21     the same bullet.  The bullet was fired from this gun.

22          **THE COURT:**  Who else?

23          See?  We're paring things down quite well today.

24          **MR. CHENG:**  Yes, Your Honor.

25          Next we have Lisa Strick.  She is an additional eyewitness

**PROCEEDINGS**

1    by the Pier.  She was not at the Pier, but she heard the

2    gunshot.  She very observed an arc and a splash at the same

3    spot that's been identified where the defendant was standing,

4    sitting, and then him standing, and taking off from the scene.

5           MR. BARRY:  And with respect to the Court's concerns

6    about what the eyewitnesses will testify to, she will not talk

7    about that a body fell.

8       She did not realize what had happened.  So she will not be

9    offering testimony that wouldn't -- possibly inflame the jury.

10          THE COURT:  Okay.

11          MR. BARRY:  So let me, again, she heard sirens and

12   came back.  And then gave the police the information that she

13   had.  But she won't be talking about the actual scene or

14   Ms. Steinle dropping, or anything like that.

15          THE COURT:  And did she take photos, did you say?

16          MR. BARRY:  She took photos.  She gave the photos to

17   the police, but the photos were essentially useless.

18          THE COURT:  Okay.  All right.  Who else?

19          MR. CHENG:  Your Honor, you have already ruled on the

20   inclusion of Mr. Steinle, which Mr. Barry will address.

21      And then we also have two potential custodians of records,

22   which we hope that will be obviated by stipulation or

23   authentication by affidavit.  But that would be Tracy Watkowski

24   from ABC, and someone --

25          THE COURT:  About the video?

**PROCEEDINGS**

1       **MR. CHENG:**  About the ABC video.

2       **THE COURT:**  Okay.

3       **MR. CHENG:**  Correct.

4       **THE COURT:**  What's her name?

5       **MR. CHENG:**  Tracy Watkowski.

6       **THE COURT:**  Okay.

7       **MR. CHENG:**  As well as a custodian of records from the

8  district court for the arraignment audio.

9       And we have already moved in limine on that issue.

10      **THE COURT:**  Right.  Okay.  Who else?

11      **MR. CHENG:**  And then, finally, with respect to the

12  police interrogation of the defendant, Mr. Tony Ravano from the

13  police department.

14      **THE COURT:**  Remind me his name again.

15      **MR. CHENG:**  Anthony Ravano.

16      **THE COURT:**  Romano?

17      **MR. CHENG:**  Ravano.  I'm sorry, Your Honor.

18  R-a-v-a-n-o.

19      **THE COURT:**  Okay.  And Officer Ravano was the one

20  asking questions of Mr. Garcia-Zarate in English?

21      **MR. CHENG:**  He is one of the officers asking questions

22  in English.

23      **THE COURT:**  Okay.  And that's the -- so that's the

24  only person you have testifying about the interrogation?

25      **MR. CHENG:**  Yes, Your Honor.

1      **MR. BARRY:**  And we also anticipate, Your Honor, that

2  he will just be the authentication and foundation witness, just

3  that -- this is the video of the interrogation and --

4      **THE COURT:**  I see.

5      **MR. BARRY:**  And that's where we'll leave it.

6      **THE COURT:**  Okay.  All right.  So those are your

7  witnesses?

8      **MR. CHENG:**  Yes, Your Honor.

9      **THE COURT:**  All right.

10  Okay.  Should we talk about the motions in limine now?

11      **MR. BARRY:**  If Your Honor wants to address, again --

12      **THE COURT:**  Oh, Steinle?  Yeah.

13      **MR. BARRY:**  Yes.  So here is -- there were two

14  photographs.

15  And could you give one to Mr. Serra.

16  There were two photographs that were introduced in the

17  state court through Mr. Steinle.  This is one.  The other one

18  is a selfie that Kate Steinle took.

19  The selfie doesn't really give you a sense of where they

20  were on the Pier, so we're not seeking to introduce that

21  photograph.  But this is one of the pieces of evidence that the

22  Government thinks is important and that we would seek to

23  introduce through Mr. Steinle.

24  And the reason it's important is to show where they were

25  on the Pier, like right before the shooting, because that

1    establishes a lot of things for the video -- again, what he is

2    wearing.  So if this is deemed admissible that's one of --

3        THE COURT:  What who is wearing?

4        MR. BARRY:  I'm sorry.  You can see that Mr. Steinle

5    is wearing white.  And, again, the video shows two people in

6    the zoomed-up portion, one of them wearing darker clothing, one

7    of them wearing white, and the person falling, and the other

8    person going to them.

9        So we want Officer Dong to be able to say definitively

10   that those were the Steinles.  And that's one of reasons we

11   would need to admit this photograph, and one of things we would

12   need Mr. Steinle's testimony for.  Again, I appreciate that he

13   will not be coming in.  But I still think this is important

14   evidence that we would like to put --

15       THE COURT:  So you're asking -- sorry.

16   So I want to make sure what you're requesting.

17   You're not requesting that Mr. Steinle come in to testify

18   that this is a photo of him.

19       MR. BARRY:  No.

20       THE COURT:  You're asking Officer Dong to testify that

21   this is a photo that was taken by Kate Steinle, I take it?

22       MR. BARRY:  Yes.  If -- actually, if we could do that

23   both through Officer Dong.  So two things that Officer Dong

24   would be.  One is that this exhibit is a photograph taken by

25   Kate Steinle shortly before the shooting depicting James

**PROCEEDINGS**

1    Steinle and a family friend standing in the area where

2    Ms. Steinle was shot.  That's it.

3        And then the second thing would be a question to

4    Officer Dong on the video "Based on your investigation, were

5    you able to determine who the individuals on the right in the

6    video of the Pier, one of them falls down, who they were?"

7        And the answer "Yes, Kate Steinle and her father, James

8    Steinle."

9        And that will obviate the need for Mr. Steinle's

10   testimony.  Again, I understand that he won't be coming.

11           **THE COURT:**  Any response on that?

12           **MS. BELYI:**  Actually, I don't actually know if the

13   photo is necessary because there is that video of -- as Your

14   Honor mentioned, where somebody is walking down the Pier and

15   somebody is falling down.  I think that actually shows exactly

16   where everybody is located and pinpoints this.  I don't think

17   there is a need for this photo.  So I think we would object to

18   having this photo entered into evidence at all.

19           **THE COURT:**  Well, I certainly get your point about the

20   attempt to use this photo to establish where they were on the

21   Pier.  I mean, this photo doesn't even really tell you exactly

22   where they were on the Pier, because we don't --

23           **MS. BELYI:**  We don't have the time.

24           **THE COURT:**  We don't have a perspective on where

25   the -- we don't have the whole pier in the photo, so we can't

1   tell.

2         **MR. BARRY:**  But, Your Honor, you sort of do because --

3         **THE COURT:**  Hold on a second.

4         **MR. BARRY:**  I'm sorry.

5         **THE COURT:**  If the -- certainly, if the only purpose

6   of the photo was to establish where they were on the Pier, I

7   would say it's not -- it's not relevant.  It's not coming in.

8         The additional question I have, I guess is, the other

9   reason that he has given to include this photo is to establish

10  that Mr. Steinle was wearing white, wearing a white sweater.

11  That's the other reason that he has given.

12        What's your response to that?

13        **MS. BELYI:**  I question the relevance of that.  I don't

14  think it's relevant what Mr. Steinle was wearing, especially

15  given that we are, as the Court indicated, are not focusing on

16  the killing of Kate Steinle.  And I think that what they are

17  going to be able to establish through video evidence is that,

18  at some point, that family is walking, somebody falls down, and

19  somebody is getting up.  And that's all that they need to show

20  and that's all that they need to establish.

21        **THE COURT:**  Okay.  Well, so, obviously, all in limine

22  rulings are subject to revisiting at trial depending on how the

23  evidence comes in.  So if the evidence starts to come in

24  differently from how I'm anticipating it, maybe this photograph

25  would be admissible.  But, based on how I anticipate the

**PROCEEDINGS**

1   evidence to come in based on my review of the state court trial

2   transcript, and all the papers that have been filed in this

3   case, I don't think this is necessary.  And it's not -- it's

4   excluding it under Rule 403.

5          **MR. BARRY:**  Then, Your Honor, for the questions then

6   for Officer Dong with respect to the video, if there is a

7   foundational objection, would the Court overrule that and allow

8   him to testify that those are people in the video?

9          **THE COURT:**  I mean, I can't -- I'm not sure I can

10  answer that in the abstract.  My anticipation is that none of

11  that is going to be contested.

12         Okay.  So anything else before we turn to the motions in

13  limine?

14         All right.  So as often occurs, many of the motions in

15  limine have five different issues baked into them, so you know,

16  going in order is always a little bit hard.  But maybe we'll

17  start with trying to go in order and start with the defendants

18  as I did in my order yesterday.

19         So the prior convictions.  I mean, the only one where, you

20  know, it is I think somewhat of a close question is the one

21  from less than 10 years ago.  My thinking on it was that its

22  relevance is just not, you know, is just not high enough to

23  justify allowing you to impeach Mr. Garcia-Zarate with it if he

24  testifies.  But I'm happy to hear you take another crack at

25  explaining why it should come in.

**PROCEEDINGS**

1       **MR. CHENG:**  Yes, Your Honor.  And there are two prior

2   convictions of the defendant.  We highlight the conviction in

3   2011, but there were two prior convictions that fall within the

4   10 years under 609/609(b).  That would be the conviction for

5   reentry of a deported alien previously convicted of an

6   aggravated felony.  He was released in 2009, so his release

7   date actually falls within the 10 years described in 609(b).

8       **THE COURT:**  I thought you said there was only one.

9       **MR. CHENG:**  I apologize.  That was missing from our

10  initial motion, but that is included in his criminal history

11  that was provided to the Court.  So that is the first

12  conviction.

13      The second --

14      **THE COURT:**  Okay.  Why don't we limit ourselves.  You

15  filed a motion you said "Here is one conviction that was within

16  10 years."

17      Let's limit ourselves to that one for now.  Why should

18  that one come in?

19      **MR. CHENG:**  Well, Your Honor, if -- and, again, we are

20  only seeking to introduce this if the defendant takes the

21  stand --

22      **THE COURT:**  I understand.

23      **MR. CHENG:**  -- and puts his credibility at issue.  And

24  under the tests for a conviction that doesn't involve

25  dishonesty, there is a balancing test under 609(a)(1)(b), and

THE COURT:

1   that's just the probative value outweighs the prejudicial

2   effect.  It's not substantially outweighs the prejudicial

3   effect.

4          **THE COURT:**  Right.  And so I'm just questioning what's

5   the probative value of it.

6          **MR. CHENG:**  Well, Your Honor, to the extent the

7   defendant does take the stand and puts his credibility at

8   issue, the fact that the defendant was recently convicted of

9   this felony for which he served a substantial amount of time

10  and then was released.  And very shortly afterwards there is

11  the conduct in this case.  That is relevant to their -- the

12  jury's determination of the witness' credibility if he takes

13  the stand and says he didn't possess this weapon.

14         And under the balancing test, there is enough distinction

15  between the conviction for an illegal reentry to the

16  possession, so that it should not be prejudicial to the

17  defendant.  And, again, because if the defendant does take the

18  stand, his credibility will be central to the case because he

19  will be up there saying, "You know, what the Government says

20  that I did was false."

21         **MS. BELYI:**  Well, from what it sounds, it also sounds

22  like the Government is going to be using the propensity

23  evidence.  I don't believe this conviction is actually

24  relevant, nor is it probative given the stipulation that we

25  have entered into basically stating that Mr. Garcia-Zarate was

**PROCEEDINGS**

```
 1   illegally in this country and that he has a prior felony

 2   conviction.  So all of that the jury would come in knowing, and

 3   I don't think any particular -- so I don't think that this has

 4   actually any probative value.  I think it's prejudicial and I

 5   think it is actually a waste of time.

 6        THE COURT:  Could I ask you -- I wouldn't have been

 7   shocked if you had argued, "You know what, bring it in, because

 8   we're already stipulating that he has a prior felony conviction

 9   and we're also stipulating that he is undocumented.  So why

10   don't we let the Government cross-examine on this so the jury

11   doesn't know that he previously had a firearm offense or that

12   he previously killed somebody.  And that all it was,

13   quote/unquote, was he -- a prior conviction for illegal

14   reentry."

15        MS. BELYI:  But, I guess we're coming into this case,

16   and as the Court knows, Mr. Garcia-Zarate was found to be not

17   guilty of any murder, nor does his conviction for possession of

18   a weapon stand in the San Francisco Superior Court.  All of

19   that -- that was overturned.  So we're not coming --

20        THE COURT:  I'm talking about the priors.  Right?  I

21   mean, you have stipulated that he is a felon.

22        MS. BELYI:  Yes.

23        THE COURT:  So, I guess, I was -- part of me was

24   wondering if you were going to say, "Well, the jury is going to

25   be wondering what felony he previously committed.  And so if
```

 1  they want to cross-examine him and establish that the felony

 2  that he previously committed was illegal reentry, then that

 3  actually might be good for us."

