

U. S. Department of Justice

Federal Bureau of Prisons

Metropolitan Detention Center

535 N. Alameda Street
Los Angeles, CA 90012

## FORENSIC EVALUATION

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**CASE NUMBER:** 17-cr-00609-VC-1
**DATE OF REPORT:** July 27, 2020

### REFERRAL INFORMATION

In an order dated February 21, 2020, the Honorable Vince Chhabria, United states District Judge, for the Northern District of California, requested an evaluation of Jose Garcia-Zarate for present competency to stand trial, pursuant to 18 U.S.C., Section 4241 (b). Specifically, the order requested the examiner's evaluation and opinion to determine whether the defendant is mentally competent to understand the nature and consequences of the proceeding against him and to assist properly in his own defense. The referral question is posed in regard to the defendant's current alleged offenses of felon in possession of a firearm and ammunition and alien in possession of a firearm and ammunition.

Due to the discrepancy between the date of the court order and the arrival of Mr. Garcia-Zarate at the Metropolitan Detention Center in Los Angeles (MDC-LA) for the evaluation on March 26, 2020, a request was submitted to the court for the evaluation period to begin on the date of arrival. Additionally, during the evaluation, the MDC-LA experienced significant delays due to modified operations as a result of the COVID-19 pandemic; additional extensions were requested.

### IDENTIFYING INFORMATION

Jose Inez Garcia-Zarate is a 50-year-old Hispanic male, who was arrested July 1, 2015, for state-related charges. A superseding indictment was later filed for the alleged offense conduct.

### ASSESSMENT PROCEDURES

Mr. Garcia-Zarate's primary Language is Spanish. Hence, the evaluation was conducted with the aid of a Spanish interpreter. He was informed about the nature and purpose of the evaluation. He was also informed that any information he provided was subject to inclusion in the evaluation report, which would be available to the Court, the prosecutor, and the defense attorney. During Discussions about evaluation procedures, the defendant was tangential, and his overall presentation vacillated between cooperative and moderately disoriented.

Due to the defendant's presentation, psychological testing was not conducted, and a legally focused clinical interview was only partially conducted. Additionally, background information was collected from collateral sources as the defendant would not participate in discussions

SENSITIVE BUT UNCLASSIFIED

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 2

related to his background. The opinion and conclusions provided in this report were based on clinical interviews and interactions, observation of his behavior, a review of legal and psychiatric documents, and information obtained from collateral sources. The evaluation should be considered with these limitations in mind.

## BACKGROUND INFORMATION ACCORDING TO THE DEFENDANT

The following account is based on information provided by Mr. Garcia-Zarate, who appeared a poor historian. As a result, information obtained in this section lacks the detail typically obtained in a background interview. The majority of his background was obtained from the prior mental health evaluation, dated February 5, 2020. At that time, he was considered an inconsistent historian.

**Family and developmental history:** Mr. Garcia-Zarate was born on [REDACTED], in Leon Guanajuata, Mexico; both parents passed away when the defendant was 15 years old. Records indicated the defendant reported having between five and nine siblings. There was no additional information with regard to the defendant's family and/or his upbringing.

**Relationship/Sexual History:** With regard to his relationship history, during the mental health evaluation, dated February 5, 2020, the defendant stated he was unmarried and had no children. However, it was noted, it 1997, he reported being divorced with four daughters, "three of whom are the same age."

**Education:** Mr. Garcia-Zarate likely completed between five to six years of formal education. There was no information with regard to whether the defendant skipped a grade and/or was placed in special education or retained. There was no information related to whether the defendant was suspended or expelled from school. During prior incarcerations, he did not participate in English as a Second Language (ESL).

**Military:** Mr. Garcia-Zarate denied any military involvement.

**Employment:** Mr. Garcia-Zarate's employment history was described as "scattered," and included roofing and landscaping in Arizona. Additionally, the records indicated he earned money "selling drugs throughout the 1990's in multiple cities."

**Substance use history:** According to the prior mental health evaluation, dated February 5, 2020, the defendant denied a history of alcohol and/or illicit drug use. His records indicated a history of alcohol and marijuana use and when queried by the evaluator, the defendant called the evaluator a "whore" and stated, "You think I'm a homeless Trump follower."

**Mental health:** Mr. Garcia-Zarate denied prior mental health treatment; however, records indicated the defendant began receiving mental health treatment prior to 1999. Additionally, the mental health evaluation, dated February 5, 2020, stated the defendant was hospitalized four times; two were for a seven-month duration. He had prior diagnoses of Schizophrenia and Antisocial Personality Disorder. His mental health records from prior incarcerations from the Federal Bureau of Prisons are summarized later in the report.

**Medical:** According to the supplemental records, the defendant is prescribed Ranitidine, an antacid medicine. There were no additional medical conditions noted for Mr. Garcia-Zarate.

