Paul M. Elizondo, D.O.
Board Certified Adult, Child/Adolescent, and Forensic Psychiatrist
Assistant Clinical Professor – Volunteer
University of California San Francisco
Department of Psychiatry

February 5, 2020

**FILED**
**FEB 06 2020**
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

The Honorable Vince Chhabria
United States District Court
Northern District of California

RE:   *USA v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra*
      Case Number(s): 17-CR-006009-VC-1; CR17-609 VC
      PFN#: UMB076

Dear Judge Chhabria,
Pursuant to your order, dated January 21, 2020, I examined Mr. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra (hereafter referred to as Mr. Garcia-Zarate) at Santa Rita Jail in Dublin, CA on January 27, 2020 and January 31, 2020. I met with him for approximately two hours and fifteen minutes on January 27, 2020; this meeting was conducted in Spanish. I met with him for approximately one hour on January 31, 2020; this meeting was conducted with the assistance of a Spanish interpreter. The following report and my conclusions are based on my meetings with Mr. Garcia-Zarate and the information listed below. I reserve the right to modify my findings and opinions should additional relevant material become available.

**REASON FOR REFERRAL**
Mr. Garcia-Zarate is a forty-nine-year-old man (DOB: ) who currently resides at Santa Rita Jail in Dublin, CA. He is charged with Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1); Alien in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(5); and Forfeiture Allegation 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). Mr. Garcia-Zarate was referred for evaluation to assess his competence to stand trial, by determining if, as a result of a mental disorder or developmental disability, he is unable to:
1. Understand the nature of the proceedings.
2. Assist counsel in the conduct of a defense in a rational manner.

**MY CONCLUSIONS (Stated to a Reasonable Degree of Medical Probability)**
1. What is the nature of the defendant's mental disorder, if any?
   Based on the available information, it is my opinion Mr. Garcia-Zarate meets the diagnostic criteria for <u>Schizophrenia, multiple episodes, currently in acute episode</u> that has been characterized by delusions; hallucinations; disorganized behavior; disorganized speech and thought process; echolalia (meaningless repetition of another person's spoken words), negative symptoms; and impaired insight. Negative symptoms refer to specific features apparent in persons who have developed Schizophrenia; these features reflect an absence of adaptive behaviors that generally serve a typically functioning person in social,

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 2

occupational, and relational domains of life. The specific negative symptoms Mr. Garcia-Zarate exhibited included inexpressive faces, a narrow range of affect (i.e. expressed emotion), monotone speech, minimal body gesturing, seeming lack of interest in the world and other people, concrete thought process, inattention, and diminished cognitive abilities.

2. Does the defendant have the ability to understand the nature of the criminal proceedings?
No. Based on the available information, it is my opinion his thought disorganization, preoccupation with apparently delusional material, and negative symptoms impair his ability to understand the nature of the criminal proceedings. For example, during my interview with Mr. Garcia-Zarate, he answered or interrupted my questions with non-sequitur information that was either unrelated to the relevant issue at hand or too incoherent from which to make sense. When he answered incoherently, several attempts to either motivate him to clarify his incoherent statements or redirect him to the relevant topic were ineffective. Mr. Garcia-Zarate also made several statements indicating he was not able to comprehend his and other essential participants' roles in court. For example, he indicated he believed the judge did not have a significant role in court role in court and later claimed he was a judge himself.

3. Does he have the ability to assist counsel in the conduct of a defense in a rational manner?
No. Based on the available information, it is my opinion his thought disorganization, preoccupation with apparently delusional material, and negative symptoms impair his ability to assist counsel in the conduct of a defense in a rational manner. For example, Mr. Garcia-Zarate vacillated about whether he could trust his attorney. At one point in the interview, he indicated he had confidence in his attorney; during another point, he indicated paranoia and suspiciousness regarding his defense attorney's intentions. For example, when asked why he believed his attorney was not trustworthy, he cited delusions that his attorney frequently speaks to the judge behind his back and does not bring a Spanish interpreter to their meetings to purposefully preclude his full understanding of relevant content. He also indicated he believed his defense attorney was working directly with the judge and that the judge would pass notes to the district attorney. He also stated he believed his attorney was accepting bribes from the police.

