J. TONY SERRA SBN 32639
3330 GEARY BLVD., THIRD FLOOR EAST
SAN FRANCISCO, CA 94118
TELEPHONE: (415) 986-5591
FACSIMILE: (415) 421-1331

MICHAEL HINCKLEY SBN 161645
803 Hearst Avenue
Berkeley, California 94710
Telephone:     (415) 706-1386
Email: mike@mhlaw.us

Attorneys for Defendant
JOSE INEZ GARCIA-ZARATE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO VENUE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE INEZ GARCIA-ZARATE<br><br>Defendant. | Case Nos. 3:17-cr-00609 VC<br><br>**DEFENDANT JOSE INEZ GARCIA-ZARATE'S SENTENCING MEMORANDUM AND OBJECTION TO THE PSR; EXHIBITS**<br><br>Date: June 6, 2022<br>Time: 9:30 a.m.<br>Hon. Vince Chhabria |

**I.      Introduction**

On the evening of July 1, 2015, an unspeakable tragedy occurred when Kate Steinle was killed by a bullet that accidently discharged from a gun held by defendant Jose Inez Garcia-Zarate ("Garcia Zarate") on Pier 14 in San Francisco. The facts surrounding the incident are largely undisputed and are supported by hours of video depicting Garcia Zarate's actions before, during and after the tragic shooting, as well as hours of a videotaped interrogation of Garcia Zarate conducted by San Francisco

police officers after his arrest. There was also a comprehensive state jury trial at which evidence was presented and tested by both Garcia Zarate and state prosecutors.

The state court jury acquitted Garcia Zarate on charges of first degree murder, second degree murder, involuntary manslaughter, and assault with a semiautomatic firearm. He was found guilty of being a felon in possession of a firearm. However, Garcia Zarate appealed the conviction contending the trial court erred in refusing to instruct the jury on transitory possession. After extensive briefing the appellate court agreed with the defense and the sole count of conviction was reverse and remanded. See Remittitur and Decision attached hereto as Exhibit A.

As distilled in the briefing, the gravamen of the respective parties theories of the case were as follows: the defense theory was that Garcia Zarate was sitting on a swivel chair on San Francisco's Pier 14, bent over to pick up an unknown object wrapped in rugs. Garcia Zarate did not know that the object wrapped in rags was a gun until it accidentally fired when he picked it up; at which point Garcia Zarate threw the gun in the water off of the pier to stop it from firing. The prosecution's theory was that Garcia Zarate intentionally and knowingly fired the gun.

Zarate Garcia has been in custody since his arrest on July 1, 2015. Following the proceedings in state court, Garcia Zarate was brought before this Court on January 8, 2018, on federal charges of being a Felon in Possession of a Firearm and Ammunition (18 U.S.C. § 922(g)(1)) (Count One), and being an Alien in Possession of a Firearm and Ammunition (18 U.S.C. § 922(g)(5)) (Count Two). Throughout the federal court proceedings Garcia Zarate's competency has been at issue. After being found not competent to stand trial, Garcia Zarate received mental health treatment and medication until, on June 11, 2021, the Bureau of Prisons informed the Court that Garcia Zarate's competency was restored. He was returned, required additional treatment and evaluation and was again determined competent. On March 14, 2022, Garcia Zarate pleaded guilty to Counts One and Two of the Superseding Indictment.

## II. Sentencing Guideline Calculations and Recommendation.

The presentence report determined the applicable sentencing guideline range in this case is 41-51 months based on a total offense level of 18 and criminal history category V. The sole unresolved object to the PSR was made by the defense which objected to the use of USSG 2K2.1(c)/2K1.4 cross reference to Involuntary Manslaughter increasing the total offense level from 16 to the 18 included in the recommendation.

Probation has also recommended an upward variance from the applicable 41-51 month guideline range to a sentence of 120 months.

For the reasons set forth infra, Probation's recommended sentence is not appropriate to this case and the defense requests it not be granted.

In one month, Garcia Zarate will have been in custody for 7 actual years based upon this incident. That is 33 months more than the applicable guideline sentence. For the reasons stated infra, the appropriate sentence that would be more than sufficient to achieve the sentencing purposes set forth in the sentencing guidelines is credit for time served.

