

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1

**FILED** San Francisco County Superior Court

NOV 20 2019

CLERK OF THE COURT

BY: _____
Deputy Clerk

Office of the County Clerk
San Francisco County Superior Court   -   Main
Attention: Civil Appeals
400 McAllister Street, 1st Floor
San Francisco, CA 94102

THE PEOPLE,
Plaintiff and Respondent,
v.
JOSE INES GARCIA ZARATE,
Defendant and Appellant.

A153400
San Francisco County Super. Ct. No. SCN224636 /CT 15014736

\* \* REMITTITUR \* \*

     I, Charles D. Johnson, Clerk of the Court of Appeal of the State of California, for the First Appellate District, do hereby certify that the attached is a true and correct copy of the original opinion or decision entered in the above-entitled cause on August 30, 2019 and that this opinion has now become final.

___Appellant ___Respondent to recover costs
___Each party to bear own costs
✓ Costs are not awarded in this proceeding
___See decision for costs determination

     Witness my hand and the Seal of the Court affixed at my office this **NOV 15 2019**

Very truly yours,
Charles D. Johnson
Clerk of the Court

Deputy Clerk

P.O. Report: ✓
Marsden Transcript: ✓
Boxed Transcripts: ✓
Exhibits: ✓
None of the above:

Sealed Tx ✓

rem1

# Exhibit A



Filed 8/30/19

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

Court of Appeal, First Appellate District
**FILED**
AUG 30 2019
Charles D. Johnson, Clerk
by_____ Deputy Clerk

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>JOSE INES GARCIA ZARATE,<br><br>   Defendant and Appellant. | A153400<br><br>(San Francisco City & County<br>Super. Ct. No. 15014736) |

   This appeal arises from circumstances resulting in the tragic death of a young woman. While walking on a crowded San Francisco pier early on a summer evening with her father and a family friend, Kate Steinle was struck in the back by a bullet and died. Jose Ines Garcia Zarate, who was holding the gun when it fired the shot that killed Ms. Steinle, was convicted of being a felon in possession of a firearm after a jury acquitted him of murder, involuntary manslaughter, and assault with a firearm. Defendant's sole contention on appeal is that the trial court erred in refusing to instruct the jury on the affirmative defense of momentary possession.

   In determining whether a court erroneously failed to instruct on an affirmative defense, we consider whether any substantial evidence supported the defense and whether it was inconsistent with the defendant's theory of the case. We are not permitted to reweigh the evidence or determine the credibility of the witnesses, and any doubts as to the sufficiency of the evidence to warrant instructions must be resolved in favor of the accused.

At trial, defendant's theory was that he was sitting in a swivel chair on the pier, bent over to pick up an object wrapped in rags, a gun fired accidentally, and he immediately threw the gun in the water to stop it from firing. Critical to defendant's theory of the case was proof that he did not know the object he picked up was a gun. After a careful review of the record, we find substantial evidence presented at trial permits at least two reasonable inferences: one, that defendant knew he held a gun and did not possess it solely with an intent to dispose of it, and two, that he was unaware he held a gun until it fired, at which time he threw it away to stop it from firing. Viewing the evidence in the light most favorable to the defense, as we must, we conclude the trial court erred in failing to give the momentary possession instruction. Because the error was prejudicial, we are compelled as a matter of law to reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of July 1, 2015, Kate Steinle was walking with her father and a family friend on Pier 14 near the Embarcadero in San Francisco. They heard a gunshot and a single bullet hit Ms. Steinle in the mid-right back, killing her.

For approximately 23 minutes before the gunshot, defendant had been seated in a swivel chair on Pier 14, swiveling in the chair. Surveillance video shows defendant sitting in the chair when the Steinles walk past him. Less than two minutes later, Ms. Steinle is shot and falls to the ground. There is a splash in the water, and defendant walks away off the pier.

Several witnesses saw defendant walking away from the pier toward the street after they heard a gunshot. Lisa S., who was on the Embarcadero near Pier 14 that day, testified she heard a loud bang and then saw something move over the pier and splash in the water. As the object "plopped" in the water, she saw a man start running away from the pier.

Based on a radio description of the suspect, the police arrested defendant within an hour of the shooting. Officers placed paper bags on his hands to preserve any gunshot residue. About an hour after his arrest, defendant's hands were swabbed for gunshot

residue. Subsequent testing revealed a single particle of gunshot residue on defendant's right hand.