 4      And then the flip side is, maybe it's not terribly

 5  prejudicial for the Government to be able to cross-examine him

 6  on that as they want to.  Maybe they don't want to anymore.  I

 7  don't know.

 8      MS. BELYI:  Theoretically, that is -- I did not think

 9  about that, Your Honor.

10      THE COURT:  Doesn't that diminish the prejudice to

11  Mr. Garcia-Zarate, the fact that you have already stipulated to

12  it and the fact that the jury might be wondering if he

13  previously committed murder, or previously committed a firearms

14  offense?

15      MS. BELYI:  That is a fair question.  I didn't look at

16  it from that perspective.  And I think that's a fair question.

17      MR. SERRA:  I think it's a moot issue.  We have no

18  issue of putting him on.

19      THE COURT:  Oh.  Okay.  Well, I'll -- nonetheless, I

20  suppose there should a ruling on it.  So I'll give it a little

21  bit more thought and -- before I put out my final ruling.

22      Okay.  What other aspects of defendant's Motion In Limine

23  Number 1 do we need to discuss?

24      MR. SERRA:  Well --

25      THE COURT:  Oh, yeah.  This is where you ask to

 1   exclude evidence that she was shot and killed.  We have

 2   discussed that.

 3         **MR. SERRA:**  Yes.  And I merely reregister our

 4   objection to the rationale utilized for your ruling, that the

 5   shooting is inextricably intertwined with the possession

 6   charge.  I don't think that's true at all.

 7         **THE COURT:**  Okay.  I understand your argument, but I

 8   disagree with it.

 9      Does -- have you all thought about maybe this is -- maybe

10   now is the time to talk about this.

11      The substantive jury instruction -- and I haven't been

12   able to give you a draft of what I propose.  I'll put out a

13   draft.

14         **MR. SERRA:**  You're referring to the limiting

15   instruction?

16         **THE COURT:**  What do you think about a limiting

17   instruction?

18         **MR. SERRA:**  That's wonderful.  Thank you.

19         **THE COURT:**  I'll take a crack at drafting a limiting

20   instruction on Kate Steinle's death.

21         **MR. BARRY:**  So, Your Honor, that would be in the

22   context of the other crimes, like the defendant is only charged

23   with this crime, nothing else?  Would it be sort of in that

24   framework?

25         **THE COURT:**  I don't know.  When I sit down in earnest

**PROCEEDINGS**

1    with jury instruction, I'll give some thought to where it's

2    best placed.

3         And -- but I wanted to at least advise you before trial of

4    my view that there is -- and I'm happy to hear argument about

5    it now, if you want.  But I want to advise you before trial of

6    my view so that you can build your strategy around it, that

7    there is not going to be a separate affirmative defense

8    instruction, but the defense is not going to be precluded from

9    arguing that this version of events does not constitute

10   possession, does not constitute knowing possession.

11        **MR. SERRA:**  Yes.  So we acknowledge that you didn't

12   say that, and we're thankful, I guess, you know, for that

13   amount.  But that's very different than the affirmative defense

14   of transitory possession.

15        You understand that at the state level, the reversal was

16   predicated on the failure to give that instruction.

17        I know that federal law is different, but this is a

18   situation that, as argued by my colleague in the in limine

19   motion, that differentiates itself because of the factual

20   matrix from the -- you know, the prohibition of the appellate

21   court.

22        So, you know, we wanted that -- if I was going to be

23   frustrated over your rulings, that -- it would be a big one.

24        And the second big one we'll get to is whether you're

25   going to allow the statement that he made before the magistrate

**PROCEEDINGS**

 1   in.  And I think your tendency is probably not to, but we'll

 2   get to that one.

 3            THE COURT:  Okay.

 4            MR. SERRA:  Those are the two big ones in my mind.

 5            THE COURT:  Okay.  So let me ask you a couple of

 6   questions about this affirmative defense issue.

 7            MR. SERRA:  Yeah.

 8            THE COURT:  Number one, I think that one confusing

 9   aspect of the discussion about this affirmative defense

10   instruction -- and it's not just from you guys, it's from the

11   case law.  I think the cases don't do really a good job of

12   separating these concepts out.  But there are -- I think there

13   are two concepts embedded in the -- what we're -- what you're

14   arguing about.

15      One concept is, like, necessity.  And the other concept is

16   transitory.  Right?  And those two are not necessarily linked.

17            MR. SERRA:  I don't get necessity.

18            THE COURT:  So necessity would be -- I'd say "All

19   right.  I'm a felon.  And I see a child reaching for a gun and

20   I grab the gun and pull it away."

21            MR. SERRA:  I got it, yes.

22            THE COURT:  Right.  But then the concept of transitory

23   is, you know, "I only had it for a brief period."  Right?

24      "I only possessed it for a brief period.  Regardless of

25   why I possessed it."  Right?

 1        And those are two -- those are two very different things.
 2   And in this case, there is no necessity issue.  Right?
 3        The only question is whether he had -- I would put it this
 4   way.  The question is, did he have -- did he ever, sort of,
 5   assert control over the weapon.
 6        I mean, if you knowingly possess something, it means
 7   you've knowingly, like, asserted control over --
 8             MR. SERRA:  Dominion, control, and knowledge; yes.
 9             THE COURT:  Say again?
10             MR. SERRA:  Dominion and control with knowledge is the
11   definition of possession.
12             THE COURT:  Right.
13             MR. SERRA:  I don't have any problem with that.
14   Knowledge is obviously going to be litigated from our
15   perspective.
16             THE COURT:  I guess I don't understand, like if you --
17             MR. SERRA:  The need --
18             THE COURT:  A lot of the discussion about the
19   affirmative defense in these cases is about necessity.  Right?
20   And we don't have that here.  So, you know, like, I can't
21   remember the name of the Ninth Circuit case where the
22   defendant -- was it *Johnson* maybe.
23             MR. CHENG:  *Johnson*, Your Honor.
24             THE COURT:  The defendant tried to argue -- really, he
25   tried to argue necessity -- right? -- that "I found the gun in

1   the bushes near a school.  And I was worried that the children

2   were going to get it.  So I took it and it I took it home with

3   me.  It was by my bedside table.  And I was planning eventually

4   on bringing it to the police."

5       It wasn't -- it was a necessity that he was trying to

6   make.

7       But here what you seem to be arguing factually is that "My

8   client never knowingly asserted control over this weapon."

9   Right?  "As soon as he realized what it was, all he did was

10  throw it away."  Right?

11      So he never -- and so that is not knowing possession of a

12  firearm, when the moment you realize that you have a firearm,

13  you get rid it.

14          MR. SERRA:  I understand that you're going to give it

15  as an instruction --

16          THE COURT:  My question is:  Why would you want an

17  affirmative -- why would you want to argue that you need to

18  prove that by a preponderance of the evidence?

19          MR. SERRA:  I understand.

20          THE COURT:  Why wouldn't you want to argue that they

21  haven't established beyond a reasonable doubt that my client

22  knowingly possessed the firearm.

23      I would think that once you take away the necessity part

24  of it, that arguing for -- you're making a mistake by arguing

25  for an affirmative defense instruction because then you have to

1   prove it by a preponderance of the evidence.  Where, what I'm

2   saying is that you don't have to prove it by a preponderance of

3   the evidence.  All you have to do is establish a reasonable

4   doubt.

5           MR. SERRA:  But, I have that burden at hand, to wit

6   knowledge.  And certainly it will be utilized.

7       Why not go have a second -- you know, I can argue both

8   defenses and without necessity, just a transitory, fleeting,

9   momentarily, you know --

10          THE COURT:  But that's not a defense.  I mean, I think

11  it comes -- you know, I would argue that in my example of you

12  grab the gun really quickly to prevent a child from getting it

13  and then you go throw it in the garbage or whatever, you know,

14  I would argue that the defense should get an instruction on

15  that.  Right?  There should be an affirmative defense.

16      And there is some language in the Ninth Circuit case that

17  you can interpret to, arguably, to the contrary, but it's not

18  clear.  And I would say that's an appropriate situation for an

19  affirmative defense instruction.  But here, all your facts, the

20  facts that you are articulating, all they did -- they go to, as

21  far as I can tell, is the point that he didn't knowingly

22  possess the weapon, and that's not an affirmative defense.

23          MR. SERRA:  It was transitory, to throw it away.  And

24  that is -- it's a shade different.  I think the Court is

25  focusing too much on necessity.  It's -- I agree.  Forget about

 1  necessity.  You know, just think about transitory, fleeting,

 2  you know, getting rid of it, you know, forthwith.

 3          THE COURT:  Yeah.  I don't think that's an affirmative

 4  defense.  Sorry.  Go ahead.

 5          MS. BELYI:  If I may add to it.  Because, if, for

 6  example, the jury does believe that he had knowledge of the

 7  weapon, the cases -- they don't just talk about necessity.

 8  They kind of link out innocence, right, an innocent possession

 9  of the weapon.

10      If they believe he found the weapon.  It was wrapped in a

11  towel or something, and he -- it was possessed innocently for a

12  brief period of time, they might think, even if he knew that,

13  you know, at some point he gained knowledge of what it was and

14  it was an innocent possession, that he quickly got rid of this

15  weapon.  So it does add --

16          THE COURT:  I guess what I would say is that -- let's

17  use a different -- let's take the hypothetical out of the fact

18  of this case.  Right?

19      Let's say I'm standing there and, you know, somebody comes

20  and slips a gun into my back pocket.  Okay?  And I didn't know

21  that they put a gun in my back pocket.  And, you know,

22  60 seconds later somebody said, "What's that gun doing in your

23  back pocket?"

24      And I say, "Oh, my God."  And take it out and look at it

25  and throw it away.  Right?

**PROCEEDINGS**

 1           I believe that that is not knowing possession of a

 2     firearm.  Because the only action I have taken is to

 3     disassociate myself from the firearm that I did not know that I

 4     had.  Okay?

 5           And I -- that is not an affirmative defense.  That is, if

 6     the Government charged me with being a felon in possession of a

 7     firearm, my argument would be, that's not an affirmative

 8     defense.  That is -- I was not in knowing possession.  The

 9     Government did not prove beyond a reasonable doubt that I was

10     in knowing possession of that firearm.  And I think that is

11     similar to the facts that you are articulated -- your factual

12     theory of the case here.

13           And so it just doesn't -- it doesn't feel like -- it

14     doesn't seem like an affirmative defense at all.  It seems like

15     an argument that the Government hasn't proven its case.  So

16     that's my final ruling on that.

17           Did the Government want to say anything on that?

18           **MR. BARRY:**  Just one thing, Your Honor, just from

19     something I heard from Mr. Serra.  I think that he indicated

20     that he has the burden in this case.  And I think the Court is,

21     obviously, dead on in that it would be, no, the Government

22     didn't meet its burden to establish that I knew what it was

23     during the time that I had some control over it.

24           **MR. SERRA:**  No, I was referring to the burden of

25     preponderance of evidence if he gave a transitory possession

**PROCEEDINGS**

```
 1   instruction.  He is not giving it, so obviously I'm not going

 2   to assume any burdens.

 3        THE COURT:  Okay.  Is there anything else to talk

 4   about with respect to defense Motion in Limine Number 1?  I'm

 5   sort of hoping not, because it is the first of 25 motions in

 6   limine that we have to discuss.

 7        MR. SERRA:  Nothing more than anticipating your draft

 8   of the instruction.

 9        THE COURT:  Okay.  Let's see.

10        Number 2 is final.

11        Number 3 is final.  My tentative my ruling was final.

12        Number 4, evidence of the gunshot residue.  So I will tell

13   you that I did not, I guess, I didn't understand the defense

14   argument for why the evidence of the gunshot residue should

15   come out.  It sounded like an argument that you don't, you

16   know, you don't consider the evidence, the Government's

17   evidence to be terribly credible.  And, you know -- but that's

18   sounds like it's something for cross-examination.  I didn't

19   understand basis for excluding it.

20        So do you want to take another crack at that?

21        MS. BELYI:  The basis to exclude.  Your Honor is

22   correct that the basis to exclude it was that it didn't appear

23   to be credible, that there are issues with the report that they

24   were -- appeared to be written over with pen, rather than going

25   with the print -- machine printout, but --
```

1        **THE COURT:**  Oh, and by the way, that reminds me of a

2   question that I posed in my order that we didn't talk about

3   when we were going through the Government's witnesses, which is

4   the -- is the person who prepared that report on the

5   Government's witness list?

6        **MR. CHENG:**  Yes, Your Honor, that was Linda Abuan, the

7   first witness that we described.