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 3

## SUPPLEMENTAL INFORMATION

**Legal:** The legal documents available for review consisted of:

1. United States District Court for the Northern District of California, Superseding Indictment, filed 10/17/2019;
2. United States of America v. Jose Inez Garcia-Zarate, Order Re Competency Evaluation Case No. 17-cr-00609-VC-1, dated 02/14/2020;
3. United States of America v. Jose Inez Garcia-Zarate, Order Committing Garcia-Zarate for Further Evaluation Case No. 17-cr-00609-VC-1, dated 02/21/2020;
4. People v. Juan Francisco Sanchez Lopez, Statement of Juan Francisco Sanchez Lopez, dated 07/02/2015;
5. Mental Health Evaluation, Paul M. Elizondo, D.O., dated 02/05/2020;
6. Federal Bureau of Prisons Mental Health Records, dated 12/2/1998 through 07/24/2020; and
7. NCIC, dated 11/01/2016;

Although all of the available documents were reviewed in detail, for the sake of brevity and clarity, only summary information, as it pertains to the referral question, is provided herein.

According to the charges outlined in the superseding indictment, on or around July 1, 2015, the defendant did knowingly possess, in and affecting interstate and foreign commerce, a firearm and ammunition. Mr. Garcia-Zarate was allegedly in possession of a .40 caliber Sig Sauer P239 semi-automatic pistol, and multiple rounds of Winchester ranger .40 Caliber ammunition. He has prior felony convictions.

**Legal:** Mr. Garcia-Zarate has the following legal history: inhaling toxic vapors/hallucinogens (05/13/1991); illegal entry (06/06/1996); threats/intimidation (07/22/1997); reentry (12/17/1998); illegal entry (03/15/1999); reentry after deportation (07/04/2003); reentry (05/04/2004); deportable alien (02/08/2007); illegal entry & false representation (09/20/2009); and supervised release violation (03/25/2015).

While incarcerated in the Federal Bureau of Prisons, the defendant received the following incident reports: fighting with another person (10/14/1999, 10/21/1999, 07/25/2000, 04/20/2005, 08/01/2008, 10/17/2001, 01/31/2012, 11/13/2012, 03/12/2012, 04/30/2012); possessing intoxicants (03/2/2000, 06/05/2001); assaulting without serious injury (08/18/2000, 10/17/2011, 01/17/2012, 07/04/2012, 07/16/2012, 03/05/2013, 01/05/2015); refusing drug/alcohol test (09/21/2001); failing to follow safety regulations (06/19/2001); assaulting with serious injury (06/29/2004, 08/16/2004, 01/11/2012); engaging in sexual acts (01/10/2003, 10/8/2004, 10/13/2004, 04/18/2006, 01/04/2008, 03/07/2008, 01/31/2009, 04/07/2009, 12/25/2011); destroying property over $100 (07/13/2001, 09/26/2011, 09/28/2011); refusing to obey an order (05/09/2005, 12/25/2011); being in unauthorized area (09/13/2007); possessing unauthorized item (09/06/2007), smoking in unauthorized area (09/06/2007); threatening bodily harm (07/21/2006, 12/25/2011), and being unsanitary or untidy (12/01/2014). Additionally, documentation dated February 2, 2010, stated, "Inmate [Garcia-Zarate] has a long history of mental health treatment…He also has a history of manipulative and assaultive behavior. He parades around naked and masturbates in front of female staff. He has also grabbed female staff in their private areas (buttocks and breasts)." In October 1999, psychology staff found the defendant "not responsible" for an incident related to "fighting with another person" and "refusing to obey an order." Additionally, while housed at the Federal Medical Center, in Rochester, Minnesota, an incident report for "fighting with another person" was suspended by psychology staff. The records indicated he was found

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 4

"responsible" for all other incident reports, to include those issued while the defendant was housed at a federal medical center.

**Mental Health:** The defendant received significant mental health treatment during prior incarcerations in the Federal Bureau of Prisons. Early records, from 1998, noted a suicide attempt by hanging and an attempt to set fire to his cell, and diagnoses ranged from "possible psychosis" to "borderline personality disorder." From December 1998 through March 1999, he was housed at the Federal Correctional Institution, in Big Springs, Texas (FCI – Big Springs). Records indicated his self-report vacillated from no presenting concerns, to reports that the "TVs and computers were monitoring his behavior." He was prescribed an [unknown] antipsychotic medication, however, staff thought he was noncompliant with medication, and suspected him of abusing illicit drugs.

From May 1999 through August 1999, Mr. Garcia-Zarate was housed at the Federal Medical Center, in Rochester, Minnesota (FMC—Rochester), for a psychiatric evaluation and treatment. Interviews with the defendant described him as "unable to grasp the incredibility of his story." He was prescribed, Risperdal (antipsychotic) and Cogentin (anti-cholinergic), and was complaint. He was provided the following diagnoses: psychotic disorder NOS, cannabis abuse, cocaine abuse, inhalant abuse, antisocial personality disorder, and rule out borderline personality disorder. He returned to FCI – Big Springs; however, in February 2000, he was re-admitted to FMC – Rochester for mental health treatment. Although he denied mental health concerns, he affirmed the presence of "voices" in the form of televisions, radios, and computers. According to the records, "The patient was reportedly hearing voices, had increased paranoia, was angry, hostile, and believed that the television and other electronic devices were broadcasting lies to other inmates. They also reported an assault on another inmate." He was prescribed Haldol (antipsychotic), Risperdal (antipsychotic) and Cogentin (anti-cholinergic), which appeared effective; occasionally the defendant was noncompliant, but agreeable when directed to take prescribed medications.