4. **Is the defendant currently competent to stand trial?**
*No. Based on the above considerations, it is my opinion Mr. Garcia-Zarate is not currently competent to stand trial.*

5. Is antipsychotic medication medically appropriate for the defendant?
Yes. As noted above, it is my opinion Mr. Garcia-Zarate meets the diagnostic criteria for a psychotic disorder, i.e. Schizophrenia. The symptoms of this disorder are appropriately treated with such medication.

6. Is antipsychotic medication likely to restore the defendant to mental competence?
Yes. As noted above, it is my opinion Mr. Garcia-Zarate meets the diagnostic criteria for a psychotic disorder. The symptoms of this disorder are appropriately treated with such medication. According to records and Mr. Garcia-Zarate's report, he is not currently taking antipsychotic medication and declined to disclose details of previous medication trials to address psychotic symptoms. The symptoms of Schizophrenia directly interfere with his

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 3

being competent to stand trial. Therefore, it is my opinion it is possible to restore his competence with appropriate treatment including such medication.

7. What are the likely side effects of the medication?
Available antipsychotic medications vary significantly in their likely side effects. All of the medications share a low risk of muscle stiffness, restlessness, fever, delirium, or (with long-term use) abnormal, involuntary movements. Other possible side effects include weight gain, elevated risk of diabetes, and increased blood levels of cholesterol and triglycerides. It is impossible to predict the exact effects of the medication in advance but the prescribing physician would be able to work with Mr. Garcia-Zarate to optimize the medication and dose to minimize side effects and maximize benefits.

8. What is the expected efficacy of the medication?
As noted above, it is my opinion Mr. Garcia-Zarate meets the diagnostic criteria for <u>Schizophrenia, multiple episodes, currently in acute episode</u>. The symptoms of this disorder are appropriately treated with antipsychotic medication. As such, I would expect improvement in his psychiatric status with appropriate treatment, including such medication. Mr. Garcia-Zarate exhibits particularly prominent negative symptoms and therefore, competency restoration may require a longer-than-average time in educational therapy and antipsychotic treatment in a supervised setting. Specific antipsychotic medications like cariprazine and clozapine, if deemed appropriate by the treating psychiatrist, may help mitigate Mr. Garcia-Zarate's negative symptoms and therefore, facilitate restoration more effectively and expeditiously.

9. Are there possible alternative treatments?
No alternative treatments would be expected to address his psychotic symptoms effectively.

10. Is the defendant a danger to himself?
Mr. Garcia-Zarate's history of psychotic symptoms and the stressors he faces in the legal system place him at an elevated risk of future harm to himself. At present, Mr. Garcia-Zarate denied having thoughts or intent to hurt himself, and in a controlled setting with ongoing assessment and treatment, he does not appear to be at high or imminent risk of self-injury. It will, of course, be necessary to monitor his status over time.

11. Is the defendant a danger to others?
Mr. Garcia-Zarate's psychotic symptoms elevate his future risk of violence. However, at present, while in a controlled setting with ongoing assessment and treatment, he does not appear to be at high risk of harming others. It will, of course, be necessary to monitor his status over time.

12. Does the defendant have the capacity to make decisions regarding antipsychotic medication?
No. Based on the available information, it is my opinion his level of thought disorganization, cognitive processing problems (a negative symptom) and limited insight into the nature and severity of his mental illness would prevent him from engaging in a rational discussion of treatment options.

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 4

## COLLATERAL INFORMATION
The following information was received from Ms. Diana Weiss:
1. Records of United States District Court, District of New Mexico, which document events, arrests, and proceedings between May 13, 1991 to September 10, 2010.
2. Medical and Psychological Records of the Federal Bureau of Prisons, dated from December 2, 1998 to June 9, 2005.
3. Mental health records of the Psychology Data System, Federal Bureau of Prisons, dated from October 5, 2005 to March 31, 2015.
4. Video recording of a police interrogation of the defendant, dated July 2, 2015.
5. Video recording of an ABC interview with the defendant, dated July 6, 2015.
6. Records of California Forensic Medical Group, Alameda County Sheriff's Department, Medical Records Department, dated from January 5, 2018 to January 9, 2020. These records indicated Mr. Garcia-Zarate was last administered antipsychotic medication, specifically risperidone, on April 3, 2019.
7. Superseding Indictment, United States District Court for the Northern District of California, dated October 17, 2019.
8. Amended Order Requiring The Production of Medical Records and Mental Health Records, United States District Court, Northern District of California, dated January 9, 2020.