## III. Background & Facts[1]

On March 26, 2015, Garcia Zarate completed a federal sentence on a charge of illegal re-entry into the United States, and he was transferred from federal custody to San Francisco authorities on a warrant relating to a 20-year old marijuana arrest. As a result of confusion between the federal and local authorities, Garcia Zarate was simply released into the City of San Francisco. Garcia Zarate, who has a documented history of Schizophrenia dating back to at least 1998, found himself living in the city alone, poor, and with only the clothing he received from a local Goodwill Store. Garcia Zarate lived unhoused

---

[1] Unless otherwise indicated, all factual references are from trial evidence set forth in Exhibit A.

3

along San Francisco's waterfront in the months preceding the incident in this case. In the meantime, on June 27, 2015, a ranger with the federal Bureau of Land Management left a firearm unattended in his vehicle, which was parked in the Embarcadero area of San Francisco. The vehicle was broken into and the firearm, a .40 caliber Sig Sauer P239 semi-automatic pistol, was stolen. The government does not contend that Garcia Zarate stole the firearm.

Four days after the theft of the firearm, on July 1, 2015, at approximately 6:30 p.m., Kate Steinle was tragically killed by a gunshot from the stolen firearm as she was walking with her father and a friend on Pier 14.

Witnesses reported seeing a homeless man tossing something into the Bay and leaving the area immediately after the shooting. Based upon descriptions and photographs provided by witnesses, San Francisco Police Officers arrested Garcia Zarate on the day of the incident. Video showed that Garcia Zarate had not left the waterfront area after the shooting, and had been casually walking around and looking through garbage bins. He was malnourished, wearing two extremely oversized pairs of jeans held on by a single shoelace, a pair of oversized shoes, one sock, an extremely oversized jacket, a hooded sweatshirt, and a t-shirt. The only other item he had on him, or anywhere else, was a small blue fragment of a broken lighter in his pocket. Ex B.

During a lengthy police interrogation, Garcia Zarate told investigators that he was resting on a chair on Pier 14 when he found an object wrapped in rags or a T-shirt. As he unwrapped the object to see what it contained the gun discharged and the fatal bullet was fired. Garcia Zarate then immediately threw the gun into the Bay to stop it from firing more. Garcia Zarate was unaware that the object was a firearm until it discharged. The undisputed evidence of the case demonstrated that the bullet traveled 12 feet from the firearm onto the ground, where it then ricocheted and traveled 78 feet before hitting Ms. Steinle in her back.

///

4

DEFENDANT'S SENTENCING MEMORANDUM & OBJECTIONS TO PSR    Macintosh HD:Users:michaelhinckley:Documents:Betts sn-Final MLH.docx

*The Interrogation*

Following his arrest, Garcia Zarate was subjected to a multiple hour interrogation by San Francisco Police Officers. The questioning began after he had been arrested and had spent 5 hours in the back of a parked patrol car at the Hall of Justice. Then sometime before 2:00 am the interrogation began and ended after 7:00 am. An Investigator admitted that Garcia Zarate had to be awakened at several points during the interrogation. During the lengthy interrogation Garcia Zarate made nonsensical and non-sequitur statements and phrases (Garcia Zarate stated several times that he was born in 1863), and also made exculpatory and inculpatory affirmations. Many of Garcia Zarate's inculpatory statements, damaging at face value, were flatly contradicted by the physical evidence.

For example, the during the interview, Mr. Garcia Zarate agreed with police interrogators that Ms. Steinle was only five feet away from him when she was shot. However, the undisputed physical evidence showed that Ms. Steinle was actually approximately 90 feet away from Mr. Garcia Zarate when she was shot. Similarly, Garcia Zarate agreed with police during the interrogation that he had passed by Ms. Steinle lying on the pier as he left after the shooting, without attempting to render aid. Yet, the video evidence showed that Mr. Garcia Zarate did not pass Ms. Steinle when he left the pier after the shooting. Instead, 90 feet away from Ms. Steinle, Garcia Zarate left going in the opposite direction of Ms. Steinle after the gun discharge, likely unaware that anyone had been shot. Zarate Garcia stated during the interrogation that he had been shooting at seals; but no other person on the pier that day said they had seen any marine animals near the pier. Nor had anyone seen Garcia Zarate on the edge of the pier looking down into the water. Indeed, one of the police officers interrogating Garcia Zarate challenged his statement about shooting at seals by stating no seals had been seen near the pier.