Defendant was taken to the San Francisco Hall of Justice about midnight. Around 1:00 a.m., defendant was placed in an interview room, and later Officer Martin Covarrubias read defendant his *Miranda*[1] rights in Spanish. Defendant was then interrogated by Officers Ravano, Canning, and Covarrubias. Covarrubias served as an interpreter because defendant said he was more comfortable speaking Spanish than English. The interview with police would be a central focus of both the prosecution and defense cases at trial.

## A. *Police Interrogation*

Officers Ravano, Covarrubias, and Canning interviewed defendant over the course of approximately four and a half hours.

At the beginning of the interview, defendant told officers his name was Juan Francisco Lopez Sanchez and repeated several times that he was born in 1863. He had been sleeping on the street during the previous week.

The officers[2] repeatedly told defendant they had witnesses who saw him throw a gun in the water and asked him if he threw a gun in the water. Defendant said no, that he was walking somewhere else and eating cookies far away from the pier, near the baseball stadium. Defendant initially denied having been on the pier at all. He denied knowing a girl had been killed, and denied seeing or hearing anything.

When asked why he shot "the girl" and threw the gun in the water, defendant said, "Yeah, I no remember." When an officer then said, "You fired that bullet," defendant responded, "Very well," and when asked, "You fired?," he said yes. Officers then asked whether he threw away the gun or threw it into the water. Defendant said he thought he threw it with his left hand because his left hand has more strength. An officer asked

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

[2] The officers in the interview transcript are identified only as SFPD-1 or SFPD-2. Though the transcript does not identify which officer was speaking or asking questions, it does state when Officer Covarrubias was interpreting questions or responses.

whether he was seated or standing up when he shot, to which defendant responded, "Well I think I was [¶] . . . [¶] [s]eated or something like that." When asked what he was pointing at, he said he did not know, but when pressed he said, "I think at a, over towards a seal, something like that."

Asked how many feet he was away from the girl, defendant responded, "Five, six." Trial testimony established defendant was approximately 90 feet away from Kate Steinle when she was shot. Defendant said he was pointing at a "black fish [¶] . . . [¶] A seal." When asked how the girl got hit, defendant responded, "Well, I just remember that I did this with my hand and I threw it. [¶] . . . [¶] . . . into the, the water." Asked how many times he fired, he said, "Mm, mm, once."

Defendant did not remember how long he had the gun. In explaining how he obtained it, he said, "Well, well, I'm going to tell you that [¶] . . . [¶] . . . when I got there [¶] . . . [¶] There was a, like a rag there, something like that, like a shirt there. When I was around there, walking or something I think, or seated, I think I stepped on it and, and it went off by itself and [¶] . . . [¶] It was like in a big sack, it was heavy and and, uhm, well it just went off when I was stepping on it. I threw it down." Defendant added: "So when I was, uh, either walking, uh, along there was a, a rag and stuff and I stepped on it and then it fired and then I grabbed it and then tossed it." Defendant affirmed the gun was "on the pier." When asked why he threw the gun, defendant said, "Because if not it was going to keep firing by itself."

When asked if he had the gun in his hand, defendant responded, "Yes, because I wanted to hold it back when— [¶] . . . [¶] I got there and I stepped on it with the, the rag, the shirt, wrapped up. I couldn't hold it back and I didn't have anything else to throw it down with." Asked how he shot the gun, defendant had the following exchange with Covarrubias:

Covarrubias: "So when you had the gun in your hand and you fired, you had your jacket like this on top when you fired?"

Defendant: "Yes."

Covarrubias: "Or did you fire outside like this, pointing?"

4

Defendant: "Outside because I wanted to hold it back because it was sort of pulling. [¶] . . . [¶]"

Officer: "It recoiled?"

Defendant: "Yes, that was all that happened, that I couldn't, I couldn't hold it back and I had to throw it down. And, uhm, and what I saw was that, well, it was something very heavy to be carrying, yes." Defendant later added, "Since I'm kind of fat, that's why it fired on it's [sic] own and I couldn't hold it back."

Defendant said he did not know why he didn't help the girl, and he did not know he shot her. Officers asked him why he did not help her when he walked past her and saw her bleeding and her family crying. Defendant said he did not know. Surveillance video and witness testimony established defendant did not walk past Kate Steinle after the gun fired as he was exiting the pier.

One of the officers told defendant he did not believe him that he found the gun on the dock, and asked defendant if it was true he found it before. Defendant responded, "yes," but when asked where he found the gun said, "Well there where I was seated. [¶] . . . [¶] I found it there."

Asked whether he meant to do it, defendant said, "No, sir." An officer then asked if it was an accident, and defendant said, "Yesssssss." Next defendant was asked, "You made, you made the decision to fire?," to which he responded, "Yes."