8        **THE COURT:**  Okay.  All right.

9        **MS. BELYI:**  And so -- but we can go with, you know, if

10  Your Honor wants to go --

11       **THE COURT:**  You'll just rip her apart on the stand.

12       **MS. BELYI:**  No, we can go with that.

13       **THE COURT:**  That tentative becomes final.

14   Where are we?  Number 5.  5 was final.

15   6 was final.

16   7 was tentative.

17   Okay.  So let me get one thing straight first.  Which

18  video are we talking about here?  We're talking about the video

19  of the Pier where it shows from afar what happened?  Is that

20  the video we're taking about?

21       **MR. CHENG:**  That was our understanding, Your Honor.

22       **THE COURT:**  So one thing I wasn't clear on was, so

23  there was a -- the raw video footage and then there was an

24  edited version of the video.  The edited version of the video,

25  where did those edits come from?

**PROCEEDINGS**

1    **MR. CHENG:**  The edits come from work that Officer Dong

2    did with somebody from NCRIC.

3         **THE COURT:**  Was that admitted in the state court

4    trial?

5         **MR. CHENG:**  The one without labels on it was admitted,

6    whereas the one with labels was only used during argument.

7      We have provided each of those versions --

8         **THE COURT:**  So which version are you proposing to play

9    to the jury?  Which video?

10        **MR. CHENG:**  Our proposal is to play the zoomed-in

11   version that is excerpted in a very similar way as what was

12   done in the state court trial.

13        **MR. BARRY:**  With no commentary.

14        **MR. CHENG:**  With no commentary.

15        **THE COURT:**  So without the picture of Kate and

16   James Steinle appearing, and without all that stuff?

17        **MR. CHENG:**  Correct.  That would be what would be

18   introduced into evidence.

19        **THE COURT:**  So no labels, no words appearing on the

20   video, just the zoomed-in version of the raw surveillance

21   footage?

22        **MR. CHENG:**  Correct.

23        **THE COURT:**  Presumably, clips of it; not the entire

24   45 minutes.

25        **MR. CHENG:**  That's right, Your Honor.

1          **MR. SERRA:**  In their exhibit list they say "enhanced."

2    Is the enhancement the editing that you're talking about?

3          **THE COURT:**  I gather it's the zooming.

4          **MR. BARRY:**  That's a good point.  Thank you for

5    clarifying that, Mr. Serra.

6          So, the enhancement, all it is, is zoomed in.  None of

7    pixels are changed.  None of the quality is changed.  It's just

8    a focus in on that area.  It's enhancement, pure mechanically.

9    It's -- nothing has been edited or altered in any way.  It's

10   just to focus on the a certain part.

11         That's a good question.  I'm glad you addressed that.

12         **THE COURT:**  That's fine.  I think the video is

13   appropriate to show and video with zooming is appropriate to

14   show.  And, you know, you can pause the video where you need to

15   pause it and all that, that's fine.

16         I just want to make sure that the version of the video

17   where you're showing Kate Steinle's face is not being used.

18         **MS. BELYI:**  Just also from our perspective, I think it

19   would just be good, the way that it's being discussed here,

20   before any video -- or maybe, if we can get like a handout for

21   each video what was done.  Like, this is a zoomed-in version,

22   just something like that, so we're aware of what the

23   manipulations are.  That would just be helpful.

24         **THE COURT:**  Well, that should be described --

25   presumably, that would be described by the witness who is used

**PROCEEDINGS**

 1   to put on the video.

 2            **MS. BELYI:**  That would be fine too.

 3            **MR. BARRY:**  Mechanically, Your Honor, what we intend

 4   to do is to have the witness view the video, in order to

 5   introduce it, it would be the same video that the defense has.

 6   They will view it.  They will sign a disk with it.

 7        Then we will present them with the disk.  Say, "Do you

 8   know what this is?"

 9        "Yes, it's a video of the Pier that I took and I zoomed

10   in."

11        And introduce it that way.  And we will assert to the

12   defense that it's the exact same thing that they have.  So

13   there is -- there would be no confusion about that because that

14   way we could have them look at it on the monitor, just to make

15   sure, before we publish it.  But that's the mechanism that we

16   intend to do.

17            **THE COURT:**  Okay.  Are we going to have the video

18   available to the jury in the jury room during deliberations?

19            **THE CLERK:**  We can.

20            **THE COURT:**  What are people's positions on that?

21            **MR. BARRY:**  We're -- we would like the jury to be able

22   to view it.  The question is whether it's going to be court

23   equipment or government equipment, I guess.  But we can work

24   that out with the courtroom deputy.

25            **THE CLERK:**  It would be court.  But your office would

**PROCEEDINGS**

1  set it up in here, and then we push it back to them.

2          **MR. BARRY:**  You'll have a cart?

3          **THE CLERK:**  Yes.

4          **MR. BARRY:**  Okay.

5          **MS. BELYI:**  That's, I think that's fine.

6          **THE COURT:**  Okay.  So make sure -- let's make sure we

7  make arrangements for that.

8      Let's see.  Number 8.

9      By the way we'll need to -- we have been going for about

10 an hour and a half.  So I guess what I propose we do is, in a

11 few minutes, we'll take a half-hour break, maybe, and people

12 can grab a quick bite and stuff.  Then we'll come back.  Okay?

13     Let's see.  Number 8.  Oh, wait.  We kind of covered

14 Number 8.  Let's see.

15     9 was final.  10 was --

16          **MS. BELYI:**  For the record, 8 is final?

17          **THE COURT:**  8 is now final.

18          **MS. BELYI:**  Yeah.

19          **THE COURT:**  9, 10, 11, 12, were final.  13, final.

20     Okay.  Anybody have anything to say about this?  My theory

21 of relevance was that to the extent there is any, you know,

22 concern that this was Garcia-Zarate's gun, the fact that it was

23 stolen from a van nearby, a few days prior -- was it a few days

24 prior?

25          **MR. CHENG:**  Yes, Your Honor.

**PROCEEDINGS**

1      **THE COURT:**  Obviates that concern.  And I guess is at

2   least somewhat consistent with this -- Mr. Garcia-Zarate's

3   story, or the story that he told in the -- and his lawyers told

4   in the state court trial, that he found the gun there.  I mean,

5   arguably it makes it slightly more likely that he did find the

6   gun there.

7      So it struck me that, you know, maybe it -- probably

8   perhaps it doesn't matter that it was a stolen from a

9   government vehicle.  I don't know.

10      I mean, I sort of got the sense from the state court

11   transcript that it is inevitably going to come in that it was a

12   government -- you know, the safety being on or whatever, that

13   all that stuff was going to come in.

14      But anyway, so my thinking was that it would be

15   appropriate to allow the jury to learn that the gun was stolen

16   nearby from a car a few days prior, or whatever it was.

17      And it sounds like the Government wasn't intending on

18   arguing that, or implying that Mr. Garcia-Zarate stole the gun.

19   So does -- but maybe that was before you knew what my ruling

20   was going to be about the fact that the gun was stolen.

21      So what do you -- do you have anything you want to say

22   about that?

23      **MR. BARRY:**  Yes, Your Honor.

24      So as the Court could see from the transcript of the state

25   court proceeding, there was sort of the whole sideshow, if you

**PROCEEDINGS**

1   will, about BLM policies, about negligence, about what the BLM

2   ranger did.

3       To avoid that we would propose the following stipulation:

4   First, the parties agree that the firearm in this case had been

5   stolen from the vehicle parked along the Embarcadero on -- I'm

6   sorry the date escapes me, but we'll specify the days.

7           MR. CHENG:  June -- we'll provide the exact date.

8           MR. BARRY:  Then second:  The Government has no

9   evidence that Mr. Garcia-Zarate was the person who burglarized

10  the car and took the firearm.

11      MR. SERRA:  You know, we like that.  But I think one

12  thing that should be added is it was a government vehicle.  Why

13  are we disguising that?

14          MR. BARRY:  There is no relevance.

15          THE COURT:  It might matter -- I haven't figured it

16  out yet.  But it might matter that it was a government weapon.

17  But why would it matter that it's a government vehicle?

18      Why would it matter that it was stolen from a government

19  vehicle?

20          MR. SERRA:  Well, from my perspective it -- how would

21  I call it -- disperses culpability.  It gives the jury another

22  focus.  Was this negligence?  You know, was it wanton disregard

23  for the safety of people?

24      I know it's not a civil case, but I think those

25  considerations will flow through the minds of the jurors if

1   they know that it was a government vehicle.  And if it's not a

2   government vehicle, other inferences are possible.  They won't

3   know.

4          **MR. BARRY:**  And that's precisely why the jury

5   shouldn't hear that, Your Honor.

6          **THE COURT:**  I agree.

7          **MS. BELYI:**  And --

8          **THE COURT:**  I'm sorry.  Go ahead.

9          **MS. BELYI:**  Just as far as the phrasing, instead of

10  saying that there is no evidence that Mr. Garcia-Zarate was the

11  person that stole it could it be something along the lines of

12  there is -- and I had it my mind and it just kind of slipped

13  out, something along the lines of Mr. Garcia-Zarate is not --

14  there is no evidence or that's not --

15         **MR. SERRA:**  Charged.

16         **MS. BELYI:**  Just something that's not -- because I

17  feel like saying there is no evidence that Mr. Garcia-Zarate

18  was the person that stole is it sort of implies that maybe he

19  did or didn't, we're not sure.  But that's not really the case.

20         I think that there was a series of car thefts along the

21  Embarcadero on that evening.  I think it's pretty well

22  determined that it's not Mr. Garcia-Zarate that's the

23  perpetrator in those thefts.  So something along the lines of,

24  Mr. Garcia-Zarate is not at all implicated in the theft, or

25  something to make it less -- I feel, like it has a little sound

**PROCEEDINGS**

 1  of legalese technicality, that we have no evidence that he did

 2  this.

 3          THE COURT:  What about:  The Government does not

 4  contend that he stole it?

 5          MS. BELYI:  "There is no contention that he stole the

 6  weapon."

 7          MR. BARRY:  That's fine with the Government.

 8          THE COURT:  Um-hmmm.

 9          MR. BARRY:  So the simple one would be:  The

10  Government does not contend that the stole it.

11          THE COURT:  And then -- so I think that all sounds

12  fine.

13      My only additional question about that and, again, from

14  looking through the -- and I haven't read the entire state

15  court transcript, but just to kind of flip through it, there

16  was all this discussion of a hair-trigger.  Right?

17      And was there testimony -- I think there was testimony

18  from the BLM person about how the gun was set, and that it was

19  set, you know -- I gathered the Government isn't intending

20  on -- the Government doesn't have him on their witness list.

21  The Government doesn't intend on getting into any of that.

22          MR. BARRY:  No.

23          THE COURT:  In that case, I don't think it's relevant

24  that -- I don't think it's relevant that it came from a BLM

25  vehicle.  And it -- it may also not be relevant that it was a

**PROCEEDINGS**

 1   BLM weapon.  Is that correct?

 2          MR. BARRY:  That's correct, Your Honor.

 3      The defense will be able to argue based on the trigger

 4   pull, like we intend to present evidence of how many pounds per

 5   pressure it took to pull the trigger in single-action and

 6   double-action mode.  And the defense is free to argue whatever

 7   they want about that, but they will have those facts.

 8          THE COURT:  Okay.  So to be clear on that, you know,

 9   sort of tweak this for the final order on the motions in

10   limine, but it's -- there is going to be this stipulation about

11   the fact that it was stolen from a car along the Embarcadero.

12      Can we say anything more specific than "along the

13   Embarcadero"?

14          MR. BARRY:  We'll work with the defense to -- because

15   I think it was near the ballpark, but we'll nail that down, but

16   specifically where and specifically when.