From February 2000 through February 2003, Mr. Garcia-Zarate was housed at FMC—Rochester, the United States Medical Center for Federal Prisons, in Springfield, Missouri (USMCFP – Springfield), and the Federal Correctional Complex, in Beaumont, Texas (FCC – Beaumont). He was diagnosed with "Schizophrenia, Paranoid Type" and prescribed Haldol. At one point, medication was administered intramuscularly because of the defendant's noncompliance. He was placed on suicide watch after he complained of auditory hallucinations and thoughts of self-harm. He was given the mental health assignment "MDS [Medical Duty Status]" and "Psy Alert [Psychology Alert]," which are assigned to inmates who require monthly mental health intervention and/or follow-up and immediate screening upon arrival to a new institution respectively. It was noted that the defendant presented with "a mix of active psychotic symptoms and feigning symptoms." He released from custody on February 20, 2003.

On or around December 1, 2003, the defendant was re-committed to the custody of the Federal Bureau of Prisons, and from December 2003 through June 2009, Mr. Garcia-Zarate was housed at FCC – Beaumont, the United States Penitentiary, in Florence, Colorado (USP – Florence), the USMCFP – Springfield, and the United States Penitentiary, in Tucson, Arizona (USP – Tucson). On or around June 25, 2005, while housed at the USMCFP – Springfield, it was recommended that the defendant be civilly committed at the end of his sentence; the report was unavailable. The defendant was housed at the USMCFP – Springfield for nine months. On or around March 2006, he was transferred to the USP – Florence, where he remained for 10 months, before returning to the USMCFP – Springfield. While housed at the USP – Florence, he was placed in the Special Housing Unit, for several infractions, to include but not limited to threatening staff and masturbation. During interactions with psychology staff, Mr. Garcia-

NAME: Garcia-Zarate, Jose
REGISTER NUMBER: 14115-051
PAGE: 5

Zarate's psychological adjustment was described as "unsatisfactory," with threat to others deemed as "moderate" to "low." His compliance with psychotropic medication varied, and he was described as "bizarre," and "unpredictable…lack of insight into mental illness."
While housed at the USP – Florence, it was noted that he routinely complained about his cellmates to Psychology Services, and often requested single-cell status. Unit staff did not report any significant difficulties and/or deficits in his daily functioning. In November 2006, he requested protective status; he indicated he was threatened due to a refusal to "hand over" a book. In December 2006, while housed in SHU, he reported thoughts of suicide with "no identifiable plan," however, in January 2007, he was placed on suicide watch after he threatened to cut himself, and reported several risk factors (i.e., medication non-compliance, financial and familial stressors.) Despite receiving a Haldol injection, he reported auditory hallucinations. In January 2007, Mr. Garcia-Zarate was transferred to the USFMC – Springfield, where he remained until October 2007. From October 2007 through June 2009, he was housed at USP – Florence and USP – Tucson. According to the records, the defendant was sporadically noncompliant with medication, and when doing so, appeared to decompensate. He was placed in a medication compliance group, which met monthly to address programming and medication concerns.

Mr. Garcia-Zarate appeared to adjust to the demands of incarceration, however, he was placed in SHU for a variety of infractions (e.g., fighting, assaults, masturbation), and on June 1 2009, requested protective custody. With regard to the defendant's request for protective custody, Mr. Garcia-Zarate approached staff and "demanded" to return to SHU. The records stated, "He reported he would take his clothes off in front of female staff, or break windows or throw water on computers in order to go to [SHU]…He described his plan to donate his brain and having it connected to a big computer…His train of thought became tangential and his ideas did not appear to be based on reality." During the interaction and placement in SHU, the defendant struck a staff member in the face, which he later admitted was a behavior to ensure his placement in SHU. Whiles housed in SHU, he was deemed "low" threat to self and "moderate" threat to others. Mr. Garcia-Zarate released from custody on June 29, 2009.

In January 2010, Mr. Garcia-Zarate returned to the custody of the Federal Bureau of Prisons; he was at the Metropolitan Correctional Center, in San Diego, California (SDC – San Diego), and United States Penitentiaries, in Canaan, Pennsylvania (USP – Canaan), Hazelton, West Virginia (USP – Hazelton), Coleman, Florida (USP Coleman), Victorville, California (USP – Victorville), and Tucson.