## INFORMED CONSENT
Prior to beginning the interview, I informed Mr. Garcia-Zarate that I am a psychiatrist who was ordered by the court to evaluate him. I explained the nature and purpose of the evaluation; that treatment services would not be provided; the limits of confidentiality; and the voluntary nature of his participation. Mr. Garcia-Zarate indicated he understood these issues. He indicated his willingness to take part in the examination. It was my opinion he was competent to decide whether to do so.

## CLINICAL INTERVIEW
At the beginning of the interview, Mr. Garcia-Zarate introduced himself as Juan Garcia. After introducing myself and reviewing relevant informed consent material, Mr. Garcia-Zarate asked if I was "another attorney." When asked to estimate how long he had been incarcerated at Santa Rita County Jail, he replied, "they haven't given me a clean blanket and they are supposed to do a clean blanket every ninety days and now it's been longer than that and they should have given me one [multiple words of profanity]." I followed up by validating Mr. Garcia-Zarate's concern and asking whether he believed this meant he had been incarcerated at Santa Rita Jail for at least 90 days; he replied, "no, because it would not be worth it for them to keep me here just to eat tortillas and tamales." When asked about specific aspects of his history that were present in the provided records, Mr. Garcia-Zarate either denied the documented material was true or began speaking about another irrelevant topic. For example, when asked about his psychiatric history, he began by denying he had ever seen a psychiatrist or psychologist before, then stated, "what the archives say, there's no problems with them, because they did not bring me gifts like they promised."

Mr. Garcia-Zarate indicated he believed I already knew about his history. When asked why he believed this was material I already knew, he directed an intense gaze at me, appeared

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 5

suspicious, looked down at his lap and stop talking. It was difficult to re-engage Mr. Garcia-Zarate immediately after this behavior; he stopped responding to questions for several minutes. After discussing his general experience in jail for approximately five minutes by asking him simple "yes" or "no" questions, Mr. Garcia-Zarate begin to use multiple-word phrases again. He was not able to sustain conversational engagement for longer than two minutes at a time. Mr. Garcia-Zarate began echoing the last word of my comments and questions (echolalia). For example, I asked Mr. Garcia-Zarate to tell me about the food at Santa Rita Jail. At first he repeated the last word of my question three times, which was "comidas [meals]." I asked the question in four different other ways; after the fourth time, Mr. Garcia-Zarate provided two coherent responses: he initially stated, "why are you asking these questions, [profanity], what's your job anyway?" I restated my role for his understanding, then he interrupted me and stated, "it's generally fine not too bad not too good." Mr. Garcia-Zarate returned to exhibiting echolalia, i.e. repeating the last word of my comments or questions. When this occurred, I repeated my comment or question and asked if he understood. He continued to exhibit this behavior into the next two tasks, which were to discuss his medical and substance use histories. He stopped this behavior when we transitioned to discuss his legal case and upcoming proceedings in court.

After introducing his legal case as our next topic, he began speaking rapidly and stated he believed any time spent discussing this subject would be a waste of his time, my time, and the government's time. Mr. Garcia-Zarate stated he wanted to be reminded of the purpose of this evaluation. After making this request, he talked for two minutes without allowing me to interrupt. His conveyed thoughts were generally incoherent and presented in an order that was difficult to understand. His affect (expressed emotion) became irritable and hostile at this point in the interview. He indicated he believed his defense attorney was working directly with the judge and that the judge would pass notes to the district attorney. He indicated he believed the United States government was conspiring to make everyone homeless. He stated he believed police people were separate from the government and that the government was not aware of this. He stated he believed his defense attorney was accepting bribes from the police. He stated he was waiting to be deported back to Mexico and did not feel discussion of other topics would be worthy of his time. He indicated he would decline to participate in this interview unless we were confirming his deportation date. At this point in the interview, we transitioned from the unstructured clinical interview and I indicated to him that we would continue with structured assessments. Before we proceeded, Mr. Garcia-Zarate stated he needed to use the restroom and that he had already urinated in his pants. He requested we end the interview completely. A custody officer was notified and he was escorted to the bathroom. Mr. Garcia-Zarate returned to the interview room and agreed to continue the exam.