Asked how the gun went off, Garcia Zarate repeatedly said in the interview that it was an accident, telling police the gun "just went off" and "it went off by itself", and that "it fired on its own." There was substantial evidence at trial supporting an accidental discharge. Firearms expert James Norris

5

explained that the at-issue gun lacked an external safety mechanism, and he confirmed that the firearm could accidentally discharge if it were in single-action mode. Norris also explained to the jury that the gun likely discharged while Garcia Zarate was bent over, and that the gun "somehow discharged, ricocheted, and unfortunately stuck the victim." Norris also confirmed that the gun "seemed to be pointed down towards the ground", which would make the gun "extremely difficult for a person to aim…." Another defense expert, Alan Voth, opined that the facts of the case ( a single bullet shot from a seated position, hitting the ground 12 feet away, ricocheting and traveling 78 feet before striking a person in the lower back) indicate that gun was discharged unintentionally.

Garcia Zarate was clear during the interrogation that he had no reason to shoot Ms. Steinle -- he did not know her, he had never seen her before and she had done nothing to disrespect him in any way. There in fact was no evidence that Garcia Zarate had any prior interactions with Ms. Steinle or that he had any motive at all to harm her.

***Gun Shot Residue is Consistent With Accidental Discharge***

The evidence showed that gunshot residue (GSR) was found on Garcia Zarate's right hand near the time of his arrest. However, GSR is not evidence that Garcia Zarate knowingly shot the firearm. Zarate Garcia explained that he did not know that the object he picked up as a firearm because the firearm was wrapped in rags or a t-shirt. He did not realize the object was a firearm until it discharged. Expert testimony at trial demonstrated that gunshot residue can transfer from objects that have gunshot residue on them, onto a person's hands. In other words, the gunshot residue could have transferred from the gun onto the rags, and from the rags onto Garcia Zarate's hand.

### IV. Booker Factors

In fashioning sentences, courts are asked to impose a penalty that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2). Those sentencing purposes are:

(a) retribution (to reflect seriousness of the offense, to promote respect for the law, and provided "just punishment");
(b) deterrence;
(c) incapacitation ("to protect the public from further crimes"); and
(d) rehabilitation ("to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner").

(See *United States v. Carty*, 520 F.3d 984, 991 (9th Cir 2008))

In determining the sentence minimally sufficient to comply with the aforementioned purposes of sentencing the court must consider several factors listed in Section 3553(a). These factors are:

(1) "the nature and circumstances of the offense and history and characteristics of the defendant;"
(2) "the kinds of sentences available;"
(3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range;
(4) the need to avoid unwarranted sentencing disparity; and
(5) the need to provide restitution where applicable.

(18 U.S.C. §3553(a)(1), a(3),(a)(5)-(7).)

Application of the §3553(a) factors and adherence to the §3553(a)(2) purposes to the unique circumstances of Garcia Zarate's case support the conclusion that a sentence of no more than credit for time served is appropriate and should be imposed.

### V. Booker -- Relevant 3553 Facts/Facts in Mitigation

*Background/Family*

Garcia Zarate was born on July 19, 1970 in Leon, Guanajuato, Mexico. Garcia Zarate's father, Jose Inez Garcia-Valticar died approximately 30 years ago in Mexico. His mother, Maria Elaina Zarate-

Sanchez passed away in Mexico approximately 5 years ago. Garcia Zarate has seven siblings, all of whom live in Mexico.

Garcia Zarate's childhood was spent in Mexico. He started working at the age of 6 in the local shoe factory, processing leather for shoes and boots. All of the other members of the family worked similar jobs at the shoe factory.

Garcia Zarate's family experienced a serious disruption when his parents split and divorced. Garcia Zarate's father left the household, which was sad for Garcia Zarate and his siblings. After the divorce of his parents, Zarate Garcia began to go his own way, alone and separate from his family.

In approximately 1991, near the age of 20, Zarate Garcia came to the United States looking for work and a better life.

*Education*

Garcia Zarate's formal education was quite limited. The highest grade level Garcia Zarate achieved was third grade. His education was permanently interrupted when he was pulled from the school in order to work and help support his family financially.

*Difficulties in The United States/Mental Illness*

Garcia Zarate came to the United States seeking a better life. But is life here has been filled with difficulties and hardships. He has rarely had a home or house and has lived primarily on the streets or in shelters. Most of his meals have come through food pantries. He is now a 51 year old man who has spent over half his adult life in federal prison for illegally reentering the United States.