An officer asked defendant if he threw the gun in the water so no one would find it. He responded, "Mm, yes," but added, "Yes, [¶] . . . [¶] Because by leaving it there just going off, well, I didn't have any other choice but to throw it down. [¶] . . . [¶] So that it would fall down because it kept going off by itself. [¶] . . . [¶] Without me [¶] . . . [¶] grabbing it." Later he added that he "couldn't hold it back because it kept firing."

Defendant told the officers he remembered the gun was a semiautomatic and said he had never fired a gun before. Defendant said he felt "horrible" that the girl was dead and a bullet killed her.

## B. *Other Physical Evidence*

The day after the shooting, the San Francisco Police Department recovered a handgun from the water near Pier 14. The gun was a SIG SAUER P239. Officers found no rags or t-shirts in the water or on the pier.

After learning the bullet recovered from Ms. Steinle's body bore evidence of having hit a hard object, San Francisco Police Officer John Evans returned to Pier 14 to look for a possible bullet strike in the area. Officers located a small indentation in the cement walkway which was an apparent strike mark. Evans determined the bullet strike mark was about 12 to 15 feet away from where defendant was seated and about 78 feet from Ms. Steinle's location on the pier.

## C. *Charges*

On July 28, 2017, the San Francisco County District Attorney filed a three-count second amended information against defendant, charging him with murder (Pen. Code,[3] § 187, subd. (a); count I), with enhancement allegations for personal use and intentional discharge of a firearm (§§ 12022.5, subd. (a) & 12022.53, subds. (b)–(d)); possession of a firearm by a felon (§ 29800, subd. (a)(1); count II), with four prior felony convictions; and assault with a semiautomatic firearm (§ 245, subd. (b); count III), with enhancement allegations for use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury (§ 12022.7, subd. (a)). The information also alleged three prior prison terms pursuant to section 667.5, subdivision (b).

## D. *Prosecution Case*

At trial, the prosecution theorized defendant was guilty of murder because he brought the gun with him to the pier, and in "his own secret version of Russian roulette," aimed it at people on the pier, and pulled the trigger, intending to kill someone. The prosecution presented testimony from Officer Evans regarding his bullet strike investigation that there was a straight line from the swivel chair to the bullet strike mark without any obstructions, and from there, a straight line existed from the apparent bullet

---

[3] All statutory references are to the Penal Code unless otherwise indicated.

impact on the walkway to Ms. Steinle's position on the pier. Evans opined over defense objection that "a human being held a firearm, pointed it in the direction of Ms. Steinle, pulled the trigger, firing the weapon and killing the victim." He also testified individuals who are pressed for time or not well trained will sometimes jerk the trigger of the firearm, resulting in a lower aim and "causing this exact sort of shot," which he termed a "skip shot." Gerald Smith, the supervising criminalist for the firearm and toolmark unit within the police department's criminalistics laboratory, testified the gun had a number of safety features to prevent the gun from discharging accidentally and did not have a "hair trigger."[4]

## E. *Defense Case*

The defense theory, on the other hand, was that defendant did not bring the gun to the pier. He arrived, sat down in a chair on the pier, and discovered an object wrapped in a rag or cloth by touching it with his foot. He picked it up not knowing it was a gun. When it fired by itself, he threw it in the water to stop it from firing.

A defense firearms expert, James Norris, testified the gun lacked an external safety mechanism and confirmed a SIG SAUER P239 could accidentally discharge if it were in single-action mode. Norris opined the gun likely fired while defendant was seated, probably while he was bent over, and that "[i]t somehow discharged, ricocheted, [and] unfortunately struck the victim." According to Norris, the "weapon seemed to be pointed down towards the ground. It was near the ground and pointed down towards the ground. In that position, it would be extremely difficult for a person to aim . . . ." A second defense expert in firearms and unintentional discharges, Alan Voth, opined that if an operator of a firearm discharged a single bullet from a seated position, it struck the ground 12 feet away, the ground was concrete, and the bullet ricocheted from that location and traveled 78 feet before striking a person in the lower back, that would indicate an unintentional discharge. Defendant's video enhancement expert, Paul Endo,

---

[4] Smith explained a "hair trigger" is "a gun that has a really light trigger pull . . . meaning . . . basically the brush of a piece of hair is enough to cause the trigger to pull."

reviewed the surveillance footage of Pier 14 on the day of the shooting and testified, among other things, that defendant was bending down about 20 seconds before the shooting.[5]

## F.  *Request for Jury Instruction on Momentary Possession*

The jury deliberated over the course of six days.  On the fourth day of deliberations, the jury sent out a form with the following questions about the unlawful firearm possession count:

"We request clarification of charge 2 on page 39 of the jury instructions: [¶] 1) What is the definition of possession? [¶] 2) Is there any time requirement for possession? [¶] 3) Page 13 of the jury instructions states that wrongful intent is required for charge 2.  Are the points #1 (line 8 [possession]) and #2 (line 10 [knowledge]) on p. 39 sufficient to demonstrate wrongful intent?"