17          THE COURT:  All right.  But the fact that it was

18   stolen from a government car or that it was a government weapon

19   is not relevant or admissible.

20          MS. BELYI:  And perhaps part of a stipulation could be

21   that it was part of a -- it appears to be a part of a series of

22   thefts in which Mr. Garcia-Zarate is not implicated.

23          THE COURT:  That probably -- go ahead.

24          MS. BELYI:  Well, I think it also -- something that is

25   very common in San Francisco.  And I think that that's -- in

**PROCEEDINGS**

1   that way it particularly disengages Mr. Garcia-Zarate from the

2   theft, that it's -- it's something that happened, that looks

3   like --

4          **THE COURT:**  I understand what you're saying.  But I

5   think "The Government does not contend that he stole it," is

6   sufficient.

7          **MS. BELYI:**  And I just have a brief question, Your

8   Honor.  I'm sorry.

9       So we don't -- we're not going to state that it was a

10  particularly -- particular agent, or a weapon that's associated

11  with a particular agency.  That's sort of the ruling of

12  the Court?

13         **THE COURT:**  Correct.  And not only that it's not

14  associated with a particular agency, but also that it's not a

15  government weapon.  That does not seem relevant.

16      We're not going to say that it's a government weapon, is

17  what I'm saying.

18         **MS. BELYI:**  Okay.

19         **THE COURT:**  Okay.  So 15 was final.

20      16 was final.

21      17 was final.  We're almost through the defendant's.

22      We're going to -- we're going to skip over the arraignment

23  until after the break, because that may take a little longer.

24         **MR. SERRA:**  We have 18.

25         **THE COURT:**  So the last thing we want to discuss is

1    18.  Then we'll take a break.

2        So what -- this motion was written in very general terms

3    and I couldn't figure out necessarily what everybody was

4    getting at.

5        So what -- what are people getting at?  Is there any other

6    concern that you want to articulate about this issue?

7        If, again, the general overlay is that this is not going

8    to be about Kate Steinle's death; right?

9        **MS. BELYI:**  And it was a general motion in limine.

10   And I think that the -- I think the Court's ruling is --

11       **MR. SERRA:**  I would be objecting that their opinion

12   with regard to whether the responses were credible or not

13   usurps the function of the jury and is irrelevant.

14       **THE COURT:**  Well, I don't think we can say that in the

15   abstract.  I think it depends on the -- it depends on the

16   question that is asked of the officer, and why the question is

17   being asked and, you know, why it matters whether the officer

18   believed them or not.

19       Again, I mean, I guess I 95 percent agree with you that in

20   a lot of instances that's not going to be relevant or

21   appropriate in this trial.  But I can't -- thinking about it in

22   the abstract, I can't definitively say that it's never going to

23   be appropriate.  I mean, I can imagine there being some

24   examples where it would be.

25       **MR. SERRA:**  Here is what I foresee.  In a number of

**PROCEEDINGS**

1  portions of statements by my client, he says things that are

2  untenable, that he just -- you know, they don't fit the facts,

3  that they are nonsense.

4       So they want to put on, I guess, some of those and ask the

5  officer when -- you know, did you act on this; did you accept

6  this as -- whatever.

7       I don't think that that's the prerogative of an officer to

8  decide.  I kind of argued that.  But, beyond that, sauce for

9  the goose, sauce for the gander, can we put on, in terms of

10 Doctrine of Completeness, other parts of the statements that

11 were also false, to show that he is confused.

12      **THE COURT:**  Right.  That's a good -- that's a very

13 good point.  Right?  And that gets to the issue of -- that's

14 why I said the Government needs to identify --

15      **MR. SERRA:**  Yes.

16      **THE COURT:**  -- the portions of the interrogation that

17 it wishes to admit so that we can all conduct an examination of

18 those portions to see if they are, you know, if they are

19 misleadingly incomplete.  And one way -- you're describing a

20 way in which they might be misleadingly incomplete.  But we're

21 not at a point where I can rule on that yet.

22      **MR. SERRA:**  We can ask the Government to make a

23 proffer right now.

24      **THE COURT:**  I haven't looked at it yet, but I think

25 the Government has now filed, has now identified the portion of

**PROCEEDINGS**

 1  the interrogation that it wants to include.  Right?

 2         **MR. CHENG:**  That's right, Your Honor.

 3         **THE COURT:**  And so we were --

 4         **MR. CHENG:**  We filed that yesterday.

 5         **THE COURT:**  I think I told you in an order to file a

 6  response to that by close of business, and we didn't get

 7  anything from you.

 8         **MS. BELYI:**  I did not --

 9         **THE COURT:**  Which is fine.  No big deal.  There is a

10  lot going on.  There is a tight time frame.  But we need to

11  take a close look at the interrogation and the portions of the

12  interrogation that the Government wishes to introduce.  And we

13  need to take a look at whatever arguments you have about why

14  that's incomplete -- right? -- and then issue a ruling on it.

15      But the ruling is not going to be that the defense gets to

16  go introduce other portions.  The ruling is going to be either

17  the Government has to introduce a more inclusive portion of the

18  interrogation, or the Government can't put it in.  Okay?

19      So it's not going to be, they get to introduce this,

20  therefore you get to introduce that.  It's going to be, if the

21  Government wants to introduce portions of the interrogation, it

22  may have to include other portions of the interrogation for

23  completeness, to avoid a -- presenting the jury with a

24  misleading picture.

25         **MR. SERRA:**  That sounds fair.

1      **THE COURT:**  So that's not something we're going to be

2   able to discuss today.  So what I should -- the Government

3   has -- the Government has identified the portions that it wants

4   to put in.  Why don't I ask you all to file, by tomorrow, a

5   response to that, any further argument you want to make about

6   it, including identifying portions of the interrogation that

7   you think should be included for completeness.

8      And I know you have an argument that none of it should

9   come in at all, and that's fine.  You can make that argument.

10  I assume that I'm going to reject that argument, probably.  So

11  you should also include specifically which other portions of

12  the interrogation you believe the Government would need to

13  include to avoid misleading the jury.

14     **MR. SERRA:**  As soon as we get their proffer, we will

15  respond.

16     **THE COURT:**  You have their proffer.  They filed it

17  yesterday.  So why don't you file it tomorrow by 5:00.

18     Is that unreasonable?

19     **MR. SERRA:**  Do we have the portions they intend to

20  use?

21     **MS. BELYI:**  Yeah.

22     **MR. SERRA:**  I'm sorry.  I just didn't receive those

23  yet.

24     **THE COURT:**  No problem.

25     Okay.  So that -- so number 18 is sort of on hold,

**PROCEEDINGS**

1    I guess.  We'll treat number 18 as about the interrogation,

2    about, you know, which aspects of the interrogation can come

3    in.  And we'll put that one on hold until we get your further

4    argument on it.

5         And then we'll resume after our short lunch break with

6    discussion of the statement during the arraignment.  Then we'll

7    get-- and we will discuss whatever else -- whatever else we

8    need to discuss about the Government's motions in limine, we'll

9    do that.  And then there may be another couple of issues we may

10   want to discuss.

11        Why don't we return at 20 after 12:00.  Want to just make

12   it 12:30?  Let's return at 12:30.

13             **MR. BARRY:**  Thank you, Your Honor.

14             **THE CLERK:**  Court is in recess.

15                  (Recess taken at 11:53 a.m.)

16             (Proceedings resumed at 12:37 p.m.)

17        **THE COURT:**  Okay.  Back at it.  The arraignment

18   statement.  Maybe I'll hear from the defense first.  What do

19   you all -- what do you all have to add about the statement that

20   Mr. Garcia-Zarate made during the arraignment?

21        **MS. BELYI:**  From our perspective, Your Honor, we agree

22   with the Court's interpretation, or the Court's view that this

23   statement was essentially an expression of what he was accused

24   of doing and his confusion as to what was going on.

25             **THE COURT:**  Well, I said, I guess what I said was

**PROCEEDINGS**

1   that's one way to interpret his statement.

2          MS. BELYI:  Sure.

3          THE COURT:  And, I mean, if you just look at the

4   literal words, the literal language, if you take,

5   hyper-literally, what the -- words that he uttered, it sounds

6   like he is saying "This is what I did."  But the question is

7   whether in this -- if you consider in context, whether -- what

8   he is really trying to do is describe what he was accused of

9   doing.

10         MS. BELYI:  Sure.  And I think the context is

11  important because right before he says -- right that, you know,

12  right before he says, you know, supposedly what he did, he is

13  also asking whether or not he has one or two interpreters.

14         THE COURT:  Is he asking whether he has one or two

15  interpreters?  I thought he was expressing confusion about

16  whether there were one or two charges.  That's how I

17  interpreted it, that he was saying, "Look, I don't understand,

18  like, you know, there was one incident, but there are these two

19  charges that the Government has brought against me."

20      What, you know, there are two charges.  That was my

21  interpretation of what he was --

22         MS. BELYI:  My interpretation was that he was asking

23  whether or not he is going to have one or two interpreters.

24  And I don't have the transcript right in front of me,

25  unfortunately -- oh, thank you.

**PROCEEDINGS**

1          **THE COURT:**  Yeah, I'm pulling it up also.

2          **MS. BELYI:**  So --

3          **THE COURT:**  One sec.

4          **MR. SERRA:**  While she is looking, let me step in for a

5     second.  It's all fraught with --

6          **THE COURT:**  One quick second.  I'm pulling up the

7     transcript also.

8          **MR. SERRA:**  Yes.  Because, you know, Judge Hixson says

9     (reading):

10          "Do you understand the nature of the charges against

11     you?"

12     And then he says -- then the Court says -- it sounds like,

13     what I'm gathering is that Mr. Garcia-Zarate is answering in

14     English and then the interpreter is saying, "You have to talk

15     to me in Spanish."

16     And Garcia-Zarate is saying, "Yes, but one or two?"

17     I don't know why he would be saying one or two

18     interpreters.  I think he is saying one or two charges because

19     then he later says (reading):

20          "It's saying that it's just one charge.  One charge.

21     It being illegal to have a weapon in my pants."

22     He is talking about one charge versus two charges, not one

23     interpreter versus two interpreters.

24          **MS. BELYI:**  I think, as Mr. Serra says, I think it is

25     actually ambiguous in the context, because he could be confused

**PROCEEDINGS**

 1   about both.  And he could be confused about -- and I think

 2   what --

 3            THE COURT:  What reason would we have to even suspect

 4   that he is talking about one versus two interpreters?

 5            MS. BELYI:  Because sometimes he has two interpreters.

 6   Like today he has two interpreters.  And I think what,

 7   honestly, the issue here is --

 8            THE COURT:  But he later explains what he says by one

 9   or two -- what he means when he says "one or two."  He later

10   says (reading):

11                "It's saying that it's just one charge.  One charge."

12       And then the Court clarifies that there is a second

13   charge.  Anyway -- okay.

14       But let's -- I think it's probably pretty safe to assume

15   that what he was confused about was whether it was one charge

16   or two charges.  But, maybe it's beside the point.

17            MS. BELYI:  Then -- well, I don't know.  I think it's

18   arguable.  I think that what he is confused about is arguable,

19   whether or not it's one charge or two.  That's fine too.  He

20   might be confused about that.  But I think he had -- I think

21   it's clear that he is not in a good state of mind in that

22   point, that he is confused.  That he has never expressed

23   confusion before as to his charges I think that is a huge

24   indicator as to his confusion.

25       He is later asking about the amount of deportations.  He

1  is not understanding -- and he is talking about immigration,

2  which is clear that the confusion is coming from the previous

3  court appearance he had that same morning in front of Your

4  Honor, where a lot of the Trump presidency and immigration

5  policy, and how that's going to play into the jury selection

6  process was being discussed.

7       So he is coming in here and he is discussing, you know,

8  we're discussing these issues and then he is coming back out

9  there and he is like, "Well, I'm just not sure what's going

10 on."

11      And, if Your Honor is correct, "How many charges am I

12 facing," you know, "What is happening?  Are they charging me

13 with having that gun in my pocket?  Or are they charging me

14 with the deportations?"

15      And he is just not clear as to what's going on.

16      And I think admitting this statement -- and I think Your

17 Honor is right, if you're just submitting that particular

18 statement, a literal reading of that could be, well, he is

19 saying that's what happened.

20      But, then, when you look at the context of that entire

21 proceedings that morning -- which I think we would have to show

22 to the jury because that would explain all of his statements.