In January 2010, he was evaluated for competency to stand trial at SDC – San Diego. At the time of his arrival to the institution, he was placed in the SHU due to his disciplinary history. On January 27, 2010, he indicated he "can't take [SHU] anymore," and "threatened to slice his wrists." He was assessed and placed on suicide watch for one day, then transferred to a mental health unit at SDC – San Diego. In February 2010, he requested to return to SHU; he complained of problems with his cellmate, and identified this as the reason why he requested suicide watch. Eventually staff opined that the defendant reported thoughts of suicide were motivated by secondary gain (i.e., to manipulate housing status), and disingenuous. It was specifically noted, after he was placed on suicide watch, he denied suicidal ideation and identified the "real" reason for reporting said thoughts. He was diagnosed with Schizoaffective Disorder and Antisocial Personality Disorder, and prescribed Doxepin (antidepressant) and Risperdal. The competency evaluation was unavailable, however, there was no evidence in the records to suggest the defendant was transferred to a federal medical center for restoration.

In July 2011, Mr. Garcia-Zarate was designated to USP – Canaan, and requested protective custody in September 2011. He remained in SHU through March 2012, and threat to self and

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 6

others were deemed "low." Furthermore, records indicated, "He has neither reported nor evidenced any significant, negative mental health concerns, nor thoughts or intentions of harm to self or others. He has consistently presented alert and oriented to person, place, time, and event. ADLs [activities of daily living] have consistently been observed to be WNLs [within normal limits]. Neither SHU staff nor available SHU documentation reveal any indications of maladjustment to being housed in SHU."

In April 2012, he transferred to USP – Hazelton, where he remained until July 9, 2012. In May 2012, during a protective custody interview, the defendant reported a plan to commit suicide. He was unreceptive to being placed in SHU with a cellmate, and threatened to hang himself. With regard to medication compliance, it is unclear whether he took psychotropic medication at the time of the above referenced interview, however, while on suicide watch, he was prescribed Risperdal (which reportedly was previously effective). Records from that contact stated, "[Mr. Garcia-Zarate has a behavior management plan in effect as he has demonstrated a pattern of using suicide watch for reasons other than protection from self-harm." While housed at USP – Hazelton, he was prescribed Prolixin (antipsychotic), administered as an injection, but continued to endorse auditory hallucinations. The records suggested "Malingering" as an additional diagnosis.

In July 2012, the defendant was transferred to USP – Coleman, and upon arrival to the institution, denied a history of mental health treatment, to include suicidal ideation and/or attempt. He was placed in SHU, and the records described his adjustment as "satisfactory" and "low" threat to self and others. There were no significant contacts with the defendant while housed at USP – Coleman. In January, 2013, Mr. Garcia-Zarate was transferred to USP Tucson, and was housed in SHU with similar findings. The defendant was housed at USP – Tucson for nine months, and transferred to USP Victorville, in October 2013. While housed at USP Victorville, the defendant's medication regimen was re-evaluated. At that time, he was prescribed Risperdal, and endorsed "adequate" results. Additional interviews noted, "Grooming and hygiene were satisfactory. He is currently housed in General Population. He stated that his mood was 'good' and his affect was euthymic. He denied current suicidal/homicidal ideation. Inmate [Garcia-Zarate's] speech was of normal rate and volume. His thought process was linear and goal-directed. No overt signs of psychosis or responding to internal stimuli were present. His insight and judgment were fair."

On March 22, 2014, the defendant reported command hallucinations instructed him to "cut himself;" and was placed on suicide watch for three days. During an interview, Mr. Garcia-Zarate claimed he made several cuts on his arm with a razor, and displayed "old scars from previous cutting." Records reiterated that the defendant's presentation was mixed, and although some reported symptoms were "legitimate," he likely exaggerated suicidal ideation, and used suicide watch for "instrumental reasons." After removal from suicide, he indicated he was "more comfortable" in protective custody, and was placed in SHU, where he remained until his release from custody on March 26, 2015. In addition to weekly contacts, Mr. Garcia-Zarate was seen monthly for Care2-mh follow-up, whereby he denied "any major mood, anxiety, or psychotic symptoms...stated his sleep and appetite were normal...His insight and judgment appeared fair. No delusional thought content or hallucinations were apparent during the session. He denied current suicidal/homicidal ideation, plan." At the time of his release from federal custody, the defendant was diagnosed with Schizophrenia, Paranoid Type.

**Review of Telephone Calls and E-mails:** Mr. Garcia-Zarate did not place any telephone calls or send e-mails during the evaluation period.

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 7

**Collateral Contacts:** Defense counsel and the Assistant United States Attorney (AUSA) were contacted in reference to the evaluation and provided discovery for review. According to the defendant' attorney, Mr. Garcia-Zarate was acquitted of murder in the state court. After the federal indictment for the alleged offense, he made several concerning statements in court. Specifically, the defendant appeared to incriminate himself, and repeating statements that were made by other people. During a closed door confidential hearing, he was asked questions regarding his understanding of the nature of the charges against him. His responses did not satisfy the judge, and a mental health evaluation was ordered. The defendant's attorney did not discuss interactions with the defendant and/or specific concerns about his mental health.