## UNDERSTANDING OF THE NATURE OF THE CRIMINAL PROCEEDINGS
Understanding the Charges:
Mr. Garcia-Zarate recalled a conversation with his attorney during which his charges were clarified. He stated he was charged with, "Illegal, not having papers. They said I'm going back to Mexico." When asked to elaborate on his understanding of why "not having papers" was illegal, he stated, "Nothing." I asked Mr. Garcia-Zarate to tell me what he knew about the status of his case involving the murder of a woman in San Francisco; he replied, "It was a death, they tried to use it to take away my green card and social security." When asked whether

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 6

he had been convicted of a crime related to this death, he stated, "No, nothing." He indicated he neither believed there were any consequences or rulings associated with this case nor any other aspects of his behavior that constituted illegal activity. He referred to "possession" as being relevant to his charges; when asked to clarify to what he was referring, he stated, "No."

Appreciation of Penalties:
Mr. Garcia-Zarate said, "Nothing, I'm going back to Mexico," when I asked him what possible sentences the judge might impose if he were found guilty. He stated, "What the judge thinks doesn't matter. He doesn't have any say. This question is not right, you shouldn't be asking me that." I reminded Mr. Garcia-Zarate about my identity and role, the purpose of our interview, and the criteria for being competent to stand trial. Mr. Garcia-Zarate replied, "I told you that doesn't matter because I'm going back to Mexico. Mr. Garcia-Zarate declined to answer subsequent questions about possible penalties if he were found guilty. He stated, "It started and ended. We went to court twice to see what happened. That was three and half years ago."

Appraisal of Available Defenses:
I asked Mr. Garcia-Zarate if he knew which pleas he could enter in court, to which he replied, "No, but I would answer to the charges in front of me and respond to the questions." When asked what "guilty" meant, he stated, "Yes, everything is going, going home and I'll be back to Leon Guanajuato, well just that, the illegal." When asked what "not guilty" meant, he stated, "No." I repeated the question about the meaning of "not guilty" and asked Mr. Garcia-Zarate to elaborate on his previous answer. He began speaking before I could finish my question, and stated, "Every time I went to court, they told me it was the last time. Then, in the afternoon, there were three lawyers that told me they wanted me to immigrate. It's what they decided two years ago." When asked what he understood about the "not guilty by reason of insanity defense," he paused for approximately ten seconds and said, "No, No," while shaking his head.

Appraisal of Functions of Courtroom Participants:
I asked Mr. Garcia-Zarate to define the roles of the defense attorney, district attorney, judge, defendant, and witnesses in the courtroom during a criminal trial. Regarding the defense attorney, he stated, "it's three attorneys, three brunettes." When asked again to specifically state his understanding of the role of the defense attorney, he shook his head and said, "None." Mr. Garcia-Zarate defined the District Attorney (DA) as "the person who presents me with my card, a green card, for social security. Actually just the fourth thing, nothing more." He repeated "nothing more" three more times. With respect to the Judge's role, Mr. Garcia-Zarate stated, "Nothing. He starts up court and imposes the sentence." Mr. Garcia-Zarate was not able to identify himself as the defendant in his case. When asked about a witness's role in court, he stated, "there aren't any, none, I wouldn't need any." When asked if he knew what a jury was, he stated, "I didn't bring papers that day, in Nogales, Arizona." He repeated, "Nogales, Arizona" three times.

Understanding of Court Procedures:
I asked Mr. Garcia-Zarate if defendants always had to testify in their own cases in criminal proceedings, to which he replied, "No, like something like that. To wait what immigration will say. They appointed numbers until there were none left." When asked if he would have to say everything that happened if he had to testify in court, he stated, "No." When asked what his

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 7

understanding was with respect to the DA's purpose in asking him questions in court, he stated, "Immigration, five years, nothing else except that." He did not demonstrate an understanding of the difference between a court and a jury trial.

**ABILITY TO ASSIST COUNSEL IN THE CONDUCT OF A DEFENSE**
Motivation to Help Self in the Legal Process:
I asked Mr. Garcia-Zarate what he wanted the outcome of his case to be. Mr. Garcia-Zarate stated, "I don't know, who knows? I go back to Mexico, I imagine."

Appraisal of Likely Outcome:
I asked Mr. Garcia-Zarate questions to assess his understanding of the court's authority over his conviction and sentencing. He responded, "No," then stated, "This is like the doll we have wrapped up in the papers. They told me to tell the whole truth. I just told them, they said they didn't, there's stuff in Spanish too, they showed me those dolls and then called me a homeless gang banger." When I asked him to define the term, "evidence," he stated, "convicts, camera videos, voice recorders." When I asked Mr. Garcia-Zarate what evidence he believed the police and DA had against him, he stated, "Nothing." I asked him what he thought his chances of being found not guilty were, to which he replied, "None, but they said I'm going back to Mexico."