Much of Garcia Zarate's difficulties and inability to function can be attributed to longstanding serious mental illness. Records show that he was diagnosed and plagued with Schizophrenia since at least 1998, and has been hospitalized for psychiatric treatment at least 4 times by 2005. Garcia Zarate

has been treated historically with several psychiatric medications, and is presently being treated with anti-psychotic medication.

## V. Objections to PSR

**Paragraph 31: Cross reference to Involuntary Manslaughter should not be applied.**

**A. Mr. Zarate did not commit the crime of Involuntary Manslaughter.**

Paragraph 31 of the PSR, proposes an increased Garcia Zarate's offense level from 16 to 18 based on application the USSG §2K2.1(c) Cross Reference provision.

In its Addendum, probation correctly cites USSG §2K2.1(c)(1) stating "if the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, apply, if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined by applying USSG §2K2.1." PSR Addendum @ para 4. It goes on to conclude, however, "As this is the case in the underlying offense, USSG §2A1.4, Involuntary Manslaughter, is being used to determine the offense level." PSR Addendum @ para 4.

Contrary to probation's conclusion, under the facts of this case, Involuntary Manslaughter is not a 2K2.1(c) other offense.

First, for an offense to qualify, due process requires evidence of the offense meet the preponderance of the evidence standard. USSG 6A1.3. Here, the evidence does not meet the standard. As stated *supra,* Involuntary Manslaughter was fully litigated at a jury trial by the only jurisdiction which has jurisdiction to do so. The result was an acquittal. The jury, of course, applied the higher beyond a reasonable doubt standard of proof, which does not apply here. However, the state trial proceedings provide significant evidence which is relevant to resolve the issue at hand, much of which has been addressed supra.

The defense position is what happened was a tragic accident but it does not meet the legal standard for USSG 2A2.4, involuntary manslaughter, because Garcia Zarate's conduct was neither criminally negligent nor reckless. *See* USSG 2A2.4.

The prime source of the evidence on this issue is Garcia Zarate's interrogation and the video of Pier 14. As mentioned above, Garcia Zarate's statements during his interrogation were often contradictory and sometimes incomprehensible. Still, Garcia Zarate is clearly seen in the interrogation coming back to the same core facts. Namely, that while sitting on a swivel chair on the pier, he noticed something under the chair wrapped in rags, he bent over to examine it, and when he picked it up, it went off accidentally and he immediately threw it into the water to stop it from firing. He then stood up and walked off the pier unaware that anyone had been shot.

This reoccurring statement of events not only rings true, but it also has the benefit of being fully supported by the physical evidence. The relevant physical evidence includes:

1) video showing a group of people near the chair/bench approximately 30 minutes before Garcia Zarate's arrival appearing to set down an object and leave. The video shows Garcia Zarate sitting at that same chair/bench.

2) The video also shows Garcia Zarate sitting on the chair/bench – he then bends over at the waist and rises up just as Ms. Steinle can be seen collapsing. A splash in the water below the chair/bench area can then be seen as he turns and walks off away.

3) Experts testified that the bullet was fired from at or around 12-18 inches above the ground, struck the cement ground approximately 12 feet away from Garcia Zarate, and then ricocheted approximately 78 feet further before it struck Ms. Steinle in the back.

4) The firearm had no manual on/off safety switch which could disable the trigger. Expert testimony concluded that the trigger could have fired by pressure accidently placed when picking up the rag wrapped object.

5) The amount of GSR found on Garcia Zarate's hand is very minor and was consistent with the gun being wrapped in rags or a t-shirt when discharged.

6) Accidental discharges are unfortunately very common. *See also,* https://oig.justice.gov/reports/plus/e0410/intro.htm (study reflecting 3 year period over 1/3 of all federal law enforcement discharges were unintentional discharges; that is trained professional LEO, which Garcia Zarate is not).[2]

7) There is no motivation for Garcia Zarate, a homeless man sitting on the pier he frequents, to discharge a firearm intentionally or knowingly recklessly.

Garcia Zarate also made statements that are incriminating, and which, if true, reflect that he had greater agency in the discharge. However, as set forth above, the evidence proved the incriminating statements to be anything but true. The most damning statements made by Garcia Zarate were:

1) He was pointing the gun at sea lions, black fish, or seal.
2) He fired the gun when Ms. Steinle was about 5 or 6 feet away and
3) After firing the gun, he walked past Ms. Steinle as she bled when he left the pier.