Outside the presence of the jury, the court conferred with counsel.  The court came back on the record and responded to the jury's question as follows:  "For one, please refer to CALCRIM 200 semicolon, lines 26 to 28 on page 2, and lines 1 to 2 on page 3, semicolon. [¶] For question number 2, the answer is no, semicolon. [¶] For number 3, the answer is it is sufficient if you find there is wrongful intent, period."  Defense counsel requested the court give the momentary possession portion of CALCRIM No. 2512[6] as a response to the jury's question No. 2.  The court denied the request "because I don't think there's sufficient facts for it."

---

[5] At oral argument, defendant's counsel argued Endo actually testified defendant bent over eight seconds before the shooting and likely was simply mistaken when he affirmed defendant bent over 20 seconds before the shooting.  Because this argument was raised for the first time at oral argument, we do not consider it here.

[6] Defendant notes defense counsel should have asked for CALCRIM No. 2511, which contains instructions on possession of a firearm by a felon.  CALCRIM No. 2512 concerns possession of firearm by a person prohibited by court order, an offense with which defendant was not charged.  The Attorney General agrees that "[b]ecause the language of the momentary possession defense is identical in both instructions, this mistake does not affect the legal analysis."

### G. *Verdict and Sentencing*

On November 30, 2017, the jury found defendant not guilty of first degree murder, second degree murder, involuntary manslaughter, and assault with a semiautomatic firearm, and guilty of being a felon in possession of a firearm. Defendant filed a motion for new trial, arguing among other things, that the trial court erred in failing to instruct on transitory possession. The court denied the motion. The trial court sentenced defendant to three years in state prison. Based on actual days served and associated credits, the court deemed his sentence completed.

Defendant timely appealed.

## II. DISCUSSION

Defendant contends the trial court erred in failing to instruct on momentary possession. Specifically, he asserts the trial court had a sua sponte duty to instruct on his theory of the case, and alternatively, the court erred in failing to give the momentary possession instruction when requested by defendant because substantial evidence supported the defense and it was not inconsistent with defendant's theory of the case.

### A. *The Momentary Possession Defense*

The momentary or transitory possession defense was first recognized by the California Supreme Court in the context of the possession of narcotics. In *People v. Mijares* (1971) 6 Cal.3d 415 (*Mijares*), Mijares was charged with possessing heroin in violation of Health and Safety Code former section 11500. Mijares was seen by a witness as he leaned inside a parked car, slapped a passenger across the face, removed an object from the car, and threw it in a nearby field. After throwing the object out of the car, Mijares drove his friend, who was "blue and not breathing" to a fire station where he was resuscitated and taken to a hospital. Police later discovered the object thrown from the car contained drug paraphernalia and heroin. (*Id.* at pp. 417–418.)

Mijares conceded he was in momentary possession of the heroin, but argued he did so only for the purpose of disposing of it and such handling was insufficient for conviction of the crime of possession. The Supreme Court agreed. (*Mijares, supra,* 6 Cal.3d at p. 419.) Because actual abandonment terminates possession of an object, it

would be "incongruous to adhere to cases declaring that abandonment concludes an existing narcotic possession and then hold that during the brief moment involved in abandoning the narcotic, a sufficient possession which did not previously exist somehow comes into being to support a conviction for possession of contraband." (*Id.* at p. 422.) The court observed that failing to recognize a defense in cases of momentary possession "could result in manifest injustice to admittedly innocent individuals." (*Ibid.*; *People v. Martin* (2001) 25 Cal.4th 1180, 1186 (*Martin*).) To illustrate its holding, the court offered the example of the witness who observed Mijares throw the object out of the car, noting if she picked up the object to determine its contents and then placed it down after realizing it contained a narcotic, she too, would have been guilty of possession under a strict reading of the statute. The court concluded it could not "read the possession statutes to authorize convictions under such guileless circumstances." (*Mijares*, at p. 422.)