23 I think that would be -- that shows the cause for his

24 confusion.

25      And I also would point out and we pointed in out in our

**PROCEEDINGS**

1    motion that the recording is not complete.  That was maybe what

2    Your Honor was referring to this morning that sometimes it just

3    doesn't work.  So we don't even have a complete transcript of

4    the proceedings to present to the jury and from which to pick.

5         And I understand that the Government's position that they

6    can cherry-pick the statements from the Government with

7    the Court's overview and oversight as to which statements

8    actually get put in, and which context gets put in.  But --

9              **THE COURT:**  One small question:  Is it a problem that

10   there is no record of Mr. Garcia-Zarate saying that he

11   understood the nature of the charges again him?  I mean, there

12   is -- all we have is a record of him saying that doesn't

13   understand.  And then, apparently, it sounds like they went

14   back in and maybe he said that he understood the nature of the

15   charges against him.  But, we don't have a record of that.  So

16   all we have is a record of him saying he doesn't understand the

17   nature of the charges.

18        Is that a problem from the standpoint of arraignment?

19   Like, was it a bad arraignment?  Does he need to be

20   re-arraigned or something?  Has anybody thought about that?

21        I don't know the rules about that.  I don't know if there

22   is any significance to the fact that we don't have a transcript

23   of him saying that he understands the nature of the charges

24   against him.

25        Has anybody given that any thought?

**PROCEEDINGS**

1          **MR. BARRY:**  No, Your Honor.

2          **MS. BELYI:**  I don't believe that's been considered.

3          **MR. SERRA:**  From my perspective, it raises a problem

4   because what we really have here is circumstantial evidence.

5   Is he talking about, you know, what occurred?  Of course not.

6   He is talking about, in his mind, what the charges are and he

7   is confusing, you know, possession, it has to be in your

8   pocket.  So he is reciting that.

9          But we don't have all the rest.  And you need all the rest

10  of the material to infer what the confusion was, how it was

11  sought to be rectified.  It would shed more light on what the

12  reasonable interpretation of the pivotal statement is "in my

13  pocket," or words to that effect.

14         So, yes, we're handicapped by not having it.  And I think

15  it's clear, and I think your ruling, or your intended ruling

16  hits the nail on the head where you said --

17         **THE COURT:**  I said I was undecided.

18         **MR. SERRA:**  -- in all likelihood that Garcia-Zarate

19  was merely describing what he was accused of doing, admission

20  of the statement could be unfairly prejudicial.

21         And my perspective, that's exactly what he was doing.  It

22  should not be allowed in, Your Honor.

23         **THE COURT:**  Okay.  Government?

24         **MR. BARRY:**  Your Honor, first, in terms of the

25  incompleteness of the recording, the Court has heard nothing

**PROCEEDINGS**

 1   about what's missing.  There has been no proffer about, here is

 2   the missing part of it, because there was nothing.

 3        In my recollection -- and if it's an issue, there were

 4   court personnel and court security personnel, that we can call

 5   as witnesses, who would say all he was said was "yes" when he

 6   was asked the question.  So there is nothing to complete the

 7   statement here.  So incompleteness does not apply.

 8        If he needs to be re-arraigned, mechanically we can do

 9   that in the next few days.  If the defense doesn't waive that,

10   we can always do it again.

11        So let me get to the meat of it.  The only basis that I'm

12   seeing for potential exclusion would be this unfair prejudice

13   aspect of it.  What we have is a fact.  We have the fact of

14   what the defendant said.  The Government wants to present the

15   jury with that fact.

16        We don't even need to make inferences based on that fact.

17   We just want to present them with the fact that he said, "The

18   gun I had -- the weapon is it being illegal to have a weapon in

19   my pants, the one that I had that day at Embarcadero in my

20   pants pocket."

21        We want to present that to the jury.

22        It's the jury's job to figure out what that means, what

23   inferences that can be drawn from that.  If the defense wants

24   to argue that he was confused, that he what he was really doing

25   was talking about the charges and not about what he did, they

1   can argue that.

2       THE COURT:  Well, here is one concern I have about

3   that is -- I have now listened -- you know, I have now watched

4   the video of the interrogation of Mr. Garcia-Zarate.  I have

5   watched portions of the ABC interview, portions that you want

6   to introduce and some portions that you don't want to

7   introduce.  I have listened to the recording of the

8   arraignment.  I have read a variety of transcripts.  And I

9   think that I have -- I have one major takeaway from all of

10  that, and that is that a lot of the things that

11  Mr. Garcia-Zarate says don't make a lot of sense.  And that he

12  often seems confused, and he speaks with, to put it mildly,

13  imprecision.  Right?

14      And so the -- so my interpretation of what he said during

15  his arraignment is colored by my having listened to all this

16  other stuff.  But, the jury will not have heard most of that

17  other stuff, presumably; right?

18      And he often -- it often appears -- Mr. Garcia-Zarate

19  answers questions when he clearly doesn't understand what's

20  being asked of him -- right? -- particularly when it's in

21  English.  Right?

22      And, for example, there was a portion of the ABC video

23  that you didn't propose -- or maybe you did propose to put it

24  in -- where they ask him "Do you feel badly for killing

25  Ms. Steinle?"  And he says "No."  And it's obvious that he

 1    didn't understand the question asked of him.  And his English

 2    is limited.  And regardless of language, I think there is a

 3    real concern about whether his comprehension is limited.

 4         And so, in light of all if that -- in that context -- in

 5    that context, I think that the, you know, we -- when you

 6    understand that context, you realize it is far less likely that

 7    he was making an admission in his arraignment.  And far more

 8    likely that he was describing what the Government had been

 9    accused -- had been accusing him of doing.

10         And so, you know, but the jury is not going to be able to

11    understand all of that.  Another related concern, right, is

12    that where does this stuff come about having the gun in his

13    jeans pocket?  Where does that come from?  That comes from the

14    prosecution in the state court proceeding.  If you read the

15    prosecutor's closing argument, which I'm not sure you have

16    done --

17              MR. BARRY:  I have, Your Honor.

18              THE COURT:  If you read the testimony about the gun

19    fitting into the jeans pocket, there was a lot about -- the

20    prosecution's theory was he had it in his jeans pocket.  Maybe

21    he had it in his coat pocket, the prosecution says.  But the

22    primary theory seemed to be that he had the gun in his jeans

23    pocket.  But he -- when you understand that, when you realize

24    that, you start to understand that, during the arraignment, he

25    is likely just parroting back what the Government accused him

1   of doing in the prior trial, what he sat listening to in the

2   state court trial for weeks, I think.  The trial went on for

3   weeks; didn't it?

4        So that makes it even more likely that Mr. Garcia-Zarate

5   is merely trying to describe what the Government has accused

6   him of doing, the Government's theory of the case as opposed to

7   what he actually did.

8        So if this statement were to come in, at an absolute

9   minimum, wouldn't all of that other stuff need to come in?  So

10  that the defense would explain -- I mean, wouldn't all the

11  dialogue from the state court trial come in so the defense

12  could explain that "No, Mr. Garcia is just parroting the

13  accusations made against him for weeks during the prior trial."

14       Then wouldn't that open up this big Pandora's box about

15  what happened during the prior trial?  And isn't that a further

16  argument for excluding it here, given how unreliable

17  Mr. Garcia-Zarate's statements are generally?

18            MR. BARRY:  No, Your Honor, because, respectfully,

19  that's the jury's call to make.  It's the jury's job to figure

20  out what it meant.

21            THE COURT:  It's my job to decide whether evidence

22  should be excluded on 403 grounds.  And I have to exclude -- if

23  I conclude that it is substantial -- that the evidence is

24  substantially more, that the probative value is very low and

25  the prejudicial effect -- unfair prejudicial effect would be

1    high, I have the discretion to exclude it.

2        And it seems to me, given everything I have just said,

3    that the probative value of his statement is very low, and the

4    potential prejudicial effect is very high because the jury is

5    not going to understand all of the stuff that I understand

6    about Mr. Garcia-Zarate and how he communicates.

7        **MR. BARRY:**  But the -- well, let me take a step back.

8        So the probative value of a confession has the highest

9    probative value of anything.

10       **THE COURT:**  If it's a confession.  But, I think that

11    the possibility that this is an actual confession is so low

12    given everything that just you've just said.

13       **MR. BARRY:**  I'm sorry, Your Honor.  I disagree with

14    that, because one of -- the other theory about the pants

15    pocket, the reason he said "It was in my pants pocket" is

16    because it was in his pants pocket.  I mean, that is the most

17    rational, most logical option.

18        And "Does this have to do with the gun I had?"  Again, he

19    didn't say -- he didn't say "The gun that I am accused of

20    having, the prosecution said I have."

21       **THE COURT:**  That's because Mr. Garcia-Zarate is often

22    confused.  And he is a very poor communicator, which leads me

23    to another question.

24        If Mr. Garcia-Zarate actually said that, do you have

25    any -- if it was actually an admission, do you have any

**PROCEEDINGS**

1   concerns about his competency?

2           **MR. BARRY:**  I do not.

3           **THE COURT:**  Why not?

4           **MR. BARRY:**  People make mistakes all the time.

5           **THE COURT:**  Yes, but, again, let's take the totality

6   of Mr. Garcia-Zarate's communications that we have access to,

7   the stuff that he says in his interrogation, the stuff that he

8   says in the ABC interview, the stuff that he said in

9   arraignment.  Wouldn't that -- I would think that would

10  normally give you concerns about whether Mr. Garcia-Zarate

11  understands what's going on around him.

12      I mean, maybe part of it is the language issue.  Maybe

13  part of it is an issue with the fact that so often people are

14  trying to communicate with him in English, inappropriately,

15  because it was obvious that he didn't understand English.

16          **MR. BARRY:**  He had a translator.  At the arraignment

17  he had a translator.

18          **THE COURT:**  Yes, but he was --

19          **MR. BARRY:**  He had counsel.

20          **THE COURT:**  But there was confusion there too because

21  he was -- it seems from the transcript that he was listening to

22  Judge Hixson say what he was saying in English, and trying to

23  respond directly to Judge Hixson, rather than waiting for the

24  interpreter, even though he obviously has a tremendous amount

25  of difficulty understanding what people are saying in English.

**PROCEEDINGS**

1          **MR. BARRY:**  You can hear on the recording.

2          **THE COURT:**  Or hopefully that's what it is, and not

3     that he simply has difficulty understanding what anybody is

4     saying regardless of what language it is.

5          **MR. BARRY:**  So we are hamstrung a bit in terms of his

6     competency.  There has been no motion for competency, with no

7     accusation from the defense that he is incompetent.  And the

8     competency bar is extremely high:  Does he understand the

9     proceedings and can he participate in his defense?

10         **THE COURT:**  The only transcript I have seen is that he

11    didn't understand the charges against him.

12         **MR. BARRY:**  He eventually did understand the charges.

13    In fact, he understood them well, and that he talked about,

14    Charge 1:  Does this have to do with my carrying a firearm?

15    Charge 2:  Does this have to do with immigration?

16         The answer to both those questions is "yes."  That's

17    exactly what these charges are about.

18         So in order to get to the notion that it's prejudicial

19    requires a lot of inferences.  Because, again, we have got the

20    fact of what he said.  If he had said, you know, "Does this

21    have to do with the fact that I'm charged with carrying a

22    firearm," then maybe we're not in this position.  Maybe it

23    shouldn't go to the jury because the fact that he is not

24    acknowledging a charge is different than saying, "This is the

25    gun I had."

 1          And, again, that is the most logical option.  Like the

 2    whole shirt story is just absurd and it's not supported by the

 3    evidence.

 4          So the most logical option is that he did have a gun in

 5    his pants on the Embarcadero, and his acknowledgment of that at

 6    the arraignment should be put in front of the jury.

 7          If the defense wants to say he is confused, if they want

 8    to put him on the stand to show he is confused and they want to

 9    ask him what he meant to say, they can do that.  But there is

10    no basis to prevent the jury from doing its job.  And the

11    jury's job is to figure out what this means.

12          Again, there is a fact.  The fact is he said this.  What

13    it means is up to the jury.  And Your Honor has made that point

14    clear.  In other cases you said the jury must be allowed to

15    fulfill its role, even where the evidence is inconclusive or

16    indirect.  That was a civil case from a couple of years ago.