## EVALUATION FINDINGS

**Mental Status/Behavioral Observations:** Mr. Garcia-Zarate presented as a slightly below average height, slender male, who appeared his stated age. He is approximately 5'6" tall, and weighs 140 pounds. He has brown hair and brown eyes. At the time of his arrival to the MDC-LA, Mr. Garcia-Zarate was placed on Special Housing Unit (SHU), a segregation unit for administrative detention and disciplinary issues. When queried about symptoms, he denied a history of mental health treatment, to include the presence of auditory and/or visual hallucinations. His hygiene was unremarkable, and no gross impairment in his ability to care for himself was observed. No difficulties with gait or motor function were observed.

On the surface, the defendant appeared reasonably able to conform to the demands of incarceration. For instance, during the evaluation period, he did not report thoughts of self-harm and was not placed on suicide watch. Additionally he did not receive any incident reports during the evaluation period. However, when speaking with SHU staff, it was revealed that the defendant routinely used obscene language and "went off" during cell rotations and/or meal times. One particular Spanish-speaking officer was noted to have a "good" rapport with the defendant, and was therefore able to "calm him down." This behavior was not observed by the evaluator who met with the defendant twice for approximately two hours, and observed a one-hour tele-psychiatry appointment on June 17, 2020. Although the defendant presented with pressured and loud speech, he did not appear threatening during encounters with the evaluator. Furthermore, the translator verified that the defendant "rambled" and communicated loudly, but was not agitated during interactions.

On June 23, 2020, the defendant was moved to the Special Programs Unit (SPU), a small unit which houses mental health and medical cases, as well as inmates who may need closer observation and monitoring. However, on June 26, 2020, he approached the evaluator and requested to return to SHU. He denied being threatened and did not have problems with other inmates, but indicated a desire to return. After several attempts to dissuade him, he was placed in SHU with no further issue.

Mr. Garcia was oriented to his circumstances, in that he knew he was participating in an evaluation. However, he may not have been aware of the purpose, and when asked, did not know he was housed in Los Angeles. His sensorium appeared intact, in that, there was no evidence of significant deficits in attention or concentration. During superficial contact with the defendant (i.e., how are you today? I am fine.), the content of his speech did not appear odd or bizarre, however, when asked to participate in an extensive, logical and goal-oriented conversation (i.e., Tell me about your relationship with your parents.), he exhibited loosening of association, evidenced by a rapid and steady derailment, with the addition of unrelated and nonsensical statements. During bouts of nonsensical communication, it was difficult to re-direct him, even after several direct requests for him to stop speaking (i.e., "Please stop speaking.").

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 8

**Medical:** Mr. Garcia-Zarate received medical treatment for Hepatitis C. Additionally he was asymptomatic for COVID-19 and test results were negative. During the evaluation period, Mr. Garcia-Zarate participated in a psychiatric consultation. The records indicated the defendant was unable to provide a reliable history of mental illness or treatment. Specifically, Mr. Garcia-Zarate denied all mental health treatment or symptoms, and did not recognize prior medications that were documented in his records. Furthermore, he was unable to provide information with regarding to prior hospitalizations. Although the defendant was unable to recall previous medications, he indicated he took medication "to calm down," and agreed to restart medication if available. He was prescribed the antipsychotic medication, Risperdal; however, medical records indicated he sporadically refused the medication, and therefore, was not fully compliant with the regimen during the evaluation period.

The defendant was notably a poor historian; he reportedly thought he was detained by immigration, and was not able to reasonably explain the circumstances of his arrest for the alleged offense.

**Diagnosis:** Based on the available information, Mr. Garcia-Zarate's diagnoses according to the criteria outlined in the <u>Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition</u> (DSM-5) are:

|  |  |
|---|---|
| 295.90 | Schizophrenia (Principle Diagnosis) |
| 301.7 | Antisocial Personality Disorder |

From a preponderance of the available information, including the reported history, behavioral observation, review of the records, and test results, Mr. Garcia-Zarate is currently experiencing signs and symptoms associated with Schizophrenia.

According to information outlined in the DSM-5, the essential features of Schizophrenia are a mixture of characteristic signs and symptoms (both positive and negative) that have been present for a significant portion of time during a one month period (or for a shorter time if successfully treated), with some signs of the disorder persisting for at least six months. These signs and symptoms are associated with marked social or occupational dysfunction. The disturbance is not better accounted for by Schizoaffective Disorder or a Mood Disorder with Psychotic Features and is not due to the direct physiological effects of a substance or a general medical condition. The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention. No single symptom is pathognomonic of Schizophrenia; the diagnosis involves the recognition of a constellation of signs and symptoms associated with impaired occupational or social functioning.

Characteristic symptoms of Schizophrenia may be conceptualized as falling into two broad categories: positive and negative. The positive symptoms appear to reflect an excess or distortion of normal functions, whereas the negative symptoms appear to reflect a diminution or loss of normal functions. The positive symptoms include distortions in thought content (delusions), perception (hallucinations), language and thought process (disorganized speech), and self-monitoring of behavior (grossly disorganized or catatonic behavior). These positive symptoms may comprise two distinct dimensions, which may in turn be related to different underlying neural mechanisms and clinical correlates. The "psychotic dimension" includes delusions and hallucinations, whereas the "disorganization dimension" includes disorganized speech and behavior. Negative symptoms include restrictions in the range and intensity of

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 9

emotional expression (affective flattening), in the fluency and productivity of thought and speech (alogia), and in the initiation of goal-directed behavior (avolition).