Planning of Legal Strategies:
Mr. Garcia-Zarate became noticeably guarded when I asked him questions meant to assess his ability to plan legal strategies with his attorney. I asked him what plea he planned to enter, what he knew about plea bargains, and under what conditions he would accept a plea bargain. He maintained an intense stare directly at me while I repeated questions related to these issues several times. He then stared at the door to the contact visiting room for approximately thirty seconds, then stated, "These questions don't make sense. I know the answers, but you don't need me to say them." I asked Mr. Garcia-Zarate what right is forgone when a plea bargain is accepted; he looked at me blankly and gave no reply. I asked him if he was having a hard time understanding the content of my questions; he shook his head and stated, "No, there's just no purpose." I reminded Mr. Garcia-Zarate of my role as psychiatrist and evaluator for his competence to stand trial. He stated, "you're not a lawyer, I already have another one."

Ability to Cooperate Rationally with Counsel:
When I asked Mr. Garcia-Zarate if he knew his lawyer's name, he stated, "That's what she said that she would finish up with that. She had my clothes all ready to go in the bag, the street clothes I have to wear." When I asked Mr. Garcia-Zarate how he could help his attorney, he stated, "Everything is going well." I asked him if he had confidence in his attorney; he replied, "Yes." I asked Mr. Garcia-Zarate if he understood the concept of attorney-client privilege, to which he responded, "just that, to communicate with an interpreter." Mr. Garcia-Zarate indicated he believed his attorney raised the issue of his trial competence. Then he stated, "something about the units or that something never reached the immigration, but it happened."

Capacity to Disclose Pertinent Information to Counsel:
Mr. Garcia-Zarate affirmed he remembered everything that happened related to his current case by nodding his head. He stated, "Nothing can happen now, that's all we have left." When I

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 8

asked him if he believed he would be expected to tell his attorney everything he knew and remembered, he stated, "He doesn't nee anything, not even money, he lives contentedly. I'm always saying I need a teaspoon and they won't give me that. That's why I feel at ease." Mr. Garcia-Zarate indicated he would decline to share any more information with his attorney during subsequent meetings. He further stated, "It was going to that, winding up, three court dates ago. The judge asked if you have papers, I don't have American papers. That's what the lawyer said. I told him I didn't have papers."

Capacity to Testify:
Mr. Garcia-Zarate declined to answer questions to assess his capacity to testify. He stated, "You're asking me irrelevant questions. I don't need to share any more of my knowledge on this subject." Then he stated, "The government of Donald Trump in the newspaper, got me on an arrest warrant, that's what happened on the Embarcadero. They were two big black rats, they just got black stuff, all black stuff."

Challenge Prosecution Witnesses:
Mr. Garcia-Zarate declined to answer questions to assess his capacity to challenge prosecution witnesses. He shook his head and stated, "Nothing, none."

Ability to Manifest Appropriate Courtroom Behavior:
Mr. Garcia-Zarate declined to answer questions about his ability to behave appropriately in court. He stated, "They said there was a death, nothing to do with jail. Because I'm going back to my country and staying there." When asked if he understood that the judge had authority over appropriate order in a courtroom and therefore, when a participant was permitted to speak, he stated, "I did tell the truth. I'm a judge, and I'm still judge. I just want to know the truth."

Capacity to Cope with the Stress of Incarceration Awaiting Trial:
I asked Mr. Garcia-Zarate if he would be willing to take psychiatric medications while awaiting trial. He stated he did not need to take psychiatric medications; he stated, "They dressed me up and they dressed themselves. That was what happened and it was enough for them and the court. So I do not see why I'm here since I'm going back to my country any day now. So nothing matters." Mr. Garcia-Zarate declined to answer questions to assess his ability to cope with the stress of incarceration while awaiting trial. He stated, "Nothing, none," then repeated this four additional times.