Each statement is false. As to the sea lions, the Officer interrogating Garcia Zarate accurately pointed out during the interrogation that there are no sea lions at that pier. As to Zarate being 5 feet away from Ms. Steinle when the gun discharged, the evidence showed he was actually 90 feet away from Ms. Steinle when the shot occurred. Similarly, Garcia Zarate could not have walked past Ms. Steinle on his way off the pier, she and her family were 90 feet in the opposite direction from the pier exit.

It is also relevant that at times, Garcia Zarate spoke many times in incomprehensible, nonresponsive sentences, which we know to be consistent with his diagnosed mental health condition. These include false statements about how he lives in Colombia and was born in 1863. This is particularly relevant to the claim the that he was Reckless as defined by 2A1.4(a)(2) since, even if the conduct was deemed to be proven and to have created an objectively unreasonable risk, Garcia Zarate's mental illness would strongly mitigate against a finding that Zarate was subjectively aware of such a risk. His known symptoms include "delusions, disorganized thought process, disorganized behavior, hallucinations, and negative symptoms." See PSR at page 29.

In sum, the totality of the evidence supports Garcia Zarate's version of what occurred. And his conduct was not only a reasonable reaction to the situation he found himself in, but it was also predictable.

**VI. Counts One and Two Should Be Merged.**

Garcia Zarate previously moved to dismiss either Count One or Count Two of the indictment on the grounds of multiplicity. Dkt. No. 6.

The government successfully argued that a charge and conviction of multiple Section 922(g) offenses did not create multiplicity problems because the trial court can merge those convictions at the time of sentencing. *See United States v. Bloch*, 718 F.3d 638, 643-44 (7th Cir. 2013) (merger is the proper remedy); *United States v. Richardson*, 439 F.3d 421, 422 (8th Cir. 2006) (same); *United States v. Shea*, 211 F.3d 658, 673-76 (1st Cir. 2000) (sentence on a Section 922(g)(3) count should be merged with sentence on Section 922(g)(1) count); *United States v. Johnson*, 130 F.3d 1420, 1424-26 (10th Cir. 1997) (same); *see also, e.g.*, *United States v. Keen*, 104 F.3d 1111, 1119-20 (9th Cir. 1996) (holding that district court should not have "sentenced [defendant] twice" for separate counts of felon in possession of a firearm and felon in possession of ammunition); *United States v. Throneburg*, 921 F.2d 654, 656-57 (6th Cir. 1990) (finding no abuse of discretion where trial court "allowing the government to

DEFENDANT'S SENTENCING MEMORANDUM & OBJECTIONS TO PSR     Macintosh HD:Users:michaelhinckley:Documents:Betts sn-Final MLH.docx

prosecute [defendant] upon both the possession of ammunition and possession of a firearm counts," because those were "appropriate separate units of prosecution for purposes of trial" that the court "would merge for purposes of sentencing").

For the above reasons, the defense request that the convictions for Count One and Count Two be merged at sentencing.

**VII.        Conclusion**

The tragedy of this case cannot be overstated. A confluence of unlikely events combined and resulted in a devastating outcome – the death of a young woman doing nothing wrong, enjoying time with family. And while Garcia Zarate did not intend any of this tragedy to happen, he has been saddened and horrified that it did and that he had a part in causing it.

Throughout all of Garcia Zarate's struggles with mental health, his difficulties with poverty and deprivation, he has never been a cruel man. He has no arrests or convictions for violence or assaults. He has not set out to hurt people. Nonetheless, Garcia Zarate has often been portrayed in this incident as a heartless villain and a monster. *See* "Ricochet" Documentary (link to film submitted under separate cover) as Exhibit C. The fact is, Garcia Zarate has never been any of those things. He has always been a quiet man, living a life not meant to hurt anybody. He has at times been troubled, his prison record shows his ongoing struggles including with mental illness and being bullied. He has often been homeless and alone, and at time he has found life easier when alone. He was alone on the same Pier when he was approached by photographer Jay Martin five weeks before the tragedy, when this image was captured. Exhibit D.

Those who have painted Garcia Zarate's role in this incident as willful, or intentional, or reckless have been wrong entirely. This incident was always a tragic accident.

Based on the totality of the circumstance state herein, the defense requests the Court impose a sentence of no more than credit for time served.

Dated: May 31, 2022

Respectfully submitted,

*/s/ J. Tony Serra*

By _____

J. TONY SERRA

*/s/ Mike Hinckley*

By _____

MIKE HINCKLEY