In *Martin*, our Supreme Court reaffirmed its holding in *Mijares* and clarified the nature and scope of the momentary possession defense. (*Martin, supra,* 25 Cal.4th at pp. 1182, 1190–1191.) The court in *Martin* explained: " 'When a defendant relies on the *Mijares* defense, he or she essentially admits the commission of the offense of simple possession of narcotics . . . . However, the defendant additionally asserts that he or she possessed the narcotics for the limited purpose of disposal, abandonment, or destruction. *Mijares* does not serve to negate an element of the offense of possession of narcotics. Instead, it offers a judicially created exception of lawful possession under certain specific circumstances as a matter of public policy . . . .' " (*Id.* at p. 1191.) Emphasizing the *Mijares* rule " 'arose from a situation involving a fleeting, de minimis possession and a reflexive act of abandonment,' " the court held "the defense of transitory possession devised in *Mijares* applies only to momentary or transitory possession of contraband for the purpose of disposal . . . ." (*Martin*, at p. 1191)

**B.** *The Momentary Possession Defense Applies to Ex-felons*

We now turn to the application of the momentary possession defense in this case. As an initial matter, we reject the Attorney General's suggestion that the defense might not apply to ex-felons.

California courts have reached different conclusions about whether the affirmative defense of momentary possession is available to defendants charged with being a felon in possession of a firearm. (See *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1037–1038 (*Pepper*); *People v. Hurtado* (1996) 47 Cal.App.4th 805, 814 (*Hurtado*).) In *Pepper*, the appellate court noted the purpose of the law prohibiting felons from owning firearms is to protect the public from the risk of death or great bodily injury from improper use of firearms. (*Id.* at pp. 1037–1038.) Because convicted felons are more likely to misuse firearms, the court reasoned that important policy is best served by precluding even momentary possession by felons. The *Pepper* court thus held that "[former] section 12021 prohibits a convicted felon from possessing a firearm even momentarily except in self-defense, in defense of others, or as a result of legal necessity." (*Id.* at p. 1038.)

In *Hurtado,* on the other hand, the court rejected the "strict liability approach set forth in *Pepper*" and held the " 'momentary possession' defense recognized in *Mijares* extends to possession of a firearm by a felon offenses." (*Hurtado, supra,* 47 Cal.App.4th at pp. 813–814.) The court explained "[f]irearms and controlled substances are admittedly dangerous items; it is the retention of these items, rather than the brief possession for disposal or self-protection, which poses the danger which is criminalized by the relevant statutes." (*Id.* at p. 814.) In *Martin,* our Supreme Court did not address whether the momentary possession defense would apply to an ex-felon, but in dicta suggested approval of the *Hurtado* court's rationale: "We agree with the *Hurtado* court that recognition of a 'momentary possession' defense serves the salutary purpose and sound public policy of encouraging disposal and discouraging retention of dangerous items such as controlled substances and firearms." (*Martin, supra,* 25 Cal.4th at p. 1191; see *In re Grant* (2014) 58 Cal.4th 469, 479 [recognizing *Hurtado* "established that a

felon's momentary control of a firearm for purpose of disposal . . . is a defense to possession charges"].)

We likewise agree with the *Hurtado* court and the Supreme Court's apparent suggestion in *Martin* that the public policy rationale for the momentary possession defense prevails over the concerns expressed in *Pepper*. As developed by our courts, the defense applies only in very narrow circumstances—where the contraband is possessed for a fleeting moment in time, is abandoned reflexively, and where the defendant did not intend to prevent police from discovering the contraband. (See *Martin, supra,* 25 Cal.4th at pp. 1190–1191, 1193; *People v. Spry* (1997) 58 Cal.App.4th 1345, 1369–1370, disapproved on other grounds in *Martin, supra,* 25 Cal.4th at p. 1192; see also CALCRIM No. 2511.) Given the limited circumstances under which the defense applies and the strong public policy interest in encouraging disposal and abandonment of dangerous items, we conclude the defense applies to ex-felons charged with possession of firearms.

Under defendant's theory of the case here, he sat in a chair, bent over to pick up an object wrapped in rags, did not know that the object was a gun, the gun fired, and as soon as it fired, he immediately threw the gun in the water in order to stop it from firing. If believed by the jury, these facts describe an accidental discovery and abandonment that would support a momentary possession defense. (See *Mijares, supra,* 6 Cal.3d at p. 422.) Moreover, while *Pepper* has been described as taking a "strict liability" approach to the momentary possession defense for felons (*Hurtado, supra,* 47 Cal.App.4th at p. 813), even that court expressly distinguished its facts from a situation strikingly similar to the defense version of this case. The *Pepper* court explained: "First, this is not a case where a convicted felon took possession of an object solely out of curiosity, not knowing its character as a firearm, and abandoned the gun as soon as he realized it was a firearm. Parenthetically, we note such a scenario is unlikely because, although the illicit nature of controlled substances may not be readily apparent [citation], the nature of a firearm *ordinarily* is obvious. In any event, the abandonment of an illicit object immediately upon recognition of its nature as contraband is not considered to be 'possession' of the