17          But time and again in the sufficiency of the evidence

18    standard or context, in the habeas context, the Supreme Court

19    time and again says that (reading):

20              "It's the responsibility of the trier of fact,

21          fairly, to resolve conflicts in the testimony, to weigh

22          the evidence, and to draw reasonable inferences from basic

23          facts to ultimate facts."

24    That's *Jackson versus Virginia*, 443 U.S. 307.

25          **THE COURT:**  I'm not sure.  I mean, I'm not sure the

 1  relevance of that.  The point is that in every -- in every

 2  instance, I have to make a decision whether the probative value

 3  of the evidence is substantially outweighed by the potential

 4  for unfair prejudice.  And I just don't --

 5       MR. SERRA:  Your Honor, isn't there another dimension

 6  that weighs in on that decision, the 403 decision, is the undue

 7  consumption of time.  As you indicated, you have to open up the

 8  state case, which is now foreclosed, so that we can show the

 9  context, the very context the Court has read and explicated for

10  the record.

11       THE COURT:  Why wouldn't that -- why wouldn't

12  inclusion of that instruction, of this statement necessarily

13  result in the introduction of all of the stuff that the

14  prosecution accused Mr. Garcia-Zarate of in the prior trial?

15       MR. BARRY:  Because he didn't say that.  He said "The

16  gun that I had in my pants pocket."

17       THE COURT:  But, the context -- it's the context.  The

18  context is, what is he being charged with.  So it seems likely

19  that what he is attempting to articulate is what the Government

20  accused him of doing.  He did it with imprecision.  He says

21  everything with imprecision.  It's very hard to follow what

22  Mr. Garcia-Zarate is saying oftentimes.  And this is one of

23  those times.  But from the context it seems quite likely that

24  he was trying to describe what he was being accused of.

25       MR. BARRY:  Again, I disagree, Your Honor.

 1          And the person -- the body to resolve those disagreements

 2     is the jury.

 3          So -- and with respect to unfair prejudice, the unfair

 4     prejudice prong deals with evidence that is not related to

 5     culpability or guilt.  It's when stuff is dragged in -- I think

 6     "by the heels" the Supreme Court said -- just to dirty up the

 7     defendant.  The notes from Rule 403 indicate that it's

 8     really -- the jury is making a determination of guilt on

 9     something improper, like emotion.

10          Here, it's what did the defendant say and what did it

11     mean.

12          **THE COURT:**  Yeah, I see what you're saying.  That's a

13     fair point.

14          **MR. BARRY:**  With respect --

15          **THE COURT:**  Let me ask you this.

16          I mean, let's say -- what if the defendant had said --

17     what if Mr. Garcia-Zarate had said "Oh, you mean when I, you

18     know, was carrying the gun on top of my head at the Pier.

19     Balancing the gun on top of my head at the Pier"?

20          Would you be saying he made an admission or would you be

21     saying "That's not reliable because we saw this video and there

22     was no indication that anybody was carrying a gun on top of his

23     head at the Pier."

24          **MR. BARRY:**  The video was not clear enough to make

25     that determination.

PROCEEDINGS

1      **THE COURT:**  Let's say that it was.

2      **MR. BARRY:**  It could be an expression --

3      **THE COURT:**  At some point the statement becomes so

4   unreliable we say there was something wrong with what was going

5   on in the defendant's brain when he was saying that, and it was

6   so obviously incorrect that he must not have meant that.  He

7   must have meant something else.  Right?

8      **MR. BARRY:**  We're in the land of "could be."  He could

9   have meant this.  He could be doing that.  That's for the jury

10   to discuss.

11      **THE COURT:**  So what about the --

12      **MR. BARRY:**  Consumption of time.

13      **THE COURT:**  The consumption of time.

14      **MR. BARRY:**  So if the defense wants to introduce -- we

15   have a certified copy of the transcript if they want to

16   introduce that portion of the closing argument.  It's on

17   page 2443 to 2444.  Where, as the Court noted, it wasn't just

18   the accusation or the claim that he had it in his pants pocket,

19   it's that he had it in his jacket pocket.  If they want to

20   introduce that portion, or if they want to introduce some of --

21      **THE COURT:**  So if they want to introduce the portion

22   that talks about the pants pocket, then you're going to want to

23   introduce the portion that talks about the jacket.

24      **MR. BARRY:**  It's part of the same -- it in the same

25   paragraph.  It's right after -- it's one page.

**PROCEEDINGS**

1    **THE COURT:**  There is much more than one page on -- one

2    paragraph on the jacket, on the pants pocket, on him putting

3    the gun in his --

4        **MR. BARRY:**  Well, there is the testimony where they

5    did that test.  But I think there is a succinct section of the

6    closing argument where it's just one page, and it has to do

7    with, that's the claim.

8        And I also note, Your Honor, that this was two years ago,

9    so --

10       **THE COURT:**  So?

11       **MR. BARRY:**  It was November of 2017.

12       **THE COURT:**  So what?

13       **MR. BARRY:**  So if we're arguing, on the one hand, he

14   is so confused, he has no idea what's going on, he doesn't know

15   this, but yet he is remembering with precision an accusation

16   from two years ago in the state trial, we can't have it both

17   ways.

18       **THE COURT:**  But he is confused about whether there is

19   one count or two.  And I understand the one thing I'm being

20   accused of, it's that -- the thing about me being on the Pier

21   with the gun in my pocket, but why are there two counts.

22       That's what he is saying.

23       **MR. BARRY:**  Yeah, and then -- but also there is the

24   immigration question.  He said the second question, "Does it

25   have to do a with immigration," and it does.  So it's clear he

**PROCEEDINGS**

1  is getting the issue.  He is not confused about what the issues

2  are.

3       And, again, it's up to the jury to assess that.  And if

4  there are ways -- there is a way to put that he was accused of

5  this, in a prior proceeding, I mean, we can put that transcript

6  in front of the jury.  The defense can introduce those

7  portions --

8       **THE COURT:**  Then what are we going to say about the

9  prior proceeding?

10       **MR. BARRY:**  Say, in a prior proceeding the defendant

11  was accused of carrying a weapon in his pants, and here is a

12  record of it.  And there is no consumption of time --

13       **THE COURT:**  Presumably, everything in the prior

14  proceeding about whether he was carrying the weapons in his

15  pants or not would have to come in.

16       **MR. BARRY:**  I would disagree.  Because if the issue --

17  if the issue is that we are surmising that he might have been

18  thinking about the charges, instead of what he actually says,

19  then it's the fact that he was charged, not what the evidence

20  was.

21       **THE COURT:**  He might have been thinking about the

22  charges.  He was asked if he understood the charges against

23  him.  I mean, of course, he was thinking about what the charges

24  were.

25       **MR. BARRY:**  I'm talking about the state court charges.

1  Because, again, what he -- he didn't say that.  What he said

2  was, does this have to do, in effect, with the gun I had in my

3  pocket --

4          THE COURT:  "In effect" is never a good thing to

5  say --

6          MR. BARRY:  Well, I can read it.

7      Here is what he says.  So Judge Hixson (reading):

8          "What is it that you don't understand?"

9          Mr. Garcia-Zarate (reading):

10         "It's saying that it's just one charge.  One charge.

11      It being illegal to have a weapon in my pants, the one

12      that I had that day at Embarcadero in my pants pocket."

13      So, again, he is not relaying what he was confused of in

14  the past.  He is recounting a fact that -- that he did.

15      And if the defense wants to say that's not what he meant,

16  they can do it.  But there is no reason to prevent this fact

17  from being presented to the jury where they can argue it.  They

18  can determine what it is, because that's their job.

19         THE COURT:  I understand the argument.  I'm not going

20  to rule it on that now.  I'm going to think about it a little

21  more.

22         MS. BELYI:  Just really quickly, a small point.  But

23  Mr. Barry insinuated that he understood both charges and that

24  they were talking about immigration.  But the charge is not

25  about immigration.  The charge is -- he is asking specifically.

**PROCEEDINGS**

1   He is saying -- and I'm sorry.  I'm just reading it from your

2   transcript (reading):

3          "I think you need to present illegal.  You're talking

4      about immigration.  You're talking about immigration.  The

5      attorney talked about U.S. immigration.  They are talking

6      about four deportations to Mexico.  That's what they are

7      charging for."

8      So he is not really understanding that the charges are

9   essentially the same.  It's just his status while committing

10  the charge --

11         **THE COURT:**  And on the topic of not really

12  understanding, I want to go back for a minute to the question I

13  asked about competency.

14     And you, I take it, have viewed all of the video of his

15  interrogation.  You've viewed the video of the ABC News

16  interview.  You have -- you were at the arraignment.

17     Is there -- should I be concerned that Mr. Garcia-Zarate

18  maybe doesn't understand the nature of the charges against him?

19  And should I be concerned that he cannot meaningfully assist in

20  his defense?

21         **MR. SERRA:**  I don't think you should be concerned.

22         **THE COURT:**  Why?

23         **MR. SERRA:**  Because when we speak with him he seems

24  lucid.  He doesn't have a big vocabulary.  And I very -- ask

25  simple, short questions.  But he is cooperative and I don't see

1    him as incompetent.

2            THE COURT:  Would you have any objection -- I don't

3    know if this is appropriate, I'm going to think about it.  I'm

4    not going to do it now.  But would you have any objection to my

5    having a dialogue with Mr. Garcia-Zarate, of course, outside

6    the presence of the Government and under seal, regarding his --

7    to further satisfy myself regarding his competence to stand

8    trial?

9            MR. SERRA:  I don't want to agree to anything that

10   might put him in the status of incompetent.

11           THE COURT:  Why not?

12           MR. SERRA:  My view is that they go away, potentially

13   forever, until they are restored to competency.  That doesn't

14   occur.  I suppose there is a manner in which you can litigate

15   it, but you're going to have to have your shrinks and your

16   psychologists to say, you know, that he is now restored.

17   That's a big burden.  And I just -- potentially should it ever

18   occur -- again, I am not asking for it and I don't think it

19   should occur.  But if he was declared incompetent, he may never

20   get out.  Where, here, there is going to be an end to whatever

21   occurs and, you know, go back to Mexico.  But there will be an

22   end to it, a day he will see freedom, not necessarily so if he

23   were declared incompetent.

24           THE COURT:  That's what I figured your answer would

25   be.

**PROCEEDINGS**

 1        Okay.  So the arraignment, I'm going to think a little

 2   more about this competency issue and I'm going to think a

 3   little more about the arraignment issue.

 4        Should we turn now to the Government's motions?

 5            MR. SERRA:  Your Honor, let's just go back for one

 6   second.

 7            THE COURT:  Yes.

 8            MR. SERRA:  In thinking about it, you may come to a

 9   conclusion he should be examined by a professional.  That's

10   going to protract our case.

11            THE COURT:  I don't know.  I don't know if it will or

12   not.

13            MR. SERRA:  They usually want at least 60 days.

14            THE COURT:  Sixty days?

15            MR. SERRA:  To evaluate someone.  But maybe a federal

16   judge will get faster, you know, response.  I don't know.

17            THE COURT:  Okay.  Let me see.

18        Let's go to the Government's motions.  I think we have

19   covered Government's Motion Number 2; right?

20            MR. SERRA:  Yes.

21            THE COURT:  Let's see.  Number 3.  We have kind of

22   covered this too, in the sense that we're not going to be able

23   to -- we need to do -- everybody needs to do some more work

24   before we can decide whether the portions of the transcripts of

25   things that the Government wants to introduce should be

**PROCEEDINGS**

1    admitted, or if they would need to be supplemented in order to

2    be complete.

3         We can kind of gloss -- we can put that aside for another

4    day.  You're going to make a filing on that.

5         But, I do want to -- I think we can chat about the

6    ABC News interview, because I don't know -- I mean, first of

7    all, I'm curious what anybody knows about the circumstances in

8    which that ABC News interview took place.

9         I gather this was a jailhouse interview that

10   Mr. Garcia-Zarate agreed to do with ABC News before his trial;

11   is that right?

12        **MS. BELYI:**  It was before his trial.  I'm just not

13   sure about the circumstances under which it actually came to

14   fruition.

15        **THE COURT:**  I mean, how -- I can't imagine that

16   Matt Gonzalez would have allowed for Mr. Garcia-Zarate to be

17   interviewed.  So did this happen without his knowledge?

18        **MS. BELYI:**  I just don't know.  We don't know.  We can

19   ask, but we don't know.