Disorganized thinking ("formal thought disorder") has been argued by some to be the single most important feature of Schizophrenia. Because of the difficulty inherent in developing an objective definition of "thought disorder," and because in a clinical setting inferences about thought are based primarily on the individual's speech, the concept of disorganized speech has been emphasized in the definition for Schizophrenia used in this manual. The speech of individuals with Schizophrenia may be disorganized in a variety of ways. The person may "slip off the track" from one topic to another ("derailment" or "loose associations"); answers to questions may be obliquely related or completely unrelated ("tangentiality"); and, rarely, speech may be so severely disorganized that it is nearly incomprehensible and resembles receptive aphasia in its linguistic disorganization ("incoherence" or "word salad"). Because mildly disorganized speech is common and nonspecific, the symptom must be severe enough to substantially impair effective communication. Less severe disorganized thinking or speech may occur during the prodromal and residual periods of Schizophrenia.

Grossly disorganized behavior may manifest itself in a variety of ways, ranging from childlike silliness to unpredictable agitation. Problems may be noted in any form of goal-directed behavior, leading to difficulties in performing activities of daily living such as preparing a meal or maintaining hygiene. The person may appear markedly disheveled, may dress in an unusual manner (e.g., wearing multiple overcoats, scarves, and gloves on a hot day), or may display clearly inappropriate sexual behavior (e.g., public masturbation) or unpredictable and untriggered agitation (e.g., shouting or swearing). Care should be taken not to apply this criterion too broadly.

A majority of individuals with Schizophrenia have poor insight regarding the fact that they have a psychotic illness. Evidence suggests that poor insight is a manifestation of the illness itself rather than a coping strategy. It may be comparable to the lack of awareness of neurological deficits seen in stroke, termed anosognosia. This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness.

Mr. Garcia-Zarate was given a specifier of Continuous because it appears his symptoms (e.g., delusional beliefs, auditory hallucinations) have been present for the majority of the illness course. Despite his denial, his condition is well documented in his mental health records.

There was also evidence of Antisocial Personality Disorder. *Personality traits* are enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts. Only when personality traits are inflexible and maladaptive and cause significant functional impairment or subjective distress do they constitute personality disorders. The essential features of a personality disorder are an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control. This enduring pattern is inflexible and pervasive across a broad range of personal and social situations and leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning. The pattern is stable and of long duration, and its onset can be traced back at least to adolescence or early adulthood. This pattern is not better explained as a manifestation or consequence of another mental disorder and is not attributable to the physiological effects of a substance (e.g., a drug of abuse, a medication, exposure to a toxin) or another medical

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 10

condition (e.g., head trauma).

The diagnosis of a personality disorder requires an evaluation of the individual's long-term patterns of functioning, and the particular personality features must be evident by early adulthood. The personality traits that define these disorders must also be distinguished from characteristics that emerge in response to a specific situational stressors or more transient mental states (e.g., bipolar, depressive, or anxiety disorders; substance intoxication). The clinician should assess the stability of personality traits over time and across different situations. Although a single interview with the individual is sometimes sufficient for making the diagnosis, it is often necessary to conduct more than one interview and to space these over time. Assessment can also be complicated by the fact that the characteristics that define a personality disorder many not be considered problematic by the individual (i.e., the traits are often ego-syntonic). To help overcome this difficulty, supplementary information from other informants may be helpful.

According to the DSM-5, the essential feature of antisocial personality disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. This pattern has also been referred to a psychopathy, sociopathy, or dyssocial personality disorder. Because deceit and manipulation are central features of antisocial personality disorder, it may be especially helpful to integrate information acquired from systematic clinical assessment with information collected from collateral sources.

For this diagnosis to be given, the individual must be at least age 18 years and must have had a history of some symptoms of conduct disorder before age 15 years. Conduct disorder involves a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated. The specific behaviors characteristic of conduct disorder fall into one of four categories: aggression to people and animals, destruction of property, deceitfulness or theft, or serious violation of rules. There is no available information to support the diagnosis of conduct disorder prior to the age of 15, however, a review of the defendant's disciplinary history in the FBOP demonstrates a well-established pattern of violating the rights of others and laws in general. Of considerable note is the defendant's prior desire to engage in masturbation and serious assaults.

The pattern of antisocial behavior continues into adulthood. Individuals with antisocial personality disorder fail to conform to social norms with respect to lawful behavior. They may repeatedly perform acts that are grounds for arrest (whether they are arrested or not), such as destroying property, harassing others, stealing, or pursuing illegal occupations. Persons with this disorder disregard the wishes, rights, or feelings of others. They are frequently deceitful and manipulative in order to gain personal profit or pleasure (e.g., to obtain money, sex, or power). They may repeatedly lie, use an alias, con others, or malinger. A pattern of impulsivity may be manifested without forethought and without consideration for the consequences to self or to others; this may lead to sudden changes of jobs, residences, or relationships. Individuals with antisocial personality disorder tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assault (including spouse beating or child beating). These individuals also display a reckless disregard for the safety of themselves or others. This may be evidenced in their driving behavior (i.e., recurrent speeding, driving while intoxicated, and multiple accidents). They may engage in sexual behavior or substance use that has a high risk for harmful consequences.