**PSYCHIATRIC HISTORY**
Mr. Garcia-Zarate denied he had ever been diagnosed with any psychiatric disorders prior to our meeting. He cited our meeting as the only time he had met with a psychiatrist during his lifetime. He denied having ever been hospitalized; however, records of the United States Bureau of Prisons indicate he has a history of mental health treatment and at least four inpatient psychiatric hospitalizations in 1999, 2000, 2001, and 2005; two of these hospitalizations lasted for approximately seven months. He has been diagnosed with Schizophrenia, paranoid type, and has been treated with several different antipsychotic medications, including risperidone, haloperidol, and haloperidol decanoate (long-acting injectable medication lasting between two and four weeks). Records indicate Mr. Garcia-Zarate has a history of exhibiting hostile behavior, auditory hallucinations, delusions, poor insight, and paranoid ideation in the context of non-adherence to recommended medication. In the past,

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 9

Mr. Garcia-Zarate has demonstrated at least partial remission of psychotic symptoms when medication administration has been compulsory. Mr. Garcia-Zarate most recently took risperidone, antipsychotic medication, in April 2019; records indicate no antipsychotic medication has been administered to Mr. Garcia-Zarate since then.

In February 2010, Mr. Garcia-Zarate underwent forensic psychiatric evaluation for competency to stand trial. The competency evaluator diagnosed Mr. Garcia-Zarate with Schizophrenia, Paranoid Type, a diagnosis consistent with that opined for the previous ten years in Federal Medical Centers. The evaluator also opined his symptoms were not severe enough to impair his function. Records indicate Mr. Garcia-Zarate has a history of inappropriate sexualized behavior and self-harm. A mental health note from records of the Bureau of Prisons, dated April 30, 2004, indicated Mr. Garcia-Zarate attempted to overdose on alcohol. Mr. Garcia-Zarate also has a history of high-risk behavior, particularly around times of transitioning facilities. Records specifically refer to an incident in which Mr. Garcia-Zarate attempted to set his cell on fire. A mental health note from records of the Bureau of Prisons, dated December 17, 1998, indicated this behavior, i.e. setting fire to his cell, was thought to be driven by psychotic symptoms rather than intentional self-harm. When I asked Mr. Garcia-Zarate to recall this event, he stated, "Well, it's the way I used to get them away. It was their fault. That's all there is and that's it." When asked to clarify who or what he was attempting to deter from his cell, he stated, "Nothing, nobody."

## MEDICAL HISTORY

Mr. Garcia-Zarate denied any history of chronic medical problems for which he took medication or visited a doctor regularly. He denied taking any medications at this time. He denied any allergies to medications or food. Mr. Garcia-Zarate declined to answer questions about whether he was told he experienced developmental milestone delays as a child of if he required early interventions such as physical, occupational, or speech therapy. He denied any history of head trauma. He denied currently experiencing fevers, chills, nausea, vomiting, diarrhea, weight loss, heat/cold intolerance, rash, cough, shortness of breath, palpitations, pain, vision problems, hearing problems, headache, stomachache, and problems with movement.

Texas court records indicate Mr. Garcia-Zarate has a history of spitting up blood in around October 2009. These records also refer to Mr. Garcia-Zarate's report of having a "rod in his right leg to correct a broken bone." When asked directly about his history of surgeries to correct this fractured bone, Mr. Garcia-Zarate stated he did not want to discuss this issue. Medical records from Santa Rita Jail indicate Mr. Garcia-Zarate takes tamsulosin, a medication for benign prostatic hypertrophy. According to these records, his medical problem list, as of October 2019, included hyponatremia (low salt level in the blood), urinary tract infection, Hepatitis C, insomnia, and underweight. He recently underwent abdominal ultrasonography (sonogram) as part of a diagnostic workup for severe swelling in both his lower extremities in around October 2019. Mr. Garcia-Zarate has a history of taking Ensure, ferrous sulfate (iron supplement), and Vitamin C in the context of malnourishment, most recently in October 2019. When asked about his history of taking supplements for malnourishment, he stated, "it's not right for me to be here eating salsa and tamales."

## SOCIAL AND FAMILY HISTORY

Records indicate Mr. Garcia-Zarate has a history of providing inconsistent and incomplete information with respect to his family of origin, birthdate, social history, and upbringing. During our interview, Mr. Garcia-Zarate initially indicated he was born on ▇ 1667. He spontaneously amended this and stated he was born on this date in 1977. Records vary with respect to Mr. Garcia-Zarate's documented birthday. According to Santa Rita Jail medical records, Mr. Garcia-Zarate was born on ▇ 1970 in Mexico. He indicated he completed six years of formal education in Mexico. Records refer to both five and six years as the number of years of formal education Mr. Garcia-Zarate completed. Mr. Garcia-Zarate indicated he can read and write in Spanish. He denied any history of post-graduate education or military service. Records indicate Mr. Garcia-Zarate has a scattered employment history, which has included jobs in roofing and landscaping in Arizona. He stated he earned money by selling drugs throughout the 1990's in multiple cities.