object for the purpose of criminal sanctions." (*Pepper*, *supra*, 41 Cal.App.4th at p. 1037, italics added, citing *Mijares*, at p. 422.) The facts as presented by defendant in this case certainly do not constitute an ordinary fact pattern, but the defense theory is essentially the hypothetical scenario described in *Pepper* and *Mijares*—defendant found the gun on the pier not knowing what it was; when it fired by itself and he realized it was a gun, he threw it in the water immediately to stop it from firing again. In this highly unusual circumstance, we conclude the momentary possession defense is available.

## C. *Substantial Evidence Supported the Defense*

We now turn to the question of whether the defense of momentary possession was supported by substantial evidence.

" ' "It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence" ' and ' "necessary for the jury's understanding of the case." ' [Citations.] It is also well settled that this duty to instruct extends to defenses 'if it appears . . . the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 73; *People v. Vaughn* (2014) 230 Cal.App.4th 322, 334.) Substantial evidence in this context is "evidence sufficient for a reasonable jury to find in favor of the defendant." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "The threshold is not high; it does not include a predetermination by the court of the credibility of witnesses and what evidence it believes or disbelieves." (*People v. Cole* (2007) 156 Cal.App.4th 452, 484; *Salas*, at p. 982.) " ' " 'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' " ' " (*Cole,* at p. 484; *People v. Mentch* (2008) 45 Cal.4th 274, 290 [courts must consider evidence in light most favorable to defendant to determine whether sufficient evidence supports giving instruction as to affirmative defense].) "On review, we determine independently whether substantial evidence to support a defense existed." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055; *People v. Quarles* (2018) 25 Cal.App.5th 631, 634 [trial court's refusal to give requested instruction is reviewed de novo].)

Considering the evidence in the light most favorable to the defense, there was sufficient evidence from which a jury could conclude defendant was not aware of the nature of the gun until it fired, possessed it for only a brief moment knowing it was a gun, reflexively abandoned it as soon as he realized it was a gun, and did not dispose of it to prevent law enforcement from seizing it. (CALCRIM No. 2511 [defining elements of momentary possession defense].) In his police interview, defendant affirmed the gun was on the pier and stated, "There was a, like a rag there, something like that, like a shirt there." Defendant said he stepped on the gun with "the rag, the shirt, wrapped up." Defendant was seated when the gun went off. Defendant affirmed the shooting was an "accident." Defendant said the gun "just went off" and "it went off by itself." He repeated several other times that "it fired on it's [sic] own," "it kept going off by itself," and "it would have continued firing [if he did not get rid of it]." Defendant explained he threw the gun away after it fired because "if not it was going to keep firing by itself." Defendant affirmed he had no reason to shoot Kate Steinle—he had never seen her before, and she did not do anything to make him mad or disrespect him in any way and he did not know why he would point a gun at them.[7] As both parties agree, the surveillance video shows the gun splashing in the water about two seconds after the gun was fired. At trial, Lisa S. testified she heard a gunshot and saw an object land in the water moments later. Further, the defense presented expert testimony the gun could have accidentally discharged, and the locations of defendant, the bullet strike mark, and Kate Steinle were consistent with an unintentional discharge.

The Attorney General contends there was insufficient evidence for the trial court to instruct on momentary possession because defendant focuses solely on his *post*-shooting possession and ignores his *pre*-shooting possession. The Attorney General notes the defense video expert explained defendant bent down about 20 seconds before the shooting occurred, defendant admitted he aimed the gun and pulled the trigger (or fired the gun), and defendant had gunshot residue on his right hand. This evidence, the

---

[7] Presumably "them" was Ms. Steinle, her father, and their family friend.

Attorney General argues, "necessarily required [defendant] to be holding the gun before it discharged" and precludes any claim the possession was momentary or defendant possessed the gun solely for purposes of disposal. At oral argument, the Attorney General confirmed that he was arguing the defendant's holding of the gun when it fired established his legal possession of the weapon *as a matter of law.*

It is undisputed that defendant was *holding* the gun when it fired. But that fact alone does not establish he possessed the gun for more than a moment. To possess the gun, defendant had to *know* he was holding it. (CALCRIM No. 2511; *People v. Jeffers* (1996) 41 Cal.App.4th 917, 922.) The question we must decide is whether substantial evidence exists that, if believed by a jury, would show defendant did not know the gun was a gun until it fired, at which point he immediately disposed of it. As to his knowledge before the gun fired, at least two reasonable inferences can be drawn from the evidence presented at trial.