20        **MR. CHENG:**  Your Honor, our understanding what

21   happened with this interview, it happened on July 5th, about

22   four days after he was arrested, three days after he was

23   arrested.  And one thing we do have and have provided in

24   discovery is a consent form he signed consenting to ABC

25   interviewing him.

**PROCEEDINGS**

1          **THE COURT:**  Was it in Spanish?

2          **MR. CHENG:**  I believe it was.

3          **THE COURT:**  Where is that?

4          **MR. CHENG:**  We'll have to pull it up.

5          **THE COURT:**  Was anybody from the public defender's

6    office involved in --

7          **MR. CHENG:**  I'm not aware of that.

8          **THE COURT:**  Okay.  So is it possible that -- I mean,

9    the jail was involved in it, presumably -- right? --  Because

10   he was in jail.

11         **MR. CHENG:**  He was in jail at the time, Your Honor.

12         **THE COURT:**  Could this have -- is it possible that

13   this was allowed to happen without Mr. Garcia's lawyers being

14   notified?

15         **MR. CHENG:**  I don't know the answer to that, Your

16   Honor.  And I'm not sure he was appointed a lawyer at that

17   point.

18         **MR. SERRA:**  The --

19         **THE COURT:**  What's that?

20         **MR. SERRA:**  Sometimes news media seek interviews and

21   obtain them without notifying counsel, or no counsel yet has

22   made a general appearance.  I've had a number of cases where

23   that has occurred.

24         **THE COURT:**  So it's possible that this occurred before

25   Mr. Garcia-Zarate had counsel?

1    **MR. SERRA:**  I'm sorry?

2    **THE COURT:**  So it's possible that this occurred before

3 Mr. Garcia-Zarate had counsel?

4    **MR. SERRA:**  I would only say it's possible.  I don't

5 know the answer.

6    **MS. BELYI:**  I don't know that it is, if it was

7 July 5th, because that would be more than 48 hours after the

8 incident, and after the arrest.  So I imagine the public

9 defender's office would have been assigned to him at that time.

10 And I don't know that they ran the question by the public

11 defender's office.

12    **THE COURT:**  And -- it appears the bulk of this took

13 place in English.  They were trying to get him to answer in

14 English because I assume that's what they wanted for their news

15 clip for the nightly news.

16  It seems fairly clear that Mr. Garcia -- Mr. Garcia-Zarate

17 did not understand much of what he was being asked, if any of

18 what he was being asked.  Many of his answers were nonsensical.

19  Why is -- what is reliable about this?  I mean, what --

20 and what is -- how is it -- what is it probative of, in light

21 of everything I just said?

22    **MR. CHENG:**  Well, there are two direct issues where he

23 was asked "Do you remember, you know, shooting the gun?"  And

24 that is also sort of consistent with what happens, so there is

25 no question about there.  "Do you remember shooting the gun?"

**PROCEEDINGS**

1    And then more specifically "Do you remember tossing the

2    gun in the water?"  And he said, "Yes, I remember that."

3    So those are directly probative of his possession.  They

4    are completely consistent with what happened based on the

5    evidence.  And also even the defense, the defendant's own story

6    at trial, it's all consistent with that.

7            **THE COURT:**  But it seems like, again, I have not

8    watched the whole thing.  But, I've watched some of the

9    portions of it that you want to include, and some portions that

10   you haven't asked to include.

11           And what they seem to show is that Mr. Garcia-Zarate is

12   giving random answers to the questions being asked of him.

13   Without any apparent regard for whether he is being responsive

14   to the questions.  I mean, he is just saying, like, "yes" or

15   "no," kind of randomly in response to anything.  He seems

16   disoriented.  And he seems like he doesn't understand the

17   conversation he is having with these people.

18           I don't even know if he understands who these people are.

19   It's hard to tell.

20           But maybe that's because they were talking to him in

21   English and he clearly has serious problems understanding

22   English.  Or maybe there were more serious problems going on

23   with Mr. Garcia-Zarate that caused him to provide, you know,

24   these random answers to -- that didn't seem to have any

25   relationship to the questions he was being asked.

**PROCEEDINGS**

1        But either way, I just -- and by the way, they are all,

2   like, totally leading questions.  Right?  They were trying to

3   put words in his mouth.  So I just don't see -- I don't

4   understand why anything in that interview is probative of

5   anything.  And, of course, it's -- also seems like it's highly

6   prejudicial.

7            **MR. BARRY:**  Again, the prejudice aspect of it, Your

8   Honor, would be like some of the questions like "Do you feel

9   bad about killing this poor woman," we're not looking to get

10  those in.  We're not seeking admission of that stuff.

11           **THE COURT:**  But they show that -- his answer to that

12  is "no."  And what that shows is that he didn't understand what

13  he was being asked.  He was just sort of on autopilot, giving

14  answers to the questions he was being asked without regard to

15  what the questions were.

16           **MR. BARRY:**  He did say "yes" to that later, but there

17  is actually --

18           **THE COURT:**  Right to my point.

19           **MR. BARRY:**  But there is a point at which he is

20  actually indicating things that aren't being led to him, where

21  he says "I'm not going to be playing with that anymore," which

22  is a -- maybe even likely what happened.  He was playing with

23  the gun and he pulled the trigger without intending to do so.

24  But that's him saying this is what happened.  So this is

25  definitely probative of his possession of the gun.

**PROCEEDINGS**

1        The fact that acknowledges shooting the gun is probative

2   of the possession.  And his acknowledgment of his throwing it

3   in the water is definitely probative aspects of what happened,

4   and they show -- particularly "I'm not going to be playing with

5   that anymore" shows he knows what's going on.

6        **THE COURT:**  Where is that?  "I'm not going to be

7   playing with that anymore"?

8        Is that the portion that you wanted to include?

9        **MR. CHENG:**  It is, Your Honor.  So if you look at our

10   exhibit that we submitted, that would be Exhibit B to our

11   submission yesterday morning.

12        **THE COURT:**  Hm-hmm.

13        **MR. CHENG:**  And if you continue, it's the sixth and

14   seventh page of that filing, of that exhibit.

15        **THE COURT:**  Okay.  So what you're saying is probative

16   is the following exchange (reading):

17            "How do you say it in English, because I really don't

18       speak it well.  That I want to say I'm sorry.  Oh, I say

19       I'm sorry, everybody for I know, I no more playing, no

20       more like this, like that in the later."

21       Then the ABC person says (reading):

22            "You won't play with the guns again.  Is that what

23       you said?"

24       And he says "Yeah."

25       That's what you're saying is probative of that?

**PROCEEDINGS**

1          I mean, that's the other thing.  I mean, you're proposing

2     to include not just the -- his statements, but the questions

3     that the ABC person is asking, where they are clearly -- they

4     are speaking to Mr. Garcia-Zarate in a language that he doesn't

5     understand, and they are trying to put -- they are putting

6     words in his mouth?

7          **MR. BARRY:**  He doesn't understand it well.  He

8     understands it a bit.  We saw that in the police interview as

9     well.

10         **THE COURT:**  Absent a further -- on this one, I

11    actually think, if I admitted this, that would be an abuse of

12    discretion, at least based on what has been presented to me

13    about this.  I actually think it's possible that it would be an

14    abuse of discretion to admit this.  But --

15         **MR. CHENG:**  Your Honor --

16         **THE COURT:**  -- in any event, I am exercising my

17    discretion to exclude it under Rule 403.  If the Government can

18    make some showing that it hasn't made about the reliability of

19    this, given everything I have said, you know, maybe I'll

20    reconsider.  But, as of now, this video is excluded.

21         **MR. CHENG:**  Your Honor, if you just turn to the next

22    page in the excerpts that we proposed, you did have concerns

23    about the defendant not understanding the questions in English.

24    And there a number of examples like this, where the question is

25    asking in English and then immediately asked again in Spanish,

**PROCEEDINGS**

1    and the defendant confirms the exact same response.

2              THE COURT:  Okay.

3              MR. CHENG:  And if you look at this example --

4              THE COURT:  My ruling stands.  I don't think this is

5    even a close question, based on what you've given me.  And

6    without having given me anything about the circumstances of

7    this to suggest that it's -- that there is anything reliable

8    about this.  So I actually don't think this is a close

9    question.  I don't need to hear anything further about it.

10        I'm a little bit surprised you have asked to introduce

11   this, actually.

12        So, anyway, we don't have to worry about the ABC News

13   interview.  Although, again, if the Government wants to present

14   more around -- surrounding the circumstances of this interview,

15   I'm actually very curious about it.  But, beyond my personal

16   curiosity, I'm not sure that there is going to be any value to

17   discussing it further.

18        So other than that, with respect to the interviews, we're

19   going to put that off.  And I'm going to get the defense's

20   response to what the Government has put forward.

21        Let's see.  So that sort of leaves, unresolved for now,

22   the Government's Motion Number 3, I guess.

23        Let's see.  Number 4.  We've talked about that; right?  We

24   resolved that.

25             MR. CHENG:  Yes, Your Honor.  I think you made final

1   your ruling that there would be no jury instruction on innocent

2   possession.

3       One of the things we just wanted to confirm as well, and

4   we understand Your Honor's ruling that the defendant may argue

5   on the issue of knowing possession, but what we did want to

6   confirm was that the defendant -- the defense should not able

7   to make an argument contrary to the law, for example, to get up

8   there and say the defendant had an innocent motive when he was

9   possessing the weapon, therefore he should be absolved of

10  liability because that would be contrary to established

11  Ninth Circuit law.

12      **THE COURT:**  I -- the jury is going to be instructed

13  that the question they have to answer is whether he knowingly

14  possessed the weapon.  So I would be surprised if the defense

15  said that he knowingly possessed the weapon, but it was

16  innocent, because that would presumably result in a very quick

17  conviction.

18      So that's number 4.

19      Let's see, 5A was final.  5B was tentative.  The state

20  court proceedings -- I mean, the reason I made the argument --

21  the issue of the state court proceedings, the reason I made

22  that tentative is that in the normal case, there would be no

23  question that we wouldn't be talking about anything that

24  happened in the state court.

25      In the normal case, we wouldn't be talking about anything

**PROCEEDINGS**

1    that happened in the state court proceedings.  And you would be

2    required to, if you're impeaching a witness for a prior

3    statement in those proceedings, you would just refer

4    generically to them as "prior court proceedings" or "prior

5    proceedings" or something like that.  "Prior testimony given

6    under oath" is usually how we do it.

7         In this case, obviously, if the -- I think that has to

8    change if the statement from the arraignment came in.  But if

9    the statement from the arraignment doesn't come in, I don't see

10   any other reason to bring in anything from the state court

11   proceedings.

12        Anybody want to say -- what am I missing?  Okay.

13        So I guess 5B is, you know, remains unresolved until I

14   resolve the question about the arraignment.

15        And then 5D was tentative.  Let's see.  What was that

16   again?

17        Oh, yeah, we resolved that.  Right.

18        **MR. CHENG:**  I believe that was addressed by the

19   stipulation the parties discussed.

20        **THE COURT:**  And then number 7.  We have said that I'm

21   going to think more about the conviction, a little bit more

22   about the conviction that the Government identified in its

23   papers as being from earlier than 10 years ago.

24        So that I think this gets us through the motions in

25   limine.  It's been kind of a long day.  We have covered what I

1    think we need to cover before trial regarding the knowing

2    possession, the substantive instructions.

3        Is there anything else we need to discuss today?

4        **MR. CHENG:**  Yes, Your Honor.  On the jury

5    instructions, you're right with respect to your ruling on not

6    introducing the transitory possession instruction.

7        There are competing instructions on the actual substantive

8    count.  The defense has requested that you add additional

9    explanation of what "knowingly" and what "possession" means.

10   Our position is that's not something that should be included

11   there because there already are jury instructions on both

12   knowingly and possession.

13       **THE COURT:**  Yeah, but I think we can all probably

14   condense it all into one instruction.  So what I'll do is, I

15   will make the attempt to condense it all into one instruction

16   and put it out to you, and maybe we can talk about it.  We're

17   going to see each other again on Friday.  I'll put out a draft

18   of the substantive instruction, just because I think there will

19   be value in you, you know, we might be able to not totally

20   finalize it, but sort of get close enough that you'll be able

21   to do your thing at trial.

22       **MR. SERRA:**  I wanted to ask just a little bit about

23   Friday.  We have one -- I'm told we have 110 questionnaires.

24   I'm told we will start at 8:00 and read until 2:00 in court.

25   Is that realistic?  Can we finish?

**PROCEEDINGS**

1          **THE COURT:**  I think so.