Individuals with antisocial personality disorder also tend to be consistently and extremely irresponsible. Irresponsible work behavior may be indicated by significant periods of unemployment despite available job opportunities, or by abandonment of several jobs without a realistic plan for getting another job. There may also be a pattern of repeated absence from work

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 11

that are not explained by illness either in themselves or in their family. Financial irresponsibility is indicated by acts such as defaulting on debts, failing to provide child support, or failing to support other dependents on a regular basis. Individuals with antisocial personality disorder show little remorse for the consequences of their acts. They may be indifferent to, or provide a superficial rationalization for, having hurt, mistreated, or stolen from someone (e.g., "life's unfair," "losers deserve to lose."). These individuals may blame the victims for being foolish, helpless, or deserving their fate (e.g., "he had it coming anyway"); they may minimize the harmful consequences of their actions; or they may simply indicate complete indifference. They generally fail to compensate or make amends for their behavior. They may believe that everyone is out to "help number one" and that one should stop at nothing to avoid being pushed around.

It is difficult to ascertain whether the defendant's behaviors were motivated by psychotic symptomatology or a personality disorder; however, based on his behavioral history, both are likely. On one hand, he evidenced derailment and disorganized communication, and was difficult to re-direct during conversations. He was also a poor historian, was not sufficiently oriented to person, place, time, and situation, and denied mental illness despite a well-documented history. He also has a history of engaging in clearly inappropriate sexual behavior, which can fall within the range of behaviors observed in psychotic individuals. On the other hand, the defendant has a documented history of violating the rights of others, to include assaults and damaging property. With regard to sexually inappropriate behavior, records indicated the defendant touched the buttocks and/or breasts of a staff member. This type of behavior is highly objectionable and is suggestive of a predatory nature often seen in individuals diagnosed with antisocial personality disorder. Additionally, Mr. Garcia-Zarate has a lengthy history of engaging in suicidal threats/gestures, while in federal custody, and the records stated some behaviors occurred while attempting to obtain a goal (i.e., secure a cell in SHU).

Chronic mental illness and personality disorders are not mutually exclusive, and can coexist in one's presentation. It is likely that Mr. Garcia-Zarate experienced psychotic symptomology; however, throughout years of incarceration, was able to manipulate staff and navigate while in federal custody. The ability to exaggerate and over report symptoms to manipulate is deceitful in nature, and supports the diagnosis of antisocial personality disorder. Furthermore, the defendant's behavior during the evaluation period was manageable and relatively harmless in comparison to previous incarcerations, which suggests at least some of his previous behaviors were volitional and controllable.

**Prognosis:** Mr. Garcia-Zarate's current prognosis is guarded, as Schizophrenia is a chronic mental condition, which may not improve over time, even with psychosocial and psychiatric treatment. It is recommended that he be involved in treatment, including both psychosocial and psychotropic medication, if he is to realize improvement of the condition, or prevent further deterioration of his mental status. However, Mr. Garcia-Zarate displayed a significant lack of insight into his mental condition. He did not seem to think he was mentally ill; and denied a history of mental illness, despite the obvious ability for the evaluator to obtain his records. His communication style and history of medication noncompliance suggests he may not be amenable to treatment. Therefore, Mr. Garica-Zarate will likely require procedures and close monitoring and supervision over time to ensure that he remains treatment compliant.

The prognosis for Mr. Garcia-Zarate is poor based on the prognosis for Antisocial Personality Disorder, and the age of onset and severity of behaviors. Research does not support any significant improvement in Antisocial Personality Disorder, regardless of the type of treatment. By definition, personality disorders reflect a long term pattern of behavior and interpersonal functioning, which begins early in life, and tends to become stable over time. The defendant's pattern of instability and behavioral problems is well established, and has continued in spite of

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 12

significant consequences. His overall prognosis is significantly impacted by his desire to engage in irresponsible and illegal acts. To improve his condition, it is recommended Mr. Garcia-Zarate be involved in treatment that includes both psychosocial interventions and medication, to help prevent future illegal acts, and promote prosocial behaviors.

**Understanding of Criminal Charges, Court Proceedings, and Ability to Assist Counsel:**
Mr. Garcia-Zarate did not participate in the full assessment to determine whether he understood the nature and consequences of the court proceedings against him and/or whether he can properly assist counsel in a defense.

On the RCAI, The defendant was not completely attentive to questions regarding the alleged offense, and was not always easily redirected. He did not appear familiar with the charges against him, nor did he demonstrate an understanding of the possible penalties. Additionally, the defendant did not display the ability to cooperate with his attorney and to assist in his defense, as statements appeared based on delusional content.

When asked what he was charged with, he stated, "Not having papers. [Query] Being illegal." This was further queried, and the defendant claimed he had no other legal history. Mr. Garcia-Zarate did not identify the charges against him, and when asked about the possible sentence length is convicted of the charges, replied, "They will take me to court [Query]. I don't know, the judge said he will see and said something about a car. They arrested me in San Francisco, in downtown. I saw him in Oakland, California, and when they got me, I didn't put up a fight. I got a ticket on the bus and it was green with the letters. The attorney said the same. The judge told me to wait at the county jail and then something about American paperwork." Due to his presentation, Mr. Garcia-Zarate was then asked if he knew his current whereabouts, and responded, "I am in King County jail in Los Angeles." When asked to state the current date and year, he responded, "1919."

Mr. Garcia-Zarate indicated he was unfamiliar with other potential court motions, such as the plea bargain process and probation. Additionally, the defendant did not identify the various pleas a person can enter in court. When asked if he was familiar with the plea of not guilty, he replied, "Yes [Query]. I don't know what it means. [Have you ever heard the word]? No, never." When asked if he was familiar with the plea of guilty, he responded, "Yes, guilty means not having the paperwork that is [unintelligible speech] [Query]. You sit for a while [Why]? They said they will return me to court [What will happen]? I don't know." He was asked to discuss defense strategies, and stated, "I don't know. It just seems I have to wait until [unintelligible speech] white woman and models. They have a negative view of people crossing the border."

Mr. Garcia-Zarate did not demonstrate a basic understanding of the roles of courtroom participants and the related procedures. When asked to discuss his familiarity with the courtroom, he responded, "Immigration and justice, when you see a lawyer. The person entered here by error. That is what the judge said [unintelligible speech] and they put all of the inmates in a spoon. When the officers approach me, they use the wrong names." When asked to identify the role of the defense attorney, he stated, "All of my people. The immigration people don't bother us. A lot of people show up and there's a lot of white women in Oakland, California." He indicated he did not know the role of the prosecutor, and when asked to describe the role of the judge, replied, "Most important. Different people coming in from different countries. All the murdering that is occurring." The defendant continued to answer in this fashion throughout discussions about legal proceeding and strategies. Furthermore, he indicated he did not have an attorney and communicated concerns related to his immigration status. The defendant was asked to discuss the likely outcome with regard to the alleged

SENSITIVE BUT UNCLASSIFIED

**NAME:** Garcia-Zarate, Jose
**REGISTER NUMBER:** 14115-051
**PAGE:** 13

charges, and replied, "Have my family, there's always a bunch of women and it's been lowered because of the women. The consequences of my family being present, slapping and weight gain."

During the latter half of the RCAI, the defendant exclaimed, "I have to pee. I'm urinating on myself." The interview was halted, and Mr. Garcia-Zarate was asked to immediately stand. Although his clothing appeared slightly damp, there was no indication that he urinated in the chair. The RCAI was discontinued and the defendant was escorted to his cell without further incident. He was not asked to participate in additional interviews during the evaluation period.

In general, Mr. Garcia-Zarate's communication appeared inaccurate and/or the result of odd beliefs. He did not remain attentive to the questions at hand, and was not easily redirected. Furthermore, he did not rationally discuss the alleged offense conduct, which is key to understanding the possible penalties.

### OPINION ON THE ISSUE OF PRESENT COMPETENCY TO STAND TRIAL

Based on the information available, there is substantial evidence to indicate Mr. Garcia-Zarate does suffer from a mental disorder, specifically Schizophrenia, which impairs his ability to properly assist counsel in a defense. Mr. Garcia-Zarate does not appear able to ascertain reality, realistically appraise his behavior, or consistently converse in a logical and coherent manner, all of which would be necessary to some extent to properly assist counsel in a defense. It is also suggested that his presence in the courtroom may be counter-productive. Specifically, the defendant has an extensive history of impulsive behavior, to include verbal outbursts and physical assault. Although there were no significant incidents during the evaluation period, he may be disruptive during future court proceedings.

It is likely the defendant has the intellectual capacity to understand the nature and consequences of the proceedings against him, and assist counsel in his defense. Previous opinions noted that medication would likely "restore the defendant to mental competence." Although restoration is likely, the defendant's noncompliance with medication compromises his ability to meet this goal. In view of Mr. Garcia-Zarate's mental condition and related behavior, it is recommended that he be committed to a federal medical center for treatment for restoration to competency pursuant to 18 U.S.C. Section 4241(d). It is likely he will require a change in his medication regimen and close compliance monitoring, all of which can be provided at a federal medical center. Furthermore, the commitment would allow for a longer period of observation and stabilization of mental functioning, by providing longer term and consistent psychological treatment and psychotropic medication.

Samantha Shelton, Psy.D.
Forensic Psychologist

per Tiffany K. Smith, PsyD
Lisa Matthews, Psy.D.
Chief/Forensic Psychologist

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
**Evidentiary Hearing Exhibit 002**
Case No. CR 17-609 VC
Date Admitted:
By Dep. Clerk:

SENSITIVE BUT UNCLASSIFIED