Mr. Garcia-Zarate stated he was born and raised in Leon Guanajuato, Mexico. He stated his parents passed away when he was fifteen years old. He indicated he had five siblings but did not know where they were living. Records indicate he has previously reported he has nine siblings, one of whom passed away after falling off of a bed and suffocating. Records indicate Mr. Garcia-Zarate first entered the United States when he was approximately eighteen years old, lived in Arizona for approximately five years; then moved to Los Angeles, California for approximately two years; then to Oregon for four years; then to Washington for three years. Records refer to a brief residence in San Francisco, California in late 1995. He denied any marital history and denied having any children; however, records indicate he has previously reported being married to a woman named Teresa, a United States citizen, who he divorced in 1997 and that he has four daughters, three of whom are the same age (fifteen years old in 2010).

Mr. Garcia-Zarate declined to answer questions about whether any family members had a history of substance use disorders, schizophrenia, bipolar disorder, depressive disorders, anxiety disorders, chronic medical problems, neurological disorders, or thyroid problems.

**LEGAL HISTORY**
Mr. Garcia-Zarate denied any arrests or convictions as a minor. According to Texas court records, Mr. Garcia-Zarate has an extensive arrest and conviction history beginning in 1991, when he was approximately twenty years old, through 2003. These records indicate he has been convicted of drug-related charges (possession of substances, conspiracy to deliver controlled substances, loitering for drug activity) approximately eight times. His conviction history also includes trespassing, resisting arrest, and re-entry after deportation. He denied any history of serving prison time despite records indicating an extensive incarceration history.

**SUBSTANCE USE HISTORY**
Mr. Garcia-Zarate stated he has never had treatment for a substance use disorder or struggled with substance dependence; however, records indicate Mr. Garcia-Zarate has a history of alcohol and drug use. When I asked him about this, he stated, "You whore, are you the prosecutor? You just think I'm a homeless Trump follower." When asked more specifically about the substances he used, he stated, "No, I left it behind." I indicated it was important I knew about the substances he used in the past; he stated, "Is this because of the court date? It's

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 11

that they dressed me up too, so that means I'm just waiting to go back [to Mexico]." He indicated he had not used alcohol for several years and declined to talk about how frequently he used alcohol in the past. He indicated he used to smoke cigarettes, approximately two packs per day, as a young adult. He denied any history of using cannabis, PCP, heroin, cocaine, inhalants, amphetamines, recreational prescription drug use, intravenous drugs, or steroids. Records indicate Mr. Garcia-Zarate's first drink of alcohol was around age five and that he drank tequila, beer, and wine on a daily basis around this time. Records refer to his prior report of using cannabis approximately twice per year and his first use of this drug having been when he was fifteen years old.

**CURRENT MENTAL STATUS EXAMINATION**
Mr. Garcia-Zarate was escorted by a custody officer to a private, contact interview room without incident. Mr. Garcia-Zarate presented as a short statured, Hispanic man, whose appearance was commensurate with his stated age. He appeared very thin. His head was completely shaved. He had a spider web tattoo on his left elbow. He was dressed appropriately in jail attire and shackled. He was guarded during the majority of the interview. He referred to his suspiciousness about my intentions and purposes for gathering historical and clinical information during our interviews. He made intermittently intense eye contact throughout the interview. He did not exhibit psychomotor agitation or retardation throughout the interview. No tremors were apparent. Mr. Garcia-Zarate's speech demonstrated minimal inflections and was generally monotone, rapid and loud during the interview. On at least three occasions, multiple attempts were required to successfully interrupt Mr. Garcia-Zarate in order to redirect the interview to the topic at hand. Mr. Garcia-Zarate exhibited echolalia (meaningless repetition of another person's spoken words) approximately fifteen times during our interview. He stated his mood was "more or less okay." His affect (expressed emotion) vacillated between flat and irritable.

With respect to Mr. Garcia-Zarate's thought process, approximately ninety percent of his responses were tangential and ten percent of his responses were incoherent. He perseverated on certain topics he previously broached regardless of their relevance to the question at hand. He denied having suicidal or homicidal thoughts. He denied having ideas of reference, the ability to control others' thoughts or that others could control his thoughts. He expressed paranoid thoughts and delusions about his lawyer and my purpose in interviewing him. When asked about his lawyer's intentions to help him, he stated, "the attorney said some people were coming from that previous building. Donald Trump was taking care of the fall of the government."

Mr. Garcia-Zarate denied having ever experienced auditory hallucinations, visual hallucinations or illusions. Mr. Garcia-Zarate appeared to be responding to internal stimuli approximately eight times during the interview. During these times, he paused for three to five seconds before answering my question, looked to the door or wall of the contact interview room, then gave his response or looked at me intensely without providing a response. During our interview, Mr. Garcia-Zarate stopped speaking in the middle of a sentence more than twelve times to either switch to a non-sequitur topic or discontinue speaking altogether.

Mr. Garcia-Zarate's attention and concentration were impaired during the interview. He was not able to recall relevant details of the instant offense. He recalled vague, incoherent details of the incident that led to his homicide charges. He exhibited poor judgment, as he expressed severe distrust in his defense attorney and declined to participate in several parts of our interview. His insight was poor with respect to his current legal situation, mental health history and current mental status. He frequently interrupted my questions to return to an off-topic subject.

**RESULTS OF PSYCHOLOGICAL TESTING**
I administered the Montreal Cognitive Assessment (MoCA) in Spanish, Version 7.2 during our first meeting on January 27, 2020. Mr. Garcia-Zarate score on the MoCA was a 9 out of a possible 30. In accordance with MoCA scoring guidelines, one point was added to his score due to his level of education (five or six years). When this instrument is administered in a clinical setting, a score under 26 out of 30 suggests evidence of cognitive impairment for which further investigation is appropriate for its diagnostic and treatment implications. The specifics of Mr. Garcia-Zarate's performance on the MoCA are as follows: he completed a trail-making task incorrectly in which he was required to draw arrows between alternating numbers and letters in the appropriate pattern; he was unable to copy a rectangular prism accurately; he drew a clock with an appropriate contour, however, he positioned the numbers incorrectly and the hands according to a concrete interpretation of the instructions. He accurately named three common animals. He accurately repeated four of five digits spoken to him in the same order; he was unable to repeat three digits in reverse order. When asked to tap his hand when the letter "A" was spoken in a series of twenty-nine random letters, he rambled incoherently and obliquely referred to his need to have his cell blanket washed or replaced after three months of use. He made three mistakes when performing five serial subtractions by seven starting at ninety. He did not demonstrate the ability to accurately repeat sentences of ten and thirteen words in length; he missed two words when attempting to repeat the sentence of ten words in length. He named five words that started with the letter "S" in one minute (eleven required for full points); he attempted to use words that started with the letter "Z" as acceptable for this task. He accurately used abstract concepts to describe similarities between one of two object pairs. He was not able to recall any of items on the delayed recall task. He received one point on the orientation section; he believed it was the "third week of January, the sixteenth, of 2019, no, 2020." He believed the day of the week was Sunday (actually Monday). He believed we were located in a federal detention facility owned by the "ruler of the north and south;" he believed we were located in "Oakland near Walmart," (actually Santa Rita Jail in Dublin, California).

I administered the Structured Interview of Reported Symptoms (SIRS-2, an instrument designed to assess an individual for evidence of feigned psychiatric symptoms). Mr. Garcia-Zarate's performance on the Primary Scales of this instrument did not reveal evidence of feigned psychiatric symptoms. His results on the Supplementary Scales revealed he had a score of four on the Defensive Symptoms Scale. This score suggests he acknowledged having experienced a few common psychological and interpersonal difficulties frequently experienced by most people.

Thank you for referring this matter to me for evaluation and report.

Paul Elizondo, D.O.
Re: People v. Jose Inez Garcia-Zarate aka Juan Jose Dominguez De La Parra
Page 13

Respectfully submitted,

*Paul Elizondo, DO* (signature)

Paul M. Elizondo, D.O.
Board Certified Adult, Child/Adolescent and Forensic Psychiatrist
Assistant Clinical Professor – Volunteer
University of California, San Francisco, Department of Psychiatry
Child/Adolescent Psychiatrist at Youth and Family Services and Juvenile Hall
Marin County Behavioral and Mental Health Services

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
CALIFORNIA
**Evidentiary Hearing Exhibit 004**
**Date Admitted:**
**By Dep. Clerk:**