Of course, we acknowledge that substantial evidence supports a reasonable inference defendant held the gun for longer than a brief moment before it fired, knew it was a gun, and fired it knowing it was a gun. As the Attorney General asserts, defendant's admission he fired the gun or pulled the trigger establishes he was holding the gun when it went off. And defendant's admissions he fired the gun and he pointed it at a seal support a reasonable inference that he knew the gun was a gun. But as we will explain, those statements alone do not preclude a reasonable inference that defendant was unaware the object he was holding was a gun until it fired, particularly when combined with other substantial evidence and viewed in the light most favorable to the defense.

Crucially, defendant told police the gun was covered in rags or a t-shirt. If the jury believed that statement, it could have reasonably concluded defendant did not actually see the gun and was unaware it was a gun until it fired. The defense expert's testimony about the video showing that defendant bent down for 20 seconds before the shooting does not establish whether or at what point defendant picked up the gun or whether it was covered in rags or a shirt when he picked it up. The fact defendant had gunshot residue on his right hand likewise does not establish whether the gun was wrapped up, or whether

15

defendant realized the gun was a gun before it fired.[8] Defendant's statements that he fired the gun or pulled the trigger and that he pointed it at a seal *are* strong evidence he knew he had a gun in his hand before it fired. But this evidence is also contradicted by defendant's statements that he did not know what he was pointing at, the shooting was an accident, and the gun went off by itself. In sum, we cannot determine from this record that defendant knowingly possessed the gun before it fired, because the meaning and truthfulness of defendant's various statements to the police is a matter of his credibility. Though his interview was replete with contradictions and confusing, ambiguous statements, it was for the jury to determine whether he was telling the truth in all, some, or none of his responses. (CALCRIM No. 226; *People v. Salas, supra,* 37 Cal.4th at p. 982 ["In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' "]; *People v. Springfield* (1993) 13 Cal.App.4th 1674, 1680 [" ' " 'The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.' " ' "]; *People v. Burnham* (1986) 176 Cal.App.3d 1134, 1143–1144 [rejecting Attorney General's argument that court may " 'as a matter of law' " refuse to give instruction on affirmative defense because the defendant's statement was inherently incredible]; *People v. Holman* (1945) 72 Cal.App.2d 75, 90 [contradictions and inconsistencies in testimony of single witness will not constitute inherent improbability].) Further, as noted above, defendant's theory

---

[8] Indeed, the Attorney General argues the gunshot residue evidence "undercut[s] the defense theory the gun was wrapped in rags and [defendant] did not know what he was handling." On review, however, the question is not whether evidence in support of the prosecution's theory "undercuts" the defense theory, but whether the defense was supported by any substantial evidence. We also observe that while the parties do not address the expert testimony on gunshot residue in detail in their briefs, the expert witness testified gunshot residue can transfer from objects that have gunshot residue on them to a person's hands. Thus, the fact defendant had gunshot residue on his hand was not necessarily inconsistent with the gun having been covered in a rag or t-shirt.

he knowingly possessed the gun only for a brief moment was supported by other evidence in the record, including video evidence he disposed of the gun immediately after it fired, witness testimony to the same effect, expert testimony the gun could have accidentally discharged, and physical evidence the bullet strike marks were consistent with an unintentional discharge.

The Attorney General further contends the trial court was not required to instruct on momentary possession because defendant's conduct in throwing the gun in the water, briskly walking away from the scene, and evading police officers when confronted, combined with his affirmative response when asked if he threw the gun in the water so no one would find it, strongly suggests "that he disposed of the gun, not for any salutary purpose, but to evade detection by law enforcement." But defendant also stated in his police interview that he threw the gun in the water to stop it from firing. There was conflicting testimony about his conduct in leaving the scene,[9] and his response to the question about throwing the gun away so no one would find it did not specifically mention police or law enforcement. Indeed, defendant immediately followed his affirmative response to that question by stating, "Because by leaving it there just going off, well I didn't have any other choice but to throw it down. [¶] . . . [¶] So that it would fall down because it kept going off by itself." Given defendant's theory he found the gun not knowing what it was, the jury may have reasonably construed his affirmation he wanted to keep others from finding it as concern with public safety, consciousness of guilt, or something else. This presents a classic conflict of the evidence, the resolution of which is squarely within the province of the jury.

On this record, given defendant's statements to the police about the gun being wrapped in cloth, his intent to dispose of it to stop it from firing, the surveillance video showing a gun landing in the water seconds after it was fired, Lisa S.'s testimony to the

---

[9] Witnesses testified variously he was walking, walking briskly, walking casually, or running as he left the pier.

same effect, and expert opinion the gun could have accidentally discharged, substantial evidence supported a momentary possession defense.

**D.** *The Defense Was Not Inconsistent with Defendant's Theory*

The Attorney General argues even if substantial evidence supported the momentary possession defense, the trial court was not obligated to instruct on it because it was inconsistent with defendant's actual defense theory, which is that he did not knowingly possess the gun at all.

This argument fails because defendant's theory of the case was that he did not knowingly possess the gun at any time before it fired and once he realized it was a gun, he threw it in the water to stop it from firing. During his closing remarks, defendant's counsel argued: "[W]e know that he did fire the gun in some—in some colloquial sense. But can we say that he put his finger on the trigger and pulled it because he wanted to do her harm? That's the issue here really. Did he know it was a gun *when it went off*? I'm going to show you later a reference to his statement wherein he says he didn't even know that it was a gun." (Italics added.) Later he reiterated the point: "He picked up an object, didn't know its contents, and a bullet was fired. He didn't have the intent to hurt anyone." Twice defense counsel referred specifically to defendant's statement that he threw the gun in the water to stop it from firing, and asked the jury to "really reflect on this," emphasizing that defendant was making "a repeated effort to come back to something that he is repeatedly talking about, that it went off by itself." This argument, that defendant did not know the gun was a gun until it went off, at which point he threw it away to stop it from firing, is consistent with the momentary possession defense.

**E.** *The Error Was Prejudicial*

The law is unsettled as to what standard of prejudice applies to a trial court's failure to instruct on a defendant's affirmative defense—whether it is the federal constitutional standard of harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, or the state law standard whether there is a reasonable probability of a more favorable outcome absent the error under *People v. Watson* (1956)

46 Cal.2d 818 (*Watson*). We need not resolve the question here, because even under the more lenient *Watson* standard, we conclude there was prejudice.

The Attorney General contends the error was harmless because defendant repeatedly admitted he fired the gun, the parties' experts testified the gun would not fire without defendant pulling the trigger, and there was gunshot residue on defendant's hand. The Attorney General asserts this evidence established defendant had completed the act of possession before he developed an intent to dispose of the gun. But as discussed above, other substantial evidence supported defendant's theory he did not know the gun was a gun, including his statements the gun was wrapped in a rag or a shirt, the gun went off by itself, and he threw it in the water to stop it from firing, as well as video evidence and witness testimony the gun landed in the water moments after the gunshot, and expert evidence the gun could have accidentally discharged.

The jury acquitted defendant of the other charges, showing it unanimously rejected the prosecution's theories that defendant fired the gun with an intent to kill, fired intentionally with conscious disregard for human life, acted with criminal negligence, brandished a firearm, or willfully assaulted Kate Steinle. In light of its express rejection of the theory that defendant intentionally fired the gun to kill or harm Ms. Steinle, it is entirely possible the jury (or some members) believed the defense theory, or at least found it plausible. Jurors also deliberated approximately 21 hours[10] over the course of 6 court days, and asked 10 separate questions of the trial court, suggesting deliberations were difficult and it was a close case.

Most significantly, however, during deliberations, the jury asked for the definition of possession, whether there is a time requirement for possession, and whether defendant's possession of a firearm and knowledge he possessed it were sufficient to demonstrate wrongful intent. These questions go to the heart of the momentary possession defense, which requires possession be fleeting and defendant possess the

_____

[10] This excludes time the jury spent listening to readback of testimony, which consumed an additional five hours.

weapon solely with the intent to abandon or dispose of it. (*Martin, supra,* 25 Cal.4th at pp. 1190–1191.) The fact the jury asked whether there is a time requirement for possession suggests jurors were wrestling with how long defendant had the gun; the fact they asked about what constitutes wrongful intent suggests they may have been weighing the defense theory that defendant abandoned the gun immediately after it fired because he intended to stop it from firing again. In short, we conclude it is reasonably probable at least one juror may have reached a different conclusion if the jury had been instructed on the momentary possession charge. (*People v. Walker* (2015) 237 Cal.App.4th 111, 118 [*Watson* standard satisfied because it was reasonably probable at least one juror would cast a different vote]; *People v. Soojian* (2010) 190 Cal.App.4th 491, 521 [hung jury is more favorable result than guilty verdict].)

Because we determine the court erred under state law in failing to give the momentary possession instruction and the error was prejudicial, we need not reach defendant's constitutional claims.

### III. DISPOSITION

The judgment is reversed.

_____
Margulies, J.

We concur:


_____
Humes, P. J.


_____
Sanchez, J.