2          **MR. SERRA:**  Yeah?

3          **THE COURT:**  I think that's realistic.  What we're

4    doing is we're only deciding, on Friday, who is going to be

5    excused on the papers alone.  Right?

6          So the only thing we're doing on Friday when I come in at

7    2:00 to meet you all, I'll be back in chambers looking at the

8    questionnaires.  You'll be in the courtroom looking at the

9    questionnaires.  As I said before, the questionnaires do not

10   leave this courtroom.  But we will have a discussion about who

11   is to be excused for hardship on the papers alone, and who

12   should be excused for cause on the papers alone.

13         **MR. SERRA:**  That's not my issue.  My issue is, I mean,

14   I read fast enough to do 110 in four hours or five hours.  I

15   know -- it's to what degree you read it.

16         **THE COURT:**  In my experience, it's -- based on my

17   experience, it shouldn't be a problem.  It's not because you

18   don't -- you don't have to go through every response to every

19   question.  You just need to zero in on, like, two or three

20   questions and glance through the rest to get a sense of

21   whether --

22         **MR. SERRA:**  For selection purposes, the way I do it, I

23   read the whole thing.  I, you know, mark the areas that I'm

24   sensitive to, and then I grade it on a 1 to 5 basis.  It sure

25   as heck takes 10 or 20 minutes a questionnaire for me to do all

1    that.  But, let's just see what happens.  I mean, I'll read as

2    fast as I can.

3         **THE COURT:**  Yeah.  Well, I mean, I see what you're

4    saying, because we -- you're coming in on Friday and we're

5    going to do our thing on Friday.  And then the jury is coming

6    in first thing in the morning on Monday.

7         **MR. SERRA:**  I know.

8         **THE COURT:**  All right.  Let me give some thought to

9    that and see if we can figure out a way to buy you a little

10   more time with the questionnaires.

11        **MR. BARRY:**  Actually, the Government shares

12   Mr. Serra's concern on that grounds.  But also at times, even

13   though we're ready at 8:00, the jury office has a lot to do.

14   They have got to -- there are a lot of copies to make.  We

15   don't get them until 10:00.

16        **THE COURT:**  You're going to have them at 8:00.  The

17   questionnaires have already been filled out.  They came in

18   today.

19        **MR. BARRY:**  All right.

20        **THE COURT:**  That's one of the things I was wondering.

21   I'll go back and talk to folks about it.  I was wondering if we

22   can give you an opportunity to spend some time with the

23   questionnaires tomorrow.  Another thing would be to not have

24   the jurors come in until 10:00 a.m. on Monday morning and give

25   you a couple of more hours on Monday morning with the

PROCEEDINGS

1    questionnaires.

2             MR. BARRY:  Thank you.

3             MR. SERRA:  Judge, how much oral voir dire do you

4    allow, if any?

5             THE COURT:  I am -- I tend to be somewhat

6    old-fashioned about that.  I tend to prefer to let the lawyers

7    do it, rather than me.  So the way -- we can go through the

8    jury selection, the whole jury selection process now if you

9    want.

10        The way I usually do it is -- okay.  They will come in.

11   Right?  We will have excluded some people on the papers alone

12   for hardship and cause.  And they will come in.

13        Let's say we have, you know, 70 prospective jurors.  And

14   the first thing I will do is tell them -- you know, I will

15   remind them what the case is about.  And I will do hardships.

16   I will talk to people about hardships.

17        And I'll say "Oh, Juror Number 3, you've expressed a

18   concern," and I'll go through and talk to everybody about their

19   hardships.  And we'll sidebar and we'll talk about who to

20   excuse for hardships.

21        Everybody, by the way, every prospective juror will remain

22   in the seat they have been assigned that morning.  So we're not

23   going to move -- we're not going to shuffle people around.  So

24   you can kind of get used to, whoever is in their seat is going

25   to stay in their seat all day.

**PROCEEDINGS**

1        And Juror Number 1 is on the left against the wall.  It

2   goes down to Juror Number 7 and then Juror Number 8 is where

3   Marla is sitting, and that goes to Juror Number 14.  And they

4   line up in the rows on the left side there.

5            **MR. SERRA:**  And the lineup is the way they will go in?

6            **THE COURT:**  Correct, the way they would go into the

7   jury.

8        And then, after hardships, what I will ask them to do is,

9   they will each have a sheet with some few basic biographical

10  questions.  It will be a little bit of a repeat from the

11  questionnaire, but we'll figure out which questions we want

12  them to answer orally.

13       And we will ask them to introduce themselves.  "My name is

14  so and so; I live in such and such; I work in such and such,"

15  just to get a feel what they are like when they are speaking.

16  And everybody will go around and introduce themselves.

17       Then I will probably ask a few raise-your-hand questions,

18  you know, "Can you follow the law," that type of thing.  I'll

19  probably ask -- you know, sort of say what the case is about.

20  And I'll ask people to, you know, if they have a problem being

21  a fair juror in a case like this.

22       Maybe I'll ask some specific questions of a few jurors who

23  are on the -- we were on the fence about excusing on the

24  papers.  Maybe I'll do that.

25       And then I'll turn it over to you.  And you can have --

 1   each side can have 45 minutes to talk to the jurors.

 2          MR. SERRA:  In your court who goes first, the

 3   prosecution or defense?

 4          THE COURT:  I have never given any thought to it.

 5   It's always been assumed that the prosecution goes first.  But,

 6   I have never given any thought to that question.

 7          MR. SERRA:  Okay.

 8          THE COURT:  So unless you object --

 9          MR. SERRA:  I will reserve my view.

10          THE COURT:  Okay.  It's a good question.

11       The only -- so then we, you know, probably, after I do my

12   thing with the jurors, we may have another sidebar.  And we may

13   talk about excusing people for cause.

14       So I like to, sometimes, try to get rid of a few of the

15   problematic people before the lawyers do their thing.  Right?

16   So you don't have to waste your time on those prospective

17   jurors who obviously are going to be excused for cause.

18       Then you do your thing.  Then we'll have another

19   discussion about excusing people for cause.  Then we'll -- you

20   can do your peremptory challenges.  Then we'll have our jury.

21       And the only other wrinkle for this case is the issue that

22   I think I brought up a little while ago with you guys, which

23   is, you know, what do you think about doing what we did in the

24   Monsanto trial, which was, towards the beginning -- like, after

25   hardships, but before we get into substantive discussion --

**PROCEEDINGS**

1   create a separate group of prospective jurors who have read or

2   heard about the case, and have a discussion -- excuse the other

3   jurors, have a split discussion with those jurors about whether

4   they can be fair, given what they have heard about the case and

5   make sure to instruct them that they are only to consider the

6   evidence that comes in in the courtroom, blah-blah-blah, and

7   have that discussion only with those jurors, so as not to

8   expose the other prospective jurors to the stuff that those

9   jurors who know something about the case say during jury

10  selection.

11      What do you all think about that?

12      **MR. SERRA:**  With a qualification.  There is going to

13  be a number who will know something about the case.  Out of

14  that number, some will remember a lot and others will remember

15  a little.  If you do it openly it, in essence, tells the others

16  who maybe don't know as much as the one you're talking to

17  things that they never realized or don't remember.  So I think

18  it has to be done sequestered, one by one, so it doesn't

19  contaminate any of the other jurors.

20      **THE COURT:**  I don't believe that's necessary.  I mean,

21  maybe if there were like a death penalty case I would consider

22  doing that.  But I don't believe that's necessary in this case.

23      The jury will be instructed that none of what anybody says

24  during jury selection is evidence, and they are not -- not to

25  consider it when they are deciding guilt -- guilt or not

**PROCEEDINGS**

1    guilty.

2         And I think it would be perfectly fine to have jury

3    selection and just have everybody discussing things together.

4    I think that would also be -- that would be fine.

5         But I am sort of offering it as an option to both sides.

6    If anybody wants to argue for this partial sequestration, or

7    whatever you want to call it --

8              **MR. SERRA:**  I will argue it right now.

9              **THE COURT:**  You would like that?

10             **MR. SERRA:**  Yes.

11             **THE COURT:**  You want that?

12             **MR. SERRA:**  Yes.

13             **MR. BARRY:**  I think that's a fine idea.  But may I

14   propose one slight change to it, in the interest of saving

15   time?

16        So if we do, like, all of the -- if we do, instead of,

17   like, 30 to 40 minutes each side, initially we do 20 to

18   30 minutes, and then get all of the people for cause.  Like,

19   you know, "It turns out I have got religious beliefs that I

20   can't sit in judgment".  I hate guns and I will never be fair

21   to a defendant with guns."  You know, I think everyone should

22   have -- so those sort of non-case-specific causes.

23        We will be able to sort of winnow out some of them that

24   the Court may know, yeah, this is not the right jury for them.

25        If they know everything about Steinle, the case, they are

**PROCEEDINGS**

1    gone.  So we do sort of the analysis with everyone, without

2    telling them, "If you know something about the case, we're not

3    going to ask you about that now" --

4         **THE COURT:**  I understand what you're saying.

5         I think the problem with that is, you know,

6    people's knowledge of the case and thoughts about the case leak

7    out.  And so I think the better way to do it is to say:  All

8    right.  We're talking to you folks as a subset because you have

9    indicated in your questionnaire response that you know

10   something about the Steinle case.  And we have separated you

11   out because it's important, when the other prospective jurors

12   come back in, that we don't have any discussion about the

13   Steinle case, because they indicated they didn't know anything

14   about it and we want to keep it that way.  But for you -- and

15   so any other general concerns that you have, religious beliefs,

16   feelings about guns, or whatever it is, you'll have a chance to

17   talk about it, but now we're just going to have a discussion

18   about whether or not you can be fair, despite what you have

19   read or heard about the Steinle case.

20        **MR. BARRY:**  So that sequestration will be with

21   everyone who indicates knowledge, and it will be very narrowly

22   focused:  What do you know about this case and would that

23   affect you?

24        And then do the questioning with everyone else.

25        **THE COURT:**  That's the idea.  Part of what I will do

**PROCEEDINGS**

1   in chambers and part of what you will have to do is decide who

2   you think should be part of that mini sequestration.

3            **MR. SERRA:**  Right.

4            **MR. BARRY:**  Yes.

5            **THE COURT:**  So we'll have a discussion on Friday about

6   which jurors we're going to include in that discussion.

7         Anything else about jury selection?

8            **MR. BARRY:**  And then the mechanics of cause.  Does the

9   Court have the standard Court format with the two for defense,

10  one for the Government, then we go back and forth.

11           **THE COURT:**  Yes.  You mean for peremptory challenges?

12           **MR. BARRY:**  Yeah.

13           **THE COURT:**  Yeah.

14           **MR. BARRY:**  Will the jurors be here while we're doing

15  that?

16           **THE COURT:**  I don't like to do that.  What I prefer to

17  do it outside the presence of the jury.  So we can do -- we can

18  go back into the conference room back there, if

19  Mr. Garcia-Zarate wants to waive his appearance for that

20  portion of it.  If he doesn't, then, I guess, maybe I'll

21  tell -- I'll excuse the jurors and we can do it in the

22  courtroom.

23           **MR. BARRY:**  And for whatever it's worth, Your Honor, I

24  think it would be better to do it in the courtroom because both

25  parties will be probably having discussions about who they want

**PROCEEDINGS**

1   to strike.  And if we are all in the same conference room,

2   there is a -- I don't want to overhear what they say, and I

3   don't want them to hear what we say.

4        **THE COURT:**  Well, then whisper.  I'll give you some

5   time to talk about, you know, put together your strategy, of

6   course, give you a few minutes.

7     All right.  Is there anything else that for us -- that we

8   needed to talk about before Friday?

9        **MS. BELYI:**  I don't think so.

10       **THE COURT:**  Okay.  Why don't -- thank you for your

11   time.  And we will -- why don't we just take a 10-minute -- I

12   apologize to the people who are waiting for the case management

13   conferences, but we have had kind of a long day today.

14     So why don't we take a 10-minute break.  We'll be back in

15   at 10 minutes to 2:00.

16       **MR. BARRY:**  Thank you, Your Honor.

17       **MR. CHENG:**  Thank you, Your Honor.

18          (Proceedings adjourned at 1:43 p.m.)

19              ---o0o---

20

21

22

23

24

25

1

2                    **<u>CERTIFICATE OF REPORTER</u>**

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:    Thursday, January 9, 2020

7

8

9

10   _____

11       Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
